**ORAL ARGUMENT NOT YET SCHEDULED**

**CASE NO. 24-3011**

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES LITTLE,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**PUBLIC JOINT APPENDIX**

**(Sealed Material In Separate Supplement)**

**VOLUME I OF II (Pages 1 - 352)**

---

Joshua B. Carpenter
Appellate Chief
FEDERAL PUBLIC DEFENDER
  FOR THE WESTERN DISTRICT
  OF NORTH CAROLINA
1 Page Avenue, Suite 210
Asheville, NC 28801
828-232-9992
joshua_carpenter@fd.org

*Counsel for Appellant*

Reuven Dashevsky
Assistant U.S. Attorney
U.S. ATTORNEY'S OFFICE
601 D Street, NW, Room 6.232
Washington, DC 20530
202-252-6829
reuven.dashevsky@usdoj.gov

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME I OF II

JA Page

District Court Docket [1:21-cr-00315-RCL-1]..........................................................1

Criminal Complaint with Attachment
2021.03.15 [ECF1] ................................................................. 11

    Att. 1:   Statement of Facts [ECF1-1]........................................ 12

Information
2021.04.23 [ECF8] ................................................................. 17

Plea Agreement
2021.11.16 [ECF25] ............................................................... 20

Statement of Offense
2021.11.16 [ECF26] ............................................................... 30

Transcript of Plea Agreement Hearing
Before the Honorable Royce C. Lamberth
2021.11.16 [ECF55] ............................................................... 35

Government's Sentencing Memorandum with Exhibits
2022.02.04 [ECF31] ............................................................... 53

    Ex. 1:   Screen capture of CCTV footage of Little exiting
           the Senate Gallery [ECF31-1]....................................... 80

    Ex. 2:   Table of probation HD incarceration sentences [ECF31-2] ......... 81

Transcript of Sentencing
Before the Honorable Royce C. Lambert
2022.03.14.......................................................................... 91

Memorandum Opinion
2022.03.14 [ECF43] ............................................................... 157

Judgment in a Criminal Case
 2022.03.17 [ECF48] ................................................................. 173

Notice of Appeal
 2022.03.21 [ECF50] ................................................................. 180

Amended Judgment in a Criminal Case
 2022.03.24 [ECF52] ................................................................. 181

Motion to Amend Judgment and Terminate Probation
 2023.12.06 [ECF58] ................................................................. 188

Government's Memorandum in Opposition to Little's Motion
to Amend Judgment and Terminate Probation with Exhibits
 2024.01.03 [ECF65] ................................................................. 200

  Ex. A:    Email re: No Payment [ECF65-1]................................. 227

  Ex. B:    Facebook Posts in Chronological Order (PII Redacted)
            [ECF65-2]..................................................... 229

Reply in Support of Motion to Amend Judgment and Terminate Probation
 2024.01.10 [ECF66] ................................................................. 265

Memorandum and Order
 2024.01.17 [ECF69] ................................................................. 277

Government's Resentencing Memorandum
 2024.01.22 [ECF71] ................................................................. 290

  Ex. A:    BOP Records [ECF71-1]........................................ 300

Report on Offender Under Supervision
 2024.01.23 [ECF72] ................................................................. 305

Notes for Resentencing
 2024.01.25 [ECF73] ................................................................. 308

Transcript of Resentencing Hearing
Before the Honorable Royce C. Lamberth
    2024.01.25 [ECF78] ................................................................ 315

Amended Judgment in a Criminal Case
    2024.01.29 [ECF74] ................................................................ 348

Notice of Appeal
    2024.01.30 [ECF76] ................................................................ 352

## **VOLUME II OF II - Supplement - Under Seal** *(filed separately)*

Nonguideline Misdemeanor Presentence
Investigation Report (Revised Final)
    2022.02.15 [ECF36] ................................................................ 353

Statement of Reasons
    2022.03.17 [ECF49] ................................................................ 373

Statement of Reasons (Amended Judgment)
    2022.03.24 [ECF53] ................................................................ 377

Reason for Amendment
    2024.01.29 [ECF75] ................................................................ 381

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00315-RCL-1

Case title: USA v. LITTLE                                        Date Filed: 04/23/2021

Magistrate judge case number: 1:21-mj-00309-RMM

---

Assigned to: Judge Royce C. Lamberth

Appeals court case numbers: 22-3018, 24-3011

**Defendant (1)**

**JAMES LITTLE**                 represented by   **Joshua Carpenter**
FEDERAL PUBLIC DEFENDER
Western District of North Carolina
1 Page Avenue
Suite 210
Asheville, NC 28801
828-232-9992
Email: joshua_carpenter@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Peter Stewart Adolf**
FEDERAL PUBLIC DEFENDER
North Carolina
129 West Trade Street
Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: peter_adolf@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

| Pending Counts | Disposition |
|---|---|
| 18:1752(a)(1); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds (1) | Dismissed on Government's Motion [44] |

**JA1**

| | |
|---|---|
| 18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds<br>(2) | Dismissed on Government's Motion [44] |
| 40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building or Grounds<br>(3) | Dismissed on Government's Motion [44] |
| 40:5104(e)(2)(G); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Parading, Demonstrating, or Picketing in a Capitol Building<br>(4) | Defendant is committed to the custody of the Bureau of Prisons for a term of 150 days with 60 days credit for time already served and 30 days credit for the 18-month term of probation served. The Defendant is further ordered to pay a $10 special assessment and restitution in the amount of $500. ORIGINAL SENTENCE: Defendant is committed to the custody of the Bureau of Prisons for a term of 60 days followed by 36 months (3 years) of Probation as to Count 4. The Defendant is further ordered to pay a $10 special assessment. |

**Highest Offense Level (Opening)**

Misdemeanor

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| COMPLAINT in Violation of 18:1752(a)(1), 18:1752(a)(2), 40:5104(e)(2)(D) and 40:5104(e)(2)(G) | |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Michael Gordon James**<br>DOJ-USAO<br>Terry Sanford Federal Building<br>310 New Bern Avenue<br>Suite 800<br>Raleigh, NC 27601-1461<br>919-856-4530<br>Email: mike.james@usdoj.gov<br>*LEAD ATTORNEY* |

**JA2**

*ATTORNEY TO BE NOTICED*
Designation: Assistant U.S. Attorney

**Patrick C Holvey**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
Criminal Division
601 D Street, NW
Suite 3.1207
Washington, DC 20530
202-252-7224
Email: patrick.holvey@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Assistant U.S. Attorney

**Frederick Walton Yette**
U.S. ATTORNEY'S OFFICE
National Security Section
555 Fourth Street, NW
Washington, DC 20018
(202) 252-7733
Fax: (202) 252-7792
Email: Frederick.Yette@usdoj.gov
*TERMINATED: 11/12/2021*
Designation: Assistant U.S. Attorney

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2021 | 1 | SEALED COMPLAINT as to JAMES LITTLE (1). (Attachments: # 1 Statement of Facts) (zstd) [1:21-mj-00309-RMM] (Entered: 03/16/2021) |
| 03/15/2021 | 3 | MOTION to Seal Case by USA as to JAMES LITTLE. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21-mj-00309-RMM] (Entered: 03/16/2021) |
| 03/15/2021 | 4 | ORDER granting 3 Motion to Seal Case as to JAMES LITTLE (1). Signed by Magistrate Judge Robin M. Meriweather on 03/15/2021. (zstd) [1:21-mj-00309-RMM] (Entered: 03/16/2021) |
| 03/24/2021 | | Arrest of JAMES LITTLE. (ztl) (Entered: 04/27/2021) |
| 03/24/2021 | | Arrest of JAMES LITTLE in North Carolina. (bb) (Entered: 12/21/2021) |
| 03/31/2021 | | JOINT ORAL MOTION for Speedy Trial by USA, JAMES LITTLE as to JAMES LITTLE. (ztl) (Entered: 04/27/2021) |
| 03/31/2021 | | ORAL MOTION to Appoint Counsel by JAMES LITTLE. (ztl) (Entered: 04/27/2021) |
| 03/31/2021 | | Minute Entry for proceedings held before Magistrate Judge Zia M. Faruqui: Initial Appearance as to JAMES LITTLE held on 3/31/2021. Defendant present by video. Due Process Order given to the Government. Oral Motion to Appoint Counsel by JAMES LITTLE (1); heard and granted. Joint Oral Motion for Speedy Trial as to JAMES LITTLE (1); heard and granted. Speedy Trial Excluded from 3/31/2021 to 6/2/2021 in the Interest of Justice (XT). Defendant waives Preliminary Hearing. Status Hearing set for 6/2/2021 at 1:00 PM by Telephonic/VTC before Magistrate Judge Zia M. Faruqui. Bond Status of Defendant: Defendant Remain on Personal Recognizance; Court Reporter: Lorraine |

**JA3**

| | | |
|---|---|---|
| | | Herman; Defense Attorney: Peter Adolf; US Attorney: Jacob Steiner for Frederick Yette; Pretrial Officer: John Copes. (ztl) (Entered: 04/27/2021) |
| 03/31/2021 | 10 | ORDER Setting Conditions of Release as to JAMES LITTLE (1) Personal Recognizance. Signed by Magistrate Judge Zia M. Faruqui on 3/31/2021. (ztl) (Entered: 04/27/2021) |
| 04/15/2021 | 6 | MOTION to Unseal Case by USA as to JAMES LITTLE. (Attachments: # 1 Text of Proposed Order)(bb) [1:21-mj-00309-RMM] (Entered: 04/15/2021) |
| 04/16/2021 | 7 | ORDER Granting 6 MOTION to Unseal Case by USA as to JAMES LITTLE (1). Signed by Magistrate Judge G. Michael Harvey on 4/16/2021. (zpt) [1:21-mj-00309-RMM] (Entered: 04/16/2021) |
| 04/16/2021 | | Case unsealed as to JAMES LITTLE (zltp) [1:21-mj-00309-RMM] (Entered: 04/16/2021) |
| 04/23/2021 | 8 | INFORMATION as to JAMES LITTLE (1) count(s) 1, 2, 3, 4. (bb) (Entered: 04/26/2021) |
| 04/27/2021 | | MINUTE ORDER as to JAMES LITTLE: Arraignment set for 6/2/2021 at 01:00 PM in Telephonic/VTC before Judge Royce C. Lamberth. Signed by Judge Royce C. Lamberth on 4/27/2021. (lcrcl3) (Entered: 04/27/2021) |
| 04/30/2021 | 11 | NOTICE OF ATTORNEY APPEARANCE: Peter Stewart Adolf appearing for JAMES LITTLE (Adolf, Peter) (Entered: 04/30/2021) |
| 06/01/2021 | 12 | PRETRIAL COMPLIANCE REPORT as to JAMES LITTLE. This document is for informational purposes only. No action is requested.(Schuck, Christine) (Entered: 06/01/2021) |
| 06/02/2021 | | Minute Entry for video Arraignment held before Judge Royce C. Lamberth as to JAMES LITTLE on 6/2/2021. Defendant arraigned and enters a Plea of Not Guilty as to Counts 1-4. Defendant waives the formal reading of the information. Status Conference set for 7/13/2021 at 11:00 AM by VTC before Judge Royce C. Lamberth. The Court finds it in the interest of justice to toll the speedy trial clock from 6/2/2021 through 7/13/2021. Bond Status of Defendant: remains on personal recognizance (present via telephone). Court Reporter: Elizabeth Saint-Loth; Defense Attorney: Peter Stewart Adolf; US Attorney: Frederick Walton Yette. (lsj) Modified on 6/3/2021 (zlsj). (Entered: 06/02/2021) |
| 06/22/2021 | 13 | Unopposed MOTION for Protective Order by USA as to JAMES LITTLE. (Attachments: # 1 Text of Proposed Order)(Yette, Frederick) (Entered: 06/22/2021) |
| 06/29/2021 | 14 | ORDER granting 13 Motion for Protective Order as to JAMES LITTLE (1). Signed by Judge Royce C. Lamberth on 6/29/2021. (lcrcl3) (Entered: 06/29/2021) |
| 07/12/2021 | 15 | PRETRIAL COMPLIANCE REPORT as to JAMES LITTLE. This document is for informational purposes only. No action is requested.(Schuck, Christine) (Entered: 07/12/2021) |
| 07/12/2021 | 16 | STATUS REPORT *REGARDING STATUS OF DISCOVERY* by USA as to JAMES LITTLE (Attachments: # 1 Exhibit)(Yette, Frederick) (Entered: 07/12/2021) |
| 07/13/2021 | | Minute Entry for proceedings held before Judge Royce C. Lamberth: Status Conference as to JAMES LITTLE (1) held on 7/13/2021. The Court finds that the period from July 13, 2021 through August 31, 2021, inclusive, is excluded from the Speedy Trial calculation in the Interest of Justice (XT). Excludable started as to JAMES LITTLE (1). Status Conference set for 8/31/2021 at 10:00 AM in Telephonic/VTC before Judge Royce C. Lamberth. Bond Status of Defendant: remains on Personal Recognizance Bond (PR)/appeared via video; Court Reporter: Sara Wick;Defense Attorney: Peter Adolf; US Attorney: Fred Yette. (znbn) (Entered: 07/13/2021) |

| 07/13/2021 | | Set/Reset Hearings as to JAMES LITTLE:Status Conference set for 8/31/2021 at 10:00 AM in Telephonic/VTC before Judge Royce C. Lamberth. (nbn) (Entered: 07/14/2021) |
|---|---|---|
| 08/30/2021 | 17 | PRETRIAL COMPLIANCE REPORT as to JAMES LITTLE. This document is for informational purposes only. No action is requested.(Schuck, Christine) (Entered: 08/30/2021) |
| 08/30/2021 | 18 | STATUS REPORT *Regarding Status of Discovery as of August 23, 2021* by USA as to JAMES LITTLE (Yette, Frederick) (Entered: 08/30/2021) |
| 08/31/2021 | | Minute Entry for proceedings held before Judge Royce C. Lamberth: Status Conference as to JAMES LITTLE (1) held on 8/31/2021: The Court will Toll Speedy Trial from August 31, 2021 through October 5, 2021. Excludable started as to JAMES LITTLE (1). Status Conference set for 10/5/2021 at 10:00 AM in Telephonic/VTC before Judge Royce C. Lamberth. Bond Status of Defendant: remains on Personal Recognizance Bond (PR)/appeared via video; Court Reporter: Crystal Pilgrim; Defense Attorney: Peter Adolf; US Attorney: Fred Yette. (nbn) (Entered: 08/31/2021) |
| 10/03/2021 | 19 | PRETRIAL COMPLIANCE REPORT as to JAMES LITTLE. This document is for informational purposes only. No action is requested.(Schuck, Christine) (Entered: 10/03/2021) |
| 10/05/2021 | | Minute Entry for proceedings held before Judge Royce C. Lamberth: Status Conference as to JAMES LITTLE (1) held on 10/5/2021. The Court will Toll Speedy Trial from October 5, 2021 through November 16, 2021, in the interest of justice (XT). Excludable started as to JAMES LITTLE (1). Status Conference set for 11/16/2021 at 10:00 AM in Telephonic/VTC before Judge Royce C. Lamberth. Bond Status of Defendant: remains on PERSONAL RECOGNIZANCE BOND (PR)/appeared via video; Court Reporter: Bryan Wayne; Defense Attorney: Peter Adolf; US Attorney: Fred Yette. (nbn) (Entered: 10/05/2021) |
| 11/05/2021 | 20 | STATUS REPORT *REGARDING DISCOVERY AS OF SEPTEMBER 14, 2021* by USA as to JAMES LITTLE (James, Michael) (Entered: 11/05/2021) |
| 11/05/2021 | 21 | ENTERED IN ERROR.....NOTICE *OF FILING* by USA as to JAMES LITTLE (Attachments: # 1 MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF OCTOBER 21, 2021)(James, Michael) Modified on 11/8/2021 (zstd). (Entered: 11/05/2021) |
| 11/05/2021 | 22 | NOTICE *OF FILING* by USA as to JAMES LITTLE (Attachments: # 1 MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF OCTOBER 21, 2021)(James, Michael) (Entered: 11/05/2021) |
| 11/05/2021 | | NOTICE OF CORRECTED DOCKET ENTRY: as to JAMES LITTLE re 21 Notice (Other) was entered in error and counsel refiled said pleading. The correct document is filed at DE # 22. (zstd) (Entered: 11/08/2021) |
| 11/12/2021 | 23 | NOTICE OF SUBSTITUTION OF COUNSEL as to USA. Attorney James, Michael Gordon added. (James, Michael) (Entered: 11/12/2021) |
| 11/14/2021 | 24 | PRETRIAL COMPLIANCE REPORT as to JAMES LITTLE. This document is for informational purposes only. No action is requested.(Schuck, Christine) (Entered: 11/14/2021) |
| 11/15/2021 | | NOTICE OF AMENDED HEARING as to JAMES LITTLE: Plea Agreement Hearing set for 11/16/2021 at 10:00 AM by VTC before Judge Royce C. Lamberth. (lsj) (Entered: 11/15/2021) |

**JA5**

| 11/16/2021 | | Minute Entry for video Plea Agreement Hearing held before Judge Royce C. Lamberth as to JAMES LITTLE on 11/16/2021. Defendant sworn and enters a Plea of Guilty as to Count 4 of the Information. The Court accepts the Plea and the Defendant is found Guilty. Presentence investigation report ordered. Defendant's oral motion to amend pretrial conditions is TAKEN UNDER ADVISEMENT. Sentencing Memorandum due by 2/4/2022. Sentencing set for 2/11/2022 at 1:00 PM by VTC before Judge Royce C. Lamberth. Bond Status of Defendant: remains on personal recognizance. Court Reporter: Lisa Moreira; Defense Attorney: Peter Stewart Adolf; US Attorney: Mike James (stand-in for Frederick Walton Yette). (lsj) (Entered: 11/16/2021) |
|---|---|---|
| 11/16/2021 | 25 | PLEA AGREEMENT as to JAMES LITTLE (1), " Let this be filed", by Judge Royce Lamberth (znbn) (Entered: 11/16/2021) |
| 11/16/2021 | 26 | STATEMENT OF OFFENSE by USA as to JAMES LITTLE (1), " Let this be filed", by Judge Royce Lamberth. (nbn) (Entered: 11/16/2021) |
| 12/21/2021 | 27 | Rule 5(c)(3) Documents Received as to JAMES LITTLE from US District Court Western Distric of North Carolina Case Number 3:21-mj-76- DSC (bb) (Entered: 12/21/2021) |
| 01/07/2022 | 28 | DRAFT PRESENTENCE INVESTIGATION REPORT (prepared by USPO Ariel Rivera Torres) as to JAMES LITTLE(Kraemer-Soares, Kelly) (Entered: 01/07/2022) |
| 02/04/2022 | 29 | FINAL PRESENTENCE INVESTIGATION REPORT (prepared by USPO Ariel Rivera Torres) as to JAMES LITTLE(Kraemer-Soares, Kelly) (Entered: 02/04/2022) |
| 02/04/2022 | 31 | SENTENCING MEMORANDUM by USA as to JAMES LITTLE (Attachments: # 1 Exhibit, # 2 Exhibit)(James, Michael) (Entered: 02/04/2022) |
| 02/04/2022 | 32 | Unopposed MOTION to Continue *Sentencing Hearing* by JAMES LITTLE. (Adolf, Peter) (Entered: 02/04/2022) |
| 02/07/2022 | 33 | REVISED FINAL PRESENTENCE INVESTIGATION REPORT (prepared by USPO Ariel Rivera Torres) as to JAMES LITTLE(Kraemer-Soares, Kelly) (Entered: 02/07/2022) |
| 02/07/2022 | 34 | ORDER granting 32 Motion to Continue as to JAMES LITTLE. Sentencing reset for 3/14/2022 at 10:00 AM by VTC before Judge Royce C. Lamberth. Defendant is further ORDERED to respond to the issue of whether a sentencing court has the authority to impose a "split sentence." See Order for more details. Signed by Judge Royce C. Lamberth on 2/7/2022. (lcrcl3) Modified on 2/9/2022 (lsj). (Entered: 02/07/2022) |
| 02/14/2022 | 35 | NOTICE *OF FILING MEMORANDA REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9, 2022* by USA as to JAMES LITTLE (Attachments: # 1 Memorandum in Support)(James, Michael) (Entered: 02/14/2022) |
| 02/15/2022 | 36 | REVISED FINAL PRESENTENCE INVESTIGATION REPORT (prepared by USPO Ariel Rivera Torres) as to JAMES LITTLE(Kraemer-Soares, Kelly) (Entered: 02/15/2022) |
| 03/01/2022 | 37 | SENTENCING MEMORANDUM by JAMES LITTLE (Attachments: # 1 Supplement : Letters of support re: sentencing)(Adolf, Peter) (Entered: 03/01/2022) |
| 03/08/2022 | 38 | Supplemental SENTENCING MEMORANDUM by USA re 34 Order of the Court as to JAMES LITTLE (James, Michael) Modified to add link and text on 3/9/2022 (zstd). (Entered: 03/08/2022) |
| 03/09/2022 | 39 | SUPPLEMENT by JAMES LITTLE re 37 Sentencing Memorandum *: Additional letter of support* (Adolf, Peter) (Entered: 03/09/2022) |
| 03/09/2022 | 40 | LETTER as to JAMES LITTLE. "Let this be filed" by Judge Royce C. Lamberth on 3/9/2022. (zstd) (Entered: 03/10/2022) |

**JA6**

| 03/10/2022 | 41 | PRETRIAL COMPLIANCE REPORT as to JAMES LITTLE. This document is for informational purposes only. No action is requested.(Schuck, Christine) (Entered: 03/10/2022) |
|---|---|---|
| 03/11/2022 | 42 | SUPPLEMENT by JAMES LITTLE re 37 Sentencing Memorandum *Re: 18 U.S.C. § 3553(a)(6)* (Adolf, Peter) (Entered: 03/11/2022) |
| 03/14/2022 | 43 | MEMORANDUM OPINION as to JAMES LITTLE. Signed by Judge Royce C. Lamberth on 3/14/2022. (lcrcl2) (Entered: 03/14/2022) |
| 03/14/2022 | 44 | MOTION to Dismiss Count *One through Three of the Information* by USA as to JAMES LITTLE. (Attachments: # 1 Text of Proposed Order)(James, Michael) (Entered: 03/14/2022) |
| 03/14/2022 | | Minute Entry for video Sentencing held before Judge Royce C. Lamberth on 3/14/2022 as to JAMES LITTLE. It is the judgment of the Court, as to Count 4, the Defendant is committed to the custody of the Bureau of Prisons for a term of 60 days followed by 36 months (3 years) of Probation. The Defendant is further ordered to pay a $10 special assessment. Bond Status of Defendant: personal recognizance; Court Reporter: Lisa Bankins; Defense Attorney: Peter Stewart Adolf; US Attorney: Michael Gordon James; Prob Officer: Aidee Gavito. (lsj) Modified on 3/16/2022 (lsj). (Entered: 03/15/2022) |
| 03/15/2022 | 45 | ORDER granting Government's Motion 44 to Dismiss Counts One through Three of the Information as to JAMES LITTLE. Signed by Judge Royce C. Lamberth on 3/14/2022. (lsj) (Entered: 03/15/2022) |
| 03/17/2022 | 48 | JUDGMENT as to JAMES LITTLE. Statement of Reasons Not Included. Signed by Judge Royce C. Lamberth on 3/17/2022. (zstd) (Entered: 03/18/2022) |
| 03/17/2022 | 49 | STATEMENT OF REASONS as to JAMES LITTLE re 48 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Royce C. Lamberth on 3/17/2022. (zstd) (Entered: 03/18/2022) |
| 03/21/2022 | 50 | NOTICE OF APPEAL - Final Judgment by JAMES LITTLE re 48 Judgment, 43 Memorandum Opinion. Fee Status: No Fee Paid. Parties have been notified. (Adolf, Peter) (Entered: 03/21/2022) |
| 03/21/2022 | 51 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The fee was not paid as the defendant is represented by FPD as to JAMES LITTLE re 50 Notice of Appeal - Final Judgment. (zstd) (Entered: 03/21/2022) |
| 03/24/2022 | | USCA Case Number as to JAMES LITTLE 22-3018 for 50 Notice of Appeal - Final Judgment filed by JAMES LITTLE. (zstd) (Entered: 03/24/2022) |
| 03/24/2022 | 52 | AMENDED JUDGMENT as to JAMES LITTLE. Signed by Judge Royce C. Lamberth on 3/24/2022. (zstd) (Entered: 03/30/2022) |
| 03/24/2022 | 53 | STATEMENT OF REASONS as to JAMES LITTLE re 52 Amended Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Royce C. Lamberth on 3/24/2022. (zstd) (Entered: 03/30/2022) |
| 03/30/2022 | 54 | Transmitted Supplemental Record, 52 Amended Judgment, on Appeal to USCA as to JAMES LITTLE re 50 Notice of Appeal - Final Judgment. (zstd) (Entered: 03/30/2022) |
| 04/11/2022 | 55 | TRANSCRIPT OF PLEA AGREEMENT HEARING in case as to JAMES LITTLE before Judge Royce C. Lamberth held on November 16, 2021; Page Numbers: 1-18. Date of Issuance:April 11, 2022. Court Reporter/Transcriber Lisa A. Moreira, RDR, CRR, |

Telephone number at (202) 354-3187. Transcript may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public term inal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 5/2/2022. Redacted Transcript Deadline set for 5/12/2022. Release of Transcript Restriction set for 7/10/2022.(Moreira, Lisa) (Entered: 04/11/2022)

| | | |
|---|---|---|
| 08/18/2023 | 56 | JUDGMENT of USCA as to JAMES LITTLE re 50 Notice of Appeal - Final Judgment. In accordance with the Judgement Filed on August 18, 2023, it is Ordered and Adjudged that Little's sentence be vacated and the case be remanded to the District Court for resentencing, in accordance with the opinion of the court filed herein this date. USCA Case Number 22-3018. (Attachments: # 1 USCA Opinion Argued November 2, 2022, and Decided on August 18, 2023)(zstd) (Entered: 08/18/2023) |
| 11/09/2023 | 57 | MANDATE of USCA as to JAMES LITTLE re 56 USCA Judgment, USCA Case Number 22-3018. (zstd) (Entered: 11/09/2023) |
| 12/06/2023 | 58 | MOTION to Alter Judgment , MOTION for Early Termination of Probation/Supervised Release by JAMES LITTLE. (Adolf, Peter) (Entered: 12/06/2023) |
| 12/08/2023 | 59 | NOTICE OF ATTORNEY APPEARANCE Patrick C Holvey appearing for USA. (Holvey, Patrick) (Entered: 12/08/2023) |
| 12/11/2023 | | NOTICE OF HEARING as to JAMES LITTLE: Re-Sentencing set for 1/25/2024 at 10:30 AM in Courtroom 15 (In Person) before Judge Royce C. Lamberth. (smc) (Entered: 12/11/2023) |
| 12/13/2023 | 60 | NOTICE OF ATTORNEY APPEARANCE: Joshua Carpenter appearing for JAMES LITTLE (Carpenter, Joshua) (Entered: 12/13/2023) |
| 12/14/2023 | 61 | WITHDRAWN PURSUANT TO ORDER ENTERED 12/21/2023.....MOTION to Hold in Abeyance re 58 MOTION to Alter Judgment MOTION for Early Termination of Probation/Supervised Release *and Terminate Associated Deadlines* by USA as to JAMES LITTLE. (Holvey, Patrick) Modified on 12/22/2023 (zsmc). (Entered: 12/14/2023) |
| 12/15/2023 | 62 | RESPONSE by JAMES LITTLE re 61 MOTION to Hold in Abeyance re 58 MOTION to Alter Judgment MOTION for Early Termination of Probation/Supervised Release *and Terminate Associated Deadlines* (Carpenter, Joshua) (Entered: 12/15/2023) |
| 12/18/2023 | 63 | Consent MOTION for Extension of Time to File Response/Reply as to 58 MOTION to Alter Judgment MOTION for Early Termination of Probation/Supervised Release *by fourteen (14) days*, MOTION to Withdraw Document 61 MOTION to Hold in Abeyance re 58 MOTION to Alter Judgment MOTION for Early Termination of Probation/Supervised Release *and Terminate Associated Deadlines* by USA as to JAMES LITTLE. (Holvey, Patrick) (Entered: 12/18/2023) |
| 12/21/2023 | 64 | ORDER granting Motion 63 for Extension of Time to File Response/Reply as to JAMES LITTLE (1); granting Motion 63 to Withdraw Document as to JAMES LITTLE (1): It is |

**JA8**

| | | |
|---|---|---|
| | | hereby ORDERED that the Government's Motion is GRANTED. The Government shall respond to Defendant's Motion by 01/03/2024. Signed by Judge Royce C. Lamberth on 12/21/2023. (lcrcl3) (Entered: 12/21/2023) |
| 01/03/2024 | 65 | RESPONSE by USA as to JAMES LITTLE re 58 MOTION to Alter Judgment MOTION for Early Termination of Probation/Supervised Release (Attachments: # 1 Exhibit A and B) (Holvey, Patrick) (Entered: 01/03/2024) |
| 01/10/2024 | 66 | REPLY TO OPPOSITION to Motion by JAMES LITTLE re 58 MOTION to Alter Judgment MOTION for Early Termination of Probation/Supervised Release (Carpenter, Joshua) (Entered: 01/10/2024) |
| 01/16/2024 | 67 | MOTION for Leave to Appear by Telephone *Videoconference* by JAMES LITTLE. (Carpenter, Joshua) (Entered: 01/16/2024) |
| 01/16/2024 | 68 | NOTICE *of Non-Opposition* by USA as to JAMES LITTLE re 67 MOTION for Leave to Appear by Telephone *Videoconference* (Holvey, Patrick) (Entered: 01/16/2024) |
| 01/17/2024 | 69 | MEMORANDUM ORDER denying Motion 58 to Amend Judgment as to JAMES LITTLE: It is hereby ORDERED that Defendant Mr. Little's Motion to Amend the Judgment is DENIED for the reasons stated in the Memorandum Order. Signed by Judge Royce C. Lamberth on 01/17/2024. (lcrcl3) (Entered: 01/17/2024) |
| 01/17/2024 | 70 | ORDER granting Motion 67 for Leave to Appear by videoconference as to JAMES LITTLE (1). Signed by Judge Royce C. Lamberth on 01/17/2024. (lcrcl3) (Entered: 01/17/2024) |
| 01/22/2024 | 71 | SENTENCING MEMORANDUM by USA as to JAMES LITTLE (Attachments: # 1 Exhibit A (BOP Records))(Holvey, Patrick) (Entered: 01/22/2024) |
| 01/23/2024 | 72 | REPORT on Offender Under Supervision as to JAMES LITTLE. "Let this be filed". Copies to counsel by Royce C. Lamberth U.S.D.J. on 1/23/2024 (zstd) (Entered: 01/23/2024) |
| 01/25/2024 | 73 | Notes for Oral Resentencing as to JAMES LITTLE: These are notes the Court used when delivering portions of its oral resentencing today. Signed by Judge Royce C. Lamberth on 01/25/2024. (lcrcl3) (Entered: 01/25/2024) |
| 01/25/2024 | | Minute Entry for Resentencing held on 1/25/2024 before Judge Royce C. Lamberth as to JAMES LITTLE: It is the judgment of the court, that the Defendant is committed to the custody of the Bureau of Prisons for a term of 150 days with 60 days credit for time served and 30 days credit for the 18-month term of probation served. The Defendant is further ordered to pay a $10 special assessment and restitution in the amount of $500. Bond Status of Defendant: remains on Personal Recognizance and permitted to self-surrender. US Attorney: Patrick Holvey. Defense Attorney: Joshua Carpenter. Probation Officer: Crystal Lustig obo Aidee Gavito. Court Reporter: Elizabeth Saint-Loth. (smc) (Entered: 01/25/2024) |
| 01/29/2024 | 74 | AMENDED JUDGMENT as to JAMES LITTLE. Signed by Judge Royce C. Lamberth on 1/29/2024. (zstd) (Entered: 01/29/2024) |
| 01/29/2024 | 75 | AMENDED STATEMENT OF REASONS as to JAMES LITTLE re 74 Amended Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Royce C. Lamberth on 1/29/2024. (zstd) (Entered: 01/29/2024) |
| 01/30/2024 | 76 | NOTICE OF APPEAL - Final Judgment by JAMES LITTLE re 74 Amended Judgment. Fee Status: No Fee Paid. Parties have been notified. (Carpenter, Joshua) (Entered: 01/30/2024) |

| 01/30/2024 | 77 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The fee was not paid as the defendant is represented by FPD as to JAMES LITTLE re 76 Notice of Appeal - Final Judgment. (zstd) (Entered: 01/30/2024) |
| --- | --- | --- |
| 01/31/2024 | | USCA Case Number as to JAMES LITTLE 24-3011 for 76 Notice of Appeal - Final Judgment filed by JAMES LITTLE. (zstd) (Entered: 02/01/2024) |
| 02/15/2024 | 78 | TRANSCRIPT OF PROCEEDINGS, in case as to JAMES LITTLE, before Judge Royce C. Lamberth, held on 1 - 25 - 2024. Page Numbers: 1 - 33. Date of Issuance:2-15-2024. Court Reporter: Elizabeth SaintLoth, Telephone number: 202-354-3242. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/7/2024. Redacted Transcript Deadline set for 3/17/2024. Release of Transcript Restriction set for 5/15/2024.(Saint-Loth, Elizabeth) (Entered: 02/15/2024) |
| 02/22/2024 | 79 | ORDER of USCA as to JAMES LITTLE re 76 Notice of Appeal - Final Judgment. In accordance with the Order filed on February 22, 2024, upon consideration of the motion for release pending appeal and the response thereto, it is Ordered that the motion for release pending appeal be granted. Appellant has shown that his appeal presents a substantial question of law or fact likely to result in a reduced term of imprisonment that is less than the amount of time already served plus the expected duration of the appeal process. This order is without prejudice to the government filing a motion in district court requesting imposition of conditions of release pending appeal. USCA Case Number 24-3011. (zstd) (Entered: 02/22/2024) |
| 02/23/2024 | 80 | MOTION to Modify Conditions of Release *to Impose Conditions of Release* by USA as to JAMES LITTLE. (Holvey, Patrick) (Entered: 02/23/2024) |
| 02/27/2024 | 81 | RESPONSE by JAMES LITTLE re 80 MOTION to Modify Conditions of Release *to Impose Conditions of Release* (Carpenter, Joshua) (Entered: 02/27/2024) |
| 02/28/2024 | 82 | REPLY in Support by USA as to JAMES LITTLE re 80 MOTION to Modify Conditions of Release *to Impose Conditions of Release* (Holvey, Patrick) (Entered: 02/28/2024) |
| 03/01/2024 | 83 | ORDER as to JAMES LITTLE granting government's Motion 80 to Modify Conditions of Release: For the reasons stated in the Order, the government's motion to impose conditions of release is GRANTED. See Order for details. Signed by Judge Royce C. Lamberth on 03/01/2024. (lcrcl3) Modified to add defendants name on 3/1/2024 (zsmc). (Entered: 03/01/2024) |

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case: 1:21-mj-00309 |
| James Little | ) | Assigned To : Meriweather, Robin M. |
| DOB: XX-XX-XX | ) | Assign. Date : 03/15/2021 |
| | ) | Description: Complaint w/ Arrest Warrant |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 6, 2021_____ in the county of _____ in the _____ District of _____Columbia_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1752(a)(1) | -Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, |
| 18 U.S.C. § 1752(a)(2) | - Disorderly Conduct in Restricted Building or Grounds, |
| 40 U.S.C. § 5104(e)(2)(D) | - Disorderly Conduct on Capitol Grounds, |
| 40 U.S.C. §  5104(e)(2)(G) | - Parading or Demonstrating in Capitol Building. |

This criminal complaint is based on these facts:

See attached statement of facts.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Richard Sutherland, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone (specify reliable electronic means).

Date: _____03/15/2021_____

_____
*Judge's signature*

City and state: _____Washington, D.C._____          Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

**JA11**

Case: 1:21-mj-00309
Assigned To : Meriweather, Robin M.
Assign. Date : 03/15/2021
Description: Complaint w/ Arrest Warrant

**STATEMENT OF FACTS**

Your affiant, Richard Sutherland, is an FBI Special Agent assigned to the Charlotte Division. In my duties as a Special Agent, I am assigned to investigate federal criminal violations of law. Currently, I am tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As an FBI Special Agent, I am authorized by law to engage in the prevention and investigation of violations of Federal criminal laws.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification were allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage, which appeared to be captured on mobile devices of persons present on the scene, depicted evidence of

**JA12**

violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

A person identified herein as "Complainant One" is a resident of North Carolina. Complainant One called the FBI tip line after the events of January 6th to provide information to the FBI. The FBI followed up and interviewed Complainant One. Complainant One said that Complainant One is related to an individual named James "Les" Little ("LITTLE"), who lives in Claremont, NC.

On January 6, 2021, LITTLE was texting with Complainant One about something unrelated. Complainant One knows LITTLE to use a cell phone with phone number ***-***-7076. At 3:20 p.m., LITTLE texted Complainant One "We just took over the Capital." At 3:36 p.m., LITTLE texted Complainant One "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!" Complainant One provided screenshots of the above text messages to the FBI. A screenshot is included below.



Also on January 6, 2021, Complainant One saw a post about LITTLE on Facebook. A different relative of LITTLE's posted a message asking for prayer for LITTLE, who they said was traveling back from Washington, DC. Complainant One provided the FBI with a screenshot of this Facebook post.

**JA13**

On January 13, 2021, the FBI interviewed LITTLE at his residence in Claremont, NC. LITTLE told the FBI that he lived at that residence with his elderly mother.

LITTLE voluntarily provided the following information: LITTLE went to Washington, DC the day before the planned protest on January 5, 2021. On January 6th, LITTLE went to the protest.

Little stated that at some point, the police began using tear gas at the protest. LITTLE said that some people went into the Capitol, and he got caught up in the moment and went into the Capitol as well. LITTLE said that he had no intention of entering the Capitol when he went to the protest, but that he got caught up in the moment.

LITTLE said he walked around the Capitol, smiling and fist bumping other people who were also inside the Capitol. LITTLE walked around the Senate Chamber and took photographs of himself there. LITTLE stated that he sent these photographs to people that he trusted. LITTLE said that he must have gotten caught up in the moment when he sent a text about taking over the Capitol. LITTLE left the Washington, D.C. area and returned to North Carolina that evening.

LITTLE chose not to answer follow-up questions from the FBI Agents. LITTLE also declined to turn over the photographs that he took with his telephone of himself and others inside the Capitol.

On January 19, 2021, the Affiant queried a paid database that the FBI has access to for the registered owner of phone number ***-***-7076. The database reported that the phone number is assigned to James Little and serviced by AT&T.

The FBI obtained an image of LITTLE from the North Carolina Department of Motor Vehicle ("DMV") files. The FBI used this DMV image to search an FBI database of photos and videos of individuals near, and inside of, the U.S. Capitol on January 6, 2021. This search of the database returned four possible photos of LITTLE: two of the photos depicted one person and the other two photos depicted a second person

The Affiant interviewed Complainant One again and showed Complainant One the potential images of LITTLE. Complainant One positively identified the images below as being of LITTLE. Complainant One excluded two additional images, of another individual, and said that they were not LITTLE. Complainant One based their identification of LITTLE on having known LITTLE most of LITTLE's life and having spent significant amounts of time with LITTLE.

3

**JA14**



The FBI continued to search photos and videos from inside and around the Capitol Building that were collected as part of the investigation. The FBI identified an additional photograph of LITTLE inside of the U.S. Capitol on January 6, 2021. That image is below. (The Affiant has added an arrow pointing to LITTLE).



According to records obtained through a search warrant which was served on AT&T on January 6, 2021, in and around the time of the incident, the cellphone associated with ***-***-7076 was identified as having utilized a cell site consistent with providing service to a geographic area that includes the interior of the United States Capitol building.

4

**JA15**

Based on the foregoing, your affiant submits that there is probable cause to believe that JAMES LITTLE violated 18 U.S.C. §§ 1752(a)(1) and (2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Finally, your affiant submits there is also probable cause to believe that JAMES LITTLE violated 40 U.S.C. §§ 5104(e)(2)(D) and (G), which makes it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

_____
RICHARD SUTHERLAND
FBI SPECIAL AGENT

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 15th , day of March 2021.

_____
ROBIN M. MERIWEATHER
U.S. MAGISTRATE JUDGE

**JA16**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **MAGISTRATE NO. 21-MJ-309** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMES LITTLE,** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| **Defendant.** | : | **(Entering and Remaining in a Restricted** |
| | : | **Building)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building)** |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Capitol Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | **(Parading, Demonstrating, or Picketing in** |
| | : | **a Capitol Building)** |

**I N F O R M A T I O N**

The United States Attorney charges that:

**COUNT ONE**

On or about January 6, 2021, in the District of Columbia, **JAMES LITTLE**, did unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President–elect were temporarily visiting, without lawful authority to do so.

(**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(1))

**COUNT TWO**

On or about January 6, 2021, in the District of Columbia, **JAMES LITTLE**, did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and

official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

(**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(2))

## COUNT THREE

On or about January 6, 2021, in the District of Columbia, **JAMES LITTLE**, willfully and knowingly engaged in disorderly and disruptive conduct within the United States Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct in that building of a hearing before or any deliberation of, a committee of Congress or either House of Congress.

(**Disorderly Conduct in a Capitol Building or Grounds**, in violation of Title 40, United States Code, Section 5104(e)(2)(D))

## COUNT FOUR

On or about January 6, 2021, in the District of Columbia, **JAMES LITTLE** willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol Building.

(**Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(G))

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney

2

**JA18**

By:  /s/ *Frederick Yette*
FREDERICK YETTE
Assistant United States Attorney
National Security Section
U.S. Attorney's Office
D.C Bar Number 385391
Frederick.yette@usdoj.gov
(202) 252-7733 (o)

3

**JA19**



U.S. Department of Justice

Channing D. Phillips
Acting United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

**August 17, 2021**

<u>BY EMAIL</u>
Peter Adolf
Assistant Federal Public Defender
Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202

*let this be filed.*
*Roger C. Fedesta*
*U.S.D.J. 11/16/21*

Re: <u>US v. James Little, Cr. No. 21-315</u>

Dear Mr. Adolf:

 This letter sets forth the full and complete plea offer to your client, James Little (hereinafter referred to as "your client" or "defendant"), from the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). This plea offer expires on August 27, 2021. If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as "this Agreement"). The terms of the offer are as follows:

 1.    **<u>Charges and Statutory Penalties</u>**

 Your client agrees to plead guilty to Count Four of the Information, charging your client with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G).

 Your client understands that a violation of Title 40, United States Code, Section 5104(e)(2)(G) carries a maximum sentence of six (6) months of imprisonment, pursuant to 40 U.S.C. § 5109(b); a fine of not more than $5,000, pursuant to 18 U.S.C. § 3571(b)(6); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

 In addition, pursuant to 18 U.S.C. § 3013(a)(1)(A)(ii), your client agrees to pay a special assessment of $10 to the Clerk of the United States District Court for the District of Columbia.

 2.    **<u>Factual Stipulations</u>**

Page 1 of 9

**JA20**

Your client agrees that the attached "Statement of Offense" fairly and accurately describes your client's actions and involvement in the offense(s) to which your client is pleading guilty. Please have your client sign and return the Statement of Offense as a written proffer of evidence, along with this Agreement.

3.     **Additional Charges**

In consideration of your client's guilty plea to the above offense(s), your client will not be further prosecuted criminally by this Office for the conduct set forth in the attached Statement of Offense.  The Government will request that the Court dismiss the remaining counts of the Information in this case at the time of sentencing.  Your client agrees and acknowledges that the charges to be dismissed at the time of sentencing were based in fact.

After the entry of your client's plea of guilty to the offense identified in paragraph 1 above, your client will not be charged with any non-violent criminal offense in violation of Federal or District of Columbia law which was committed within the District of Columbia by your client prior to the execution of this Agreement and about which this Office was made aware by your client prior to the execution of this Agreement.  However, the United States expressly reserves its right to prosecute your client for any crime of violence, as defined in 18 U.S.C. § 16 and/or 22 D.C. Code § 4501, if in fact your client committed or commits such a crime of violence prior to or after the execution of this Agreement.

4.     **Sentencing Guidelines Do Not Apply**

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a).  Your client further understands that 40 U.S.C. § 5104(e)(2)(G) is a class B misdemeanor, as defined by 18 U.S.C. § 3559(a)(7). Accordingly, pursuant to § 1B1.9 of the United States Sentencing Commission, *Guidelines Manual* (2018), the sentencing guidelines do not apply to your client's sentencing.

5.     **Reservation of Allocution**

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charges to which your client is pleading guilty, to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement.

In addition, if in this Agreement the parties have agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the parties reserve the right to full allocution in any post-sentence litigation.  The parties retain the full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or any proceeding(s) before the Bureau of Prisons.  In addition, your client acknowledges that the Government is not obligated and does not intend to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

**JA21**

6.    **Court Not Bound by this Agreement**

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a). Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Court. Your client acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing. Your client understands that the Government's recommendation is not binding on the Court.

Your client acknowledges that your client's entry of a guilty plea to the charged offense(s) authorizes the Court to impose any sentence, up to and including the statutory maximum sentence. The Government cannot, and does not, make any promise or representation as to what sentence your client will receive. Moreover, it is understood that your client will have no right to withdraw your client's plea of guilty should the Court impose a sentence that does not follow the Government's sentencing recommendation. The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Court. Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

7.    **Conditions of Release**

Your client acknowledges that, although the Government will not seek a change in your client's release conditions pending sentencing, the final decision regarding your client's bond status or detention will be made by the Court at the time of your client's plea of guilty. The Government may move to change your client's conditions of release, including requesting that your client be detained pending sentencing, if your client engages in further criminal conduct prior to sentencing or if the Government obtains information that it did not possess at the time of your client's plea of guilty and that is relevant to whether your client is likely to flee or pose a danger to any person or the community. Your client also agrees that any violation of your client's release conditions or any misconduct by your client may result in the Government filing an ex parte motion with the Court requesting that a bench warrant be issued for your client's arrest and that your client be detained without bond while pending sentencing in your client's case.

8.    **Waivers**

a.    **Statute of Limitations**

Your client agrees that, should the conviction following your client's plea of guilty pursuant to this Agreement be vacated for any reason, any prosecution, based on the conduct set forth in the attached Statement of Offense, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of

**JA22**

limitations with respect to any prosecution of conduct set forth in the attached Statement of Offense that is not time-barred on the date that this Agreement is signed.

b.    **Trial Rights**

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule. Your client agrees to forego the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea. Your client also agrees to waive, among other rights, the right to plead not guilty, and the right to a jury trial. If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify. If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal your client's conviction. Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of self-incriminating statements in a criminal prosecution. By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the rights that arise under these rules in the event your client withdraws your client's guilty plea or withdraws from this Agreement after signing it.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the plea of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court. Your client understands that the date for sentencing will be set by the Court.

c.    **Appeal Rights**

Your client agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claim(s) that (1) the statute(s) to which your client is pleading guilty is unconstitutional, and (2) the admitted conduct does not fall within the scope of the statute(s). Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client also agrees to waive the right to appeal the sentence in this case, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Court to set conditions of release, and the manner in which the

sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court. In agreeing to this waiver, your client is aware that your client's sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement. Notwithstanding the above agreement to waive the right to appeal the conviction and sentence, your client retains the right to appeal on the basis of ineffective assistance of counsel, but not to raise on appeal other issues regarding the conviction or sentence.

### d.    **Collateral Attack**

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2), but agrees to waive the right to appeal the denial of such a motion.

### e.    **Hearings by Video Teleconference and/or Teleconference**

Your client agrees to consent, under the CARES Act, Section 15002(b)(4) and otherwise, to hold any proceedings in this matter – specifically including but not limited to presentment, initial appearance, plea hearing, and sentencing – by video teleconference and/or by teleconference and to waive any rights to demand an in-person/in-Court hearing. Your client further agrees to not challenge or contest any findings by the Court that it may properly proceed by video teleconferencing and/or telephone conferencing in this case because, due to the COVID-19 pandemic, an in-person/in-Court hearing cannot be conducted in person without seriously jeopardizing public health and safety and that further there are specific reasons in this case that any such hearing, including a plea or sentencing hearing, cannot be further delayed without serious harm to the interests of justice.

### 9.    <u>Use of Self-Incriminating Information</u>

The Government and your client agree, that the Government will be free to use against your client for any purpose at the sentencing in this case or in any related criminal or civil proceedings, any self-incriminating information provided by your client pursuant to this Agreement or during the course of debriefings conducted in anticipation of this Agreement, regardless of whether those debriefings were previously covered by an "off the record" agreement by the parties.

### 10.    <u>Restitution</u>

Your client acknowledges that the riot that occurred on January 6, 2021, caused, as of May 17, 2021, approximately $1,495,326.55 damage to the United States Capitol. Your client agrees

**JA24**

as part of the plea in this matter to pay restitution to the Department of Treasury in the amount of $500.

Payments of restitution shall be made to the Clerk of the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, your client agrees to disclose fully all assets in which your client has any interest or over which your client exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. Your client agrees to submit a completed financial statement on a standard financial disclosure form which has been provided to you with this Agreement to the Financial Litigation Unit of the United States Attorney's Office, as it directs. If you do not receive the disclosure form, your client agrees to request one from usadc.ecfflu@usa.doj.gov. Your client will complete and electronically provide the standard financial disclosure form to usadc.ecfflu@usa.doj.gov 30 days prior to your client's sentencing. Your client agrees to be contacted by the Financial Litigation Unit of the United States Attorney's Office, through defense counsel, to complete a financial statement. Upon review, if there are any follow-up questions, your client agrees to cooperate with the Financial Litigation Unit. Your client promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement could be prosecuted as a separate crime punishable under 18 U.S.C. § 1001, which carries an additional five years' incarceration and a fine.

Your client expressly authorizes the United States Attorney's Office to obtain a credit report on your client in order to evaluate your client's ability to satisfy any financial obligations imposed by the Court or agreed to herein.

Your client understands and agrees that the restitution or fines imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, your client understands that the schedule of payments is merely a minimum schedule of payments and will not be the only method, nor a limitation on the methods, available to the United States to enforce the criminal judgment, including without limitation by administrative offset. If your client is sentenced to a term of imprisonment by the Court, your client agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically imposes a schedule of payments.

Your client certifies that your client has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this Agreement and/or that may be imposed by the Court. In addition, your client promises to make no such transfers in the future until your client has fulfilled the financial obligations under this Agreement.

11.  **Breach of Agreement**

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Agreement. In the event of such a breach: (a) the Government will be free from its obligations under this Agreement; (b) your client will not have the right to withdraw the guilty

**JA25**

plea; (c) your client will be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously characterized as "off-the-record" debriefings, and including your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by a preponderance of the evidence, except where such breach is based on a violation of federal, state, or local criminal law, which the Government need prove only by probable cause in order to establish a breach of this Agreement.

Nothing in this Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

12. **Complete Agreement**

No agreements, promises, understandings, or representations have been made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Your client further understands that this Agreement is binding only upon the Criminal and Superior Court Divisions of the United States Attorney's Office for the District of Columbia. This Agreement does not bind the Civil Division of this Office or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

If the foregoing terms and conditions are satisfactory, your client may so indicate by signing this Agreement and the Statement of Offense, and returning both to me no later than August 27, 2021..

Sincerely yours,

Channing D. Phillips
Acting United States Attorney

By: _____

Frederick Yette
Assistant United States Attorney

**JA27**

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorney, Peter Adolf, Esquire. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense(s) identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorney in connection with this Agreement and matters related to it.

Date: Nov 8, 2021

James Little
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, James Little, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: 11/10/2021

Peter Adolf
Attorney for Defendant

**JA28**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CR. NO. 21-315 (RCL)** |
| | : | |
| **JAMES LITTLE,** | : | *let this be filed.* |
| | : | *Royce C. Lamberth* |
| **Defendant.** | : | *U.S.D.J. 11/16/21* |

**STATEMENT OF OFFENSE**

1.      Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, James Little, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

**Elements of the Offense**

2.      The essential elements of the charged offense of Parading, Demonstrating or Picketing in a Capitol Building in violation of Title 40, United States Code, Section 5104 (e)(2)(G), each of which the Government must prove beyond a reasonable doubt, are that:

      a.  the defendant willfully and knowingly entered the U.S. Capitol; and

      b.  the defendant paraded, demonstrated, or picketed in the U.S. Capitol.

Background

3.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include

1

**JA30**

permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

4.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

5.     On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

6.     As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

7.     At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior facade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to

2

**JA31**

security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

8.     At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

9.     Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

**JA32**

Evidence of the Defendant's Conduct

10.      On January 6, 2021, defendant James Little, entered the United States Capitol, without lawful authority to do so. While inside the U.S. Capitol, Little visited the third floor Senate Gallery.

11.      The defendant also took selfies of himself with his cell phone and sent photographs and text messages to family and friends. At 3:20 p.m., the defendant sent a text message that said: "We just took over the Capital." At 3:36 p.m., the defendant sent another text message that said: "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!"

12.      On January 13, 2021, FBI agents interviewed the defendant and he admitted that he was present in the U.S. Capitol on January 6, 2021. At the time that the defendant entered the U.S. Capitol building, he knew he did not have permission to enter the building. The defendant entered the U.S. Capitol building and paraded, demonstrated, and/or picketed within the building.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

/s/ Frederick Yette
Frederick Yette, D.C. Bar 385391
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7733
Frederick.Yette@usdoj.gov

DEFENDANT'S ACKNOWLEDGMENT

I have read this factual proffer and have discussed it with my attorney, Peter Adolf, Esquire. I fully understand this factual proffer. I agree and acknowledge by my signature that this proffer of facts is true and accurate. I do this voluntarily and of my own free will. No threats have been

4

**JA33**

made to me nor am I under the influence of anything that could impede my ability to understand
this factual proffer fully.

Date: 11/8/2021

James Little
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this factual proffer and have reviewed it with my client fully. I concur in my
client's desire to adopt this factual proffer as true and accurate. To my knowledge, my client's
decision to agree to and adopt this factual proffer is an informed and voluntary one.

Date: 11/10/2021

Peter Adolf, Esquire
Counsel for the Defendant

5

**JA34**

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2       - - - - - - - - - - - - - - - x
         THE UNITED STATES OF AMERICA,
 3                                          Criminal Action No.
                      Plaintiff,            1:21-cr-00315-RCL-1
 4                                          Tuesday, November 16, 2021
         vs.                                10:23 a.m.
 5
         JAMES LITTLE,
 6
                      Defendant.
 7       - - - - - - - - - - - - - - - x

 8       _____

 9              TRANSCRIPT OF PLEA AGREEMENT HEARING
              HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
                      UNITED STATES DISTRICT JUDGE
10       _____

         APPEARANCES:
11
         For the United States:      MICHAEL GORDON JAMES, ESQ.
12                                    DOJ-USAO
                                      Terry Sanford Federal Building
13                                    310 New Bern Avenue
                                      Suite 800
14                                    Raleigh, NC 27601-1461
                                      (919) 856-4530
15                                    mike.james@usdoj.gov

16       For the Defendant:          PETER STEWART ADOLF, ESQ.
                                      FEDERAL PUBLIC DEFENDER
17                                    NORTH CAROLINA
                                      129 West Trade Street
18                                    Suite 300
                                      Charlotte, NC 28202
19                                    (704) 374-0720
                                      peter_adolf@fd.org
20

21       Court Reporter:             Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
22                                    U.S. Courthouse, Room 6718
                                      333 Constitution Avenue, NW
23                                    Washington, DC  20001
                                      (202) 354-3187
24

25
```

**JA35**

```
 1                  P R O C E E D I N G S
 2             THE COURTROOM DEPUTY:  Good morning.  We're on the
 3    record for Criminal Case 21-315, *United States of America*
 4    *vs. James Little*.  Will counsel please identify yourselves
 5    for the record starting with the government.
 6             MR. JAMES:  Michael James; United States, Your
 7    Honor.
 8             MR. ADOLF:  Peter Adolf for Mr. Little, Your
 9    Honor.  Your Honor, Mr. Little is -- he's on the call.  His
10    video was working a moment ago, but he touched something.
11    He's sort of having trouble figuring out how to get his
12    camera back on, but he can hear as last I could tell.  There
13    he is.
14             THE COURT:  There he is.
15             Mr. Little, would you unmute so I can make sure
16    you hear me.
17             THE DEFENDANT:  Yes, Your Honor.  It's muted.
18             THE COURT:  Okay.  All right.  I understand,
19    Mr. Little, from your counsel that you wish to enter a plea
20    in this case.  I have to ask you a series of questions to
21    ensure that you fully understand your rights and that you're
22    doing this voluntarily.  First I'll ask the clerk to place
23    you under oath.
24             (Defendant sworn)
25             THE COURTROOM DEPUTY:  Please state your full name
```

1    for the record.

2              THE DEFENDANT:  James Leslie Little.

3              THE COURTROOM DEPUTY:  Thank you.  Can you please

4    spell your middle name for the court reporter's benefit.

5              THE DEFENDANT:  L-E-S-L-I-E.

6              THE COURTROOM DEPUTY:  Thank you.

7              THE COURT:  Mr. Little, your answers to my

8    questions are subject to the penalty of perjury or making a

9    false statement if you don't answer my questions truthfully.

10   Do you understand that?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  Does counsel for either side have any

13   questions on the defendant's competency to enter a plea at

14   this time?

15             MR. JAMES:  No, Your Honor.

16             MR. ADOLF:  No, Your Honor.

17             THE COURT:  That was a unanimous no, but I heard

18   no from each of you.  I find the defendant is competent.

19             Have you had adequate time and opportunity now to

20   discuss this case with your attorney, Mr. Little?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Are you satisfied with Mr. Adolf's

23   representation of you in this matter?

24             THE DEFENDANT:  Yes, absolutely.

25             THE COURT:  Do you understand that under the

**JA37**

1    Constitution and laws of the United States you're entitled

2    to a trial by -- well, actually in this case you wouldn't be

3    entitled to a trial by jury, I guess, in light of the length

4    of time that's -- but you're entitled to a trial in any

5    event on these charges.

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  Do you understand, if there were a

8    trial, you'd be presumed to be innocent?  The government

9    would be required to prove you guilty by competent evidence

10   beyond a reasonable doubt before you could be found guilty.

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  If there were a trial, witnesses for

13   the government would have to come to court to testify in

14   your presence, and your attorney could cross-examine those

15   witnesses, could object to evidence offered by the

16   prosecutors, and could offer evidence on your behalf.  Do

17   you understand that?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  Do you understand you'd have the right

20   to testify at a trial, but you'd also have the right not to

21   testify, and no inference or suggestion of guilt could be

22   drawn from the fact that you did not testify?

23           THE DEFENDANT:  Yes, Your Honor.

24           THE COURT:  Do you understand if I accept your

25   plea you waive these rights?  There will be no trial, and

**JA38**

1   I'll enter a judgment of guilty on your plea alone today.

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  If you plead guilty, do you understand

4   you'll also waive your right not to incriminate yourself

5   since you must acknowledge that you are guilty before I

6   accept your plea?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Having discussed your rights with you,

9   do you still wish to plead guilty?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  I want to go over the information with

12   you to be sure you understand exactly what you're pleading

13   guilty to.

14          The plea is to Count 4 of the information, so

15   Count 4 reads:  On or about January 6, 2021, in the District

16   of Columbia you willfully and knowingly paraded,

17   demonstrated, and picketed in the United States Capitol

18   Building.

19          So that's the charge you'd actually be pleading

20   guilty to.  Do you understand that?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Counsel advised me in the plea

23   agreement letter that the maximum penalty on that charge

24   would be six months imprisonment, a fine of not more than

25   $5,000, an obligation to pay any applicable interest or

**JA39**

1    penalties, if I find restitution -- and there is a

2    restitution agreement in this case of I think it was $500,

3    if I'm correct.

4            MR. JAMES:  That's correct, Your Honor.

5            THE COURT:  All right.  And there's a special

6    assessment required to be imposed by law of $10.  Do you

7    understand that's what the maximum penalty is in the case;

8    is that correct?

9            THE DEFENDANT:  Yes, Your Honor, but I don't

10   understand why I'm having to pay for damages that other

11   people did to the Capitol.

12           THE COURT:  I think that -- am I correct that the

13   restitution here is not being set by the Court but was

14   agreed upon?

15           MR. JAMES:  That's correct, Your Honor.  That is

16   part of the factual stipulation.

17           THE COURT:  Okay.  So if you want to go to trial,

18   the restitution question would be decided by the Court, and

19   I could answer your question.  If you want to agree to the

20   agreement, the restitution question is something you're

21   agreeing to so I can't tell you the answer to the question.

22           THE DEFENDANT:  Okay.  I agree to it.

23           THE COURT:  Okay.  I was going to say, if you want

24   to discuss that with your attorney, you can.  If you want to

25   say more about it, you can.

**JA40**

```
 1              MR. ADOLF:  Your Honor, if I could just interject
 2     briefly?  I have discussed that issue with Mr. Little.  My
 3     understanding of the restitution statute is that restitution
 4     is permissible upon agreement of the parties regardless of
 5     the other aspects of the requirements for restitution, and
 6     we have agreed to that.  And I've discussed that with him,
 7     and he's agreed to it.
 8              THE COURT:  Okay.  Now, since this is a petty
 9     offense, the sentencing guidelines won't actually apply in
10     this case, so do you understand that I will get a
11     presentence report?  Even though this is a petty offense, in
12     all of our cases we get a presentence report from the
13     probation office.  And after I get that report, you and your
14     attorney and the government will all have a chance to make
15     arguments to me on what the proper sentence in the case
16     would be.
17              I won't decide the sentence in the case until
18     after I get the presentence report, hear from you and your
19     attorney, and from the government at the time of sentencing.
20     Do you understand that?
21              THE DEFENDANT:  Yes, Your Honor.
22              THE COURT:  Has anyone threatened you or anyone
23     else or anyone forced you to enter this plea of guilty?
24              THE DEFENDANT:  No, Your Honor.
25              THE COURT:  I have what purports to be a plea
```

**JA41**

1    agreement here in writing.  I'm going to -- since you're not

2    here, I'm just going to hold my copy of this up to the

3    screen.  I don't know if you can really see that or not.

4              THE DEFENDANT:  I can see it.

5              THE COURT:  That purports to be your signature

6    there.  Did you go -- is that your signature?  That looks

7    like it.

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Did you go over this carefully with

10   your attorney?

11             THE DEFENDANT:  I did, Your Honor.

12             THE COURT:  And do you agree to it?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Okay.  I'm going to have your attorney

15   explain it to be sure -- so I can be sure you understand it.

16             Mr. Adolf, do you want to give me a little

17   description of it?

18             MR. ADOLF:  Yes, Your Honor.  Mr. Little's

19   pleading guilty to Count 4, as Your Honor already described,

20   a violation of 5104(e)(2)(G) of Title 40.  There is a

21   statement of offense that has been signed.  I didn't see it

22   on the docket, but I assume that it's been filed with the

23   Court.

24             THE COURT:  I have it as well, and I'm going to go

25   over it with him, yes.

**JA42**

1          MR. ADOLF:  Very good.  I think the plea agreement

2     speaks for itself.  The highlights are that the government

3     is not going to prosecute for any related conduct coming out

4     of this issue.  The sentencing guidelines don't apply.  He

5     has the right to allocute at sentencing, and we have the

6     right to address -- to make sentencing arguments to the

7     Court.

8          It says that the Court is not bound by the

9     agreement, but the reality is as far as sentencing goes

10    there is no agreed upon sentence within the range for this

11    particular charge, a Class B misdemeanor, so the maximum and

12    minimum are what they are.

13         There are aspects of the conditions of release,

14    and I've told -- I have discussed with counsel that once the

15    hearing's over I am going to ask the Court to consider

16    modifying one condition of release.

17         There's a waiver of the statute of limitations.

18    Your Honor already discussed the trial rights that are being

19    waived, and there's a limitation on the right to appeal,

20    which is in Section 8C, and he also waives his right to

21    collateral attack.

22         We agree to have this hearing on video

23    teleconference.

24         There's, I guess, sort of a cooperation provision.

25    There's the restitution of $500 that Your Honor already

**JA43**

1    discussed with him in some detail, and that any violation of

2    this would be a breach on our part or on the part of the

3    defense and Mr. Little and would leave the government with

4    the ability to both pursue sentencing on this charge and any

5    other charges it feels like.

6          I think that pretty much covers the basic terms,

7    Your Honor.

8          THE COURT:  Okay.  Do you understand all that,

9    Mr. Little?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Do you have any other questions about

12    it?  Because I'm the one that can resolve them, except for

13    the restitution obviously.

14          THE DEFENDANT:  My mom was saying my gun rights,

15    but I think that Mr. Adolf is going to address that because

16    I'm pleading to a misdemeanor, not a felony.  So he's going

17    to address getting my gun rights back.

18          THE COURT:  Okay.  Has anyone made any prediction

19    or promises to what sentence I'll give you in this case?

20          THE DEFENDANT:  No.  No, Your Honor.

21          THE COURT:  Do you understand I don't know myself

22    right now?  So no one can really tell you what I'm going to

23    do because I don't know myself.

24          I've only sentenced one person even on a

25    misdemeanor so far.  I haven't really figured out what's

**JA44**

1    going to happen in these cases yet.  I'm beginning to

2    sentence my first -- I've only done one fellow today.  I'm

3    doing one more tomorrow.  I really don't know where all

4    these are going so I can't even tell you myself what I'm

5    going to do.

6          I will look at the presentence report and give due

7    consideration to you and your attorney and the government at

8    the time of sentencing.  Do you understand that's how it's

9    going to go?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Okay.  I've also got a thing here

12    called the "Statement of the Offense," and it's a statement

13    of what it says happened here.  Let me hold up that one.

14    That has your signature on it as well; it looks like your

15    signature.

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Did you go over that one carefully

18    with your attorney, too?

19          THE DEFENDANT:  I did, Your Honor.

20          THE COURT:  And is that what really happened?

21          THE DEFENDANT:  Yes.

22          THE COURT:  So you are, in fact, guilty of the

23    offense to which you're pleading guilty?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.  Mr. Little, since you

**JA45**

1    acknowledge that you are guilty as charged, since you know

2    your right to a trial, since you know what the maximum

3    possible punishment is, and since I've discussed the

4    sentencing procedures with you, I hereby find you

5    voluntarily pleading guilty.  I accept your guilty plea, and

6    I'll enter a judgment of guilty on your plea to Count 4 of

7    the information.

8             All right.  I'll entertain your motion, Mr. Adolf.

9             MR. ADOLF:  Thank you, Your Honor.

10            I don't know how the procedure goes normally in

11   these cases, but I guess there isn't a lot of normal to work

12   from in these cases at this point.  But because it's a

13   standard condition in our district, and a lot of districts,

14   to not possess firearms, Mr. Little got rid of the firearms

15   that he had when he was first put on pretrial release.  He

16   hasn't had any problems.  His concern, Judge -- and what I'm

17   asking the Court to do is consider lifting the firearms

18   restriction.

19            This is now unquestionably a misdemeanor.  He has

20   no prior felony offenses or anything that would bar him from

21   firearm ownership, and once he's sentenced, he will -- his

22   gun rights will be restored -- well, I guess the restriction

23   will be lifted in any event.  And particularly for him, he

24   lives out sort of in the country in the Piedmont of Western

25   North Carolina.  He's always had firearms.

**JA46**

```
 1              In fact, he was -- it's a real concern.  He was
 2      just telling me last year that -- that last year his Jack
 3      Russell got attacked by a copperhead.  He had to kill it
 4      with a pistol.  So just out where he lives it's a thing he's
 5      always had and has never made any nefarious use of; so given
 6      that that's where we're headed anyway, I'd ask the Court to
 7      consider lifting that restriction at this time.
 8              THE COURT:  Any objection by the United States?
 9              MR. JAMES:  Yes, Your Honor.  We do object.
10              First, I would point out, based on the nature of
11      the offense, although Mr. Little has pled guilty to the
12      5104, the nature of the offense forces the factors that the
13      Court must consider.
14              Second -- and with respect to the nature of the
15      offense, I don't have to go much over that, but the Court
16      has reviewed the plea agreement and the statement of offense
17      as well, and the Court is well aware of January 6th.
18              Second, I will point out, Judge, that the Pretrial
19      Services, they haven't asked for a request for a
20      modification as well.
21              Mr. Little has pled guilty today, but he has not
22      been sentenced.  There will be another, I believe, report
23      prior to sentencing from the Pretrial Services about how
24      Mr. Little is conducting himself.
25              I'd also point out that when Mr. Little was
```

**JA47**

```
 1    interviewed on January 13th he made reference to what he
 2    believes was -- from the taped interview, at about 18
 3    minutes and 44 seconds, he thought that the country was on
 4    the brink of a civil war, and he believed that his fellow
 5    Americans who were from a different political persuasion
 6    were trying to start some sort of a civil war.
 7            So with those sort of things in mind, Your Honor,
 8    I'd ask that the Court not change the conditions at this
 9    time.  Obviously the Court can revisit it at sentencing, but
10    I'll ask that the Court not change the conditions at this
11    time.
12            THE COURT:  I'll defer at this time and review the
13    record further before I rule on the question of whether to
14    do it before I get the presentence report.
15            All right.  Madam Clerk, what's the timing for a
16    possible sentencing date?  I guess we're giving 70 days.
17            THE COURTROOM DEPUTY:  Yes, Your Honor.  We're
18    still doing 70 days.
19            THE COURT:  Okay.
20            THE COURTROOM DEPUTY:  And, Your Honor, given the
21    holidays, maybe a little after that time frame.
22            Your Honor, if we can look at early February to
23    give pretrial and probation enough time to process this.
24            THE COURT:  Yes.  February 11th at 1:00 p.m.?
25            MR. ADOLF:  That works for me, Your Honor.
```

**JA48**

```
1                THE COURT:  Is that good for the government?

2                MR. JAMES:  Oh, yes, it is, Your Honor.

3                THE COURT:  And is defendant waiving that -- to do

4       that by video again, or not?

5                MR. ADOLF:  I'm fine doing it on video, Your

6       Honor.  I don't know what the procedures are that are going

7       on in the District of Columbia at this point, but we don't

8       have a problem.

9                THE COURT:  Government?

10               MR. JAMES:  Well, Your Honor, in light of the fact

11      that the Court has not made up its mind obviously about what

12      type of particular sentence, I don't know if by video would

13      be appropriate.  If the Court were to decide an

14      incarceratory sentence was necessary, then I guess the Court

15      could just order Mr. Little to report, but I don't know if

16      that's how the Court would want to proceed.

17               THE COURT:  Well, I'm just saying possible video.

18      We'd have to get consent at the time and see if the court is

19      still doing things by video then.  I'm not sure where we'll

20      be by then.

21               All right.  I'll tentatively set it for February

22      11th at 1:00.  We'll see where we are by that point.  That

23      will give a deadline anyway for pretrial -- I mean, for

24      probation to get the report in.

25               All right.  Any other matters you all want to
```

**JA49**

1    raise today?

2            MR. JAMES:  No, Your Honor.  Thank you.

3            MR. ADOLF:  Judge, just briefly, if -- I

4    understand it's a little unusual to do a presentence report

5    in a misdemeanor case.  I don't have --

6            THE COURT:  It is.

7            MR. ADOLF:  -- any experience with that.

8            THE COURT:  Our court had decided -- my initial

9    one was to waive it, and the court as a whole decided that

10   we would do them in these misdemeanor cases, so we are doing

11   them.  And probation, because of the number of cases, has

12   asked that we give them 70 days in each one, so that's why

13   we're sort of doing it that way.

14           They're getting help from around the country with

15   other probation offices assisting, so I assume they will get

16   some assistance from North Carolina here.  That will also

17   give me some assistance with their being able to interview

18   the defendant and get more hands-on North Carolina expertise

19   about the defendant, I think.

20           MR. ADOLF:  Very good.  So should I expect, then,

21   for probation to be contacting us about a presentence

22   interview?

23           THE COURT:  Yes, yes.

24           MR. ADOLF:  Very good.  We don't need to -- I

25   don't need to -- we don't need a form in the docket?

**JA50**

```
 1              In our district, if you want a presentence
 2       interview, you have to file a form.  The magistrate files a
 3       form on the docket at the time of the plea so expressing.
 4              THE COURT:  I don't think you'll have to do that
 5       here.
 6              MR. ADOLF:  Very good.  That's all, Your Honor.
 7              THE COURT:  Okay.  Thank you very much, Counsel.
 8              MR. ADOLF:  Thank you.
 9              THE COURT:  I'll talk to you all again.
10              MR. JAMES:  Thank you.
11              THE COURT:  The Court will be in recess.
12                  (Whereupon the hearing was
13                   concluded at 10:44 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

**JA51**

1        <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3            I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        **NOTE:**  This hearing was held remotely by Zoom or some

9    other virtual platform and is subject to the technological

10    limitations of court reporting remotely.

11            Dated this 11th day of April, 2021.

12

13
                        <u>/s/Lisa A. Moreira, RDR, CRR</u>
14                        Official Court Reporter
                        United States Courthouse
15                        Room 6718
                        333 Constitution Avenue, NW
16                        Washington, DC 20001

17

18

19

20

21

22

23

24

25

**JA52**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-00315 (RCL)** |
| v. | : | |
| | : | |
| JAMES LITTLE, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence James Little ("Little") to a 1-month term of incarceration 36 months' probation, 60 hours of community service, and pursuant to the plea agreement order Little to pay $500 in restitution.

## I.      Introduction

Little, a former truck driver and current employee at a patio furniture store in Conover, North Carolina and part time restaurant food deliverer in Claremont, North Carolina, participated in the January 6, 2021 attack on the United States Capitol — a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Little pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 1 month incarceration 36 months' probation, and $500 in restitution, is appropriate in this case because: (1) Little unlawfully

1

**JA53**

entered the United States Capitol ("the Capitol") although he admitted seeing law enforcement officers deploy tear gas and supposedly fire rubber bullets to disperse rioters attempting to enter the Capitol, (2) Little penetrated the Capitol all the way to the Senate Gallery where he took photographs of himself and sent the photographs to trusted friends, (3) while in the Capitol Little fist bumped other rioters in celebration of their breach of the Capitol, (4) while also in the Capitol, Little sent a text to an individual in which he boasted, "We just took the Capitol," and minutes later sent another text stating, "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!", and (5) in November 2020 Little uploaded a video titled, "We Won't Beat Them Next Time! There Won't Be A Next Time! It's Now Or Never!" to a YouTube channel he maintains in which he threatened civil war and gun violence against political opponents of the former President if the Supreme Court did not intervene in the election on the former President's behalf and once more referenced civil war between during a January 13, 2021 interview.  The Court must consider that Little's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the U.S. Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, Little participated in a riot that actually contributed to the halting of the Congressional certification combined with Little's entry into the Senate Gallery and his lack of remorse demonstrates a probation only sentence is not warranted and a 1-month term of incarceration, 36 months' probation, and $500 in restitution is both necessary and appropriate in this case.

2

**JA54**

## II.    Factual and Procedural Background

*Little's November 30, 2020, YouTube Video*

Little maintains a presence on social media, including a YouTube channel named, "Little Drummer Boy 1970 Little."  ECF No. 29, ¶ 54.  Little uploaded a 22 minute, 54 second video on November 30, 2020, titled: "We Won't Beat Them Next Time! There Won't Be A Next Time! It's Now Or Never!"  *See* https://www.youtube.com/watch?v=K_MbUM3TL04 (last viewed on January 28, 2022).    According to the Presentence Report, Little had 83 subscribers.  *Id.*  During a portion of the video Little warned the Democratic Party of civil war if the United States Supreme Court did not support the former President because conservative law enforcement officials, members of the United States military, and conservative supporters of the former President "owned lots of guns and God forbid we'd ever have to use it on you."  *Id.* at 14:28-17:52.

*The January 6, 2021, Attack on the Capitol*

To avoid exposition, the Government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 26 (Statement of Offense), at 1-4. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*James Little's Role in the January 6, 2021, Attack on the Capitol*

Little stated that on January 5, 2021, he traveled to Washington, D.C., from his home in North Carolina to attend the "Stop the Steal" rally.  Little traveled to Washington, D.C. with an uncharged female companion whom he refused to identify when later interviewed by FBI Agents on January 13, 2021, because he asserts his companion did not enter restricted grounds.   On the

3

**JA55**

evening of January 5, 2021, Little became uneasy and believed that he might have to fight members of Antifa on January 6, 2021.

On January 6, 2021, Little attended the former President's rally. Afterwards, Little walked to the Capitol. While in route to the Capitol, Little called his mother, and learned that she just had a medical emergency and was being tended to by emergency medical personnel. Little did not attempt to turn back and return to North Carolina.

According to Little, he was 100 yards away from the U.S. Capitol when he saw law enforcement officers deploy tear gas and supposedly fire rubber bullets into the crowd. Little claimed supporters of Antifa and Black Lives Matter pretending to be supporters of the former President led the former President's supporters into the Capitol. Little saw protesters climb the scaffolding and stairs. Little stated he entered the Capitol through an entrance under the scaffolding. Little asserts law enforcement officers did not seek to prevent him from entering the Capitol. He then walked through the Capitol Building taking photographs, including of the Rotunda. Little fist-bumped and smiled at other rioters inside the Capitol as he excitedly walked through what he referred to in his statement to the FBI Agents as "hallowed ground."

4

**JA56**





[1]    Little claimed

---

[1] Little referred to the Senate Gallery as the Senate Chamber in his statement to the FBI Agents. Exhibit 1, the screen captured CCTV footage, demonstrates Little exited the Senate Gallery. The exhibit was provided to defense Little in discovery. The Senate camera number and other identifying information has been removed.

5

**JA57**

he then exited the Capitol where he and others prayed on the Capitol steps and sang "We're Not Gonna Take it," by Twisted Sister.[2]

<div align="center"><em>Little's January 13, 2021, Interview</em></div>

On January 13, 2021, Little consented to an interview with FBI Agents. As noted above, Little blamed D.C. and Capitol Police for antagonizing the crowd, blamed supporters of Antifa and Black Lives Matter for leading supporters of the former President to commit violence and stated that he believes a civil war between Americans of differing political affiliations will take place because the former President won the popular vote. Little's statements referencing civil war were similar to his references to civil war made during his November 30, 2020 uploaded YouTube video titled, "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!"

During the Rule 11 hearing, Little admitted that knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building. ECF No. 26 (Statement of Offense) at 4-5: ECF No. 29 (Presentence Report ("PSR")) at ¶¶ 4, 6-7, 22.

<div align="center"><em>The Charges and Plea Agreement</em></div>

On March 15, 2021, the Government filed a Complaint that charged Little with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 24, 2021, FBI agents arrested Little at his home in North Carolina. On April 23, 2021, the Government filed a four-count Information that charged Little with violating 18 U.S.C. §§ 1752(a)(1) and (2), and

---

[2] The song "We're Not Gonna Take it" is contained on Twisted Sister's 1984 album titled "Stay Hungry." https://www.discogs.com/master/68247-Twisted-Sister-Stay-Hungry (last viewed on January 28, 2022).

<div align="center">6</div>

<div align="center">**JA58**</div>

40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 16, 2021, Little pleaded guilty to Count Four of the Information, which charged Little with violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  Pursuant to Paragraph 10 of the Plea Agreement, Little agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Little now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Little faces up to six months of imprisonment and a fine of up to $5,000. Little must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of a period of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of

7

**JA59**

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. Indeed, Little admittedly saw tear gas as he approached the Capitol. No rioter was a mere tourist that day. And Little is no exception.

Additionally, while looking at each individual conduct, the Court should assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Little personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or

8

**JA60**

destructive acts on the part of Little is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Little from most other misdemeanor defendants. Little's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Here, Little marched to the Capitol and saw law enforcement officers deployed tear gas against protesters in a restrictive area. This did not dissuade Little from participating in the disorder. Nor did protesters scaling the scaffolding to unlawfully enter the Capitol or his mother's medical emergency convince him to turn back. Once inside Little fist-bumped other rioters as he eventually made his way to the Senate Gallery. Once there, he took photographs of himself that he sent to trusted friends. Little also boasted to others during and after the attack that, "We took the Capitol." He also wrote, "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!" These statements demonstrate a lack of remorse.

Little's statements on January 13 further showed a lack of remorse. When FBI agents interviewed him, Little attributed acts of violence to Antifa and Black Lives Matter. Little also blamed law enforcement officers sworn to protect the Capitol for antagonizing the crowd when the officers struggled to maintain order. Further, Little blamed those officers for failing to prevent him from entering the Capitol. Moreover, Little entering the Senate Gallery is another aggravating factor because in doing so he entered a sensitive area in the Capitol where the certification process had been underway until rioters began their assault on the Capitol.

Additionally, prior to the Capitol breach and in his January 13 statement, Little justified the use political violence if the former President was not returned to office.

The Government recognizes that not all of the circumstances of Little's offense are aggravating. He did not engage in extensive planning. He does not appear to have been a member

9

**JA61**

of any organized groups and traveled to the Capitol on his own. The Government has no information suggesting he destroyed evidence or personally defied law enforcement. But the possibility that Little could have done something worse does not change the fact that what he did do that day establishes a need for incarceration. His baseline conduct, breaching the Capitol, is serious: the riot could not have succeeded without the efforts of even more minor contributors like Little. Little's conduct calls for a period of incarceration. Nor does the fact that Little is a primary caretaker of his mother act as factor warranting a non-incarceration sentence. According to the Presentence Report, Little has three siblings who all reside in North Carolina. ECF No. 29 at ¶ 39. Further, Little maintains regular contact with his siblings. *Id.* As such, there is no basis to believe that these siblings could not provide support if the Court sentences Little to a term of incarceration.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Little's criminal history consists of convictions for infractions and a misdemeanor arising out of alcohol and traffic offenses: Prearranged Speed Competition, ECF No. 29, ¶ 29; Speeding, ECF No. 29, ¶¶ 32-33; alcohol-related convictions, i.e., a misdemeanor conviction for Consume Malt Beverage on Unauthorized Property and an infraction, Possession of Malt Beverage or Unfortified Wine by a Person of 19 or 20, ECF No. 29, ¶ 30: and Driving While Impaired and Civil Revocation of Driver License, ECF No. 29, ¶ 34.

Little was employed as a truck driver for 25 years. ECF No. 29, ¶ 62. He is currently employed at a furniture store in Conover, North Carolina, and as a part time food delivery driver for a restaurant in Claremont, North Carolina. *Id.*

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

**General Deterrence.**

The demands of general deterrence weigh in favor of a term of incarceration and a term of probation in cases where a defendant has pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G ), Parading, Demonstrating, or Picketing in a Capitol Building confinement. Indeed, general deterrence may be the most compelling reason to impose a sentence of a term of incarceration and

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

**JA63**

a term of probation because such defendants contributed to the lawlessness, public disorder, and drained limited law enforcement resources needed to combat the more violent rioters. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

*Tr.* at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher,* 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. Contrary to Little's claims to the FBI Agents that interviewed him, this was not a peaceful protest that got out of hand because of Antifa, Black Lives Matter, or measures taken by the police to repel rioters in deploying tear gas. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of

First Amendment rights.") (statement of Judge Moss). And it is important to convey to future

potential rioters—especially those who intend to improperly influence the democratic process—

that their actions will have consequences. There is possibly no greater factor that this Court must

consider.

**Specific Deterrence.**

Little's actions, statements justifying political violence on his YouTube channel,

statement to the FBI in which he deflected blame for the riots, and statements to others during the

rioting celebrating the Capitol breach clearly demonstrate the need for specific deterrence. Little

marched to the Capitol despite believing beforehand that there would be violence. He continued

to press forward despite news of his mother's illness and the deployment of tear gas by law

enforcement officers attempting to keep order. Once inside he fist-bumped other rioters in

celebration of the breach of the Capitol, wrote to others, "We just took the Capitol." Little also

wrote, "We are stopping treason! Stealing elections is treason! We're not going to take it

anymore!" Further, he strode unlawfully through the Capitol taking photographs in the Rotunda

and other areas before entering the Senate Gallery where he took a photograph of himself.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the Government has charged hundreds of individuals for their roles

in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the

backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum

---

[4] Attached to this sentencing memorandum is Exhibit 2, a table providing additional information
about the sentences imposed on other Capitol breach defendants. That table also shows that the
requested sentence here would not result in unwarranted sentencing disparities.

**JA65**

that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[5] Indeed, the Court admonition in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19, "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *Id.*

　　Little has pleaded guilty to Count Four of the Information, charging him with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(D). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

　　For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol,

---

[5]　Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd,* 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-0097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The Government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

14

**JA66**

how long a defendant remained inside, the nature of any statements a defendant made (on social media or otherwise), whether a defendant destroyed evidence of his or her participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the Government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed in cases involving sensitive areas.  In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all

**JA67**

the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration.  Further, in *United States v. Charles Pham*, No. 21-cr-109 (TJK), Charles Pham entered an office space for which he was sentenced to 45 days' imprisonment.  *Id.*, ECF No. 36, at 2.  A facet in the Pham case similar to the instant matter before the Court is that Pham, like Little, saw confrontations between rioters and police but nevertheless entered the Capitol. Moreover, in *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Mazzocco, like Little, pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside a sensitive area, the Spouse's Lounge of the Capitol, and Judge Chutkan sentenced Mazzocco to 45 days of incarceration. Mazzocco, like Little, took photographs of himself during the riot.  Gov. Sentencing Mem., Mazzocco, 21-cr-54, ECF No. 28 at 2, 12.  Lastly, in *United States v. Courtright*, No. 21-cr-72 (CRC), a misdemeanant who reached the Senate Floor, even though she appeared to not have known where she was, also received a sentence of 30 days' incarceration and a 1-year term of supervised release.  *Id.*

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender*." United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

16

**JA68**

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    The Court's Authority to Impose a Split Sentence

The sentence requested by the Government—1 month incarceration and 36 months' probation—is a lawful one.  A sentencing court may impose a "split sentence" — "a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted) — for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3).  In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### i.    Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[6] followed by a term of probation.

---

[6] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part V(b) *infra*.

**JA69**

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[7] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section

---

[7] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

    *ii.*       *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight

imprisonment," consistent with the general rule in Section 3551(b).   *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty

20

**JA72**

offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one."). When Congress enacted the general

prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout

for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 18 (recounting

statutory history). That carveout does not "void" the general prohibition on split sentences in

Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by

the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia &

Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences

"govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts

with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-

enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where

provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict

constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a

conflict exists "between a general provision and a specific one, whichever was enacted later might

be thought to prevail." *Id.* at 185. "The 'specific provision'—here Section 3561(a)(3)—"does

not negate the general one entirely, but only in its application to the situation that the specific

provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more

specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose

between probation and imprisonment when imposing a sentence for a petty offense," *United States

v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is

not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense

22

**JA74**

case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 18, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Limit pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

23

**JA75**

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

> ### b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.*

> #### i. *Relevant Background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant:

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[8]

> #### ii. *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests

---

[8] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

24

**JA76**

that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); Forbes, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10). That would be an appropriate sentence in this case.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the Government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the Government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

25

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of home detention. Balancing these factors, the Government recommends that this Court sentence Little to a 1-month term of incarceration, 36 months' probation, 60 hours of community service, and pursuant to the plea agreement order Little to pay $500 in restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior. Lastly, pursuant to the plea agreement, the Government request at the conclusion of the sentencing hearing that the Court dismiss Counts One through Three of the Information.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ MICHAEL G. JAMES
Michael G. James
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-D.C.)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov

</div>

**JA78**

**CERTIFICATE OF SERVICE**

This is to certify that undersigned counsel for the Government served a copy of the

foregoing Sentencing Memorandum on counsel of record for the Defendant via CM/ECF.

By:    /s/ <u>MICHAEL G. JAMES</u>
           Michael G. James
           Assistant United States Attorney
           N.Y. Reg. No. 2481414
           Office of the United States Attorney
           Eastern District of North Carolina
           (on detail to the USAO-D.C.)
           150 Fayetteville Street, Suite 2100
           Raleigh, NC 27601
           Mike.James@usdoj.gov



EXHIBIT ONE – Screen capture of CCTV footage of Little exiting the Senate Gallery

Table 1: Cases in which the government recommended a probation sentence without home detention[1]

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Morgan-Lloyd, Anna | 1:21-CR-00164-RCL | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 36 months' probation, 120 community service hours, $500 restitution |
| Ehrke, Valerie | 1:21-CR-00097-PLF | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 36 months' probation, $500 restitution |
| Bissey, Donna | 1:21-CR-00165-TSC | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 14 days incarceration, 60 hours community service, $500 restitution |
| Hiles, Jacob | 1:21-CR-00155-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 60 hours community service, $500 restitution | 24 months' probation, 60 hours community service, $500 restitution |
| Wangler, Douglas | 1:21-CR-00365-DLF | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 24 months' probation, 60 hours of community service, $500 restitution |
| Harrison, Bruce | 1:21-CR-00365-DLF | 40 U.S.C. § 5104(e)(2)(G) | 48 months' probation, 40 hours community service, $500 restitution | 24 months' probation, 60 hours of community service, $500 restitution |

Table 2: Cases in which the government recommended a probation sentence with home detention

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
|  |  |  |  |  |

---

[1] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

EXHIBIT TWO - Table of probation HD incarceration sentences.

| | | | | |
|---|---|---|---|---|
| Bustle, Jessica | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 40 hours community service, $500 restitution | 2 months of home detention, 24 months' probation, 40 hours community service, $500 restitution |
| Bustle, Joshua | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 40 hours community service, $500 restitution | 1 month home detention, 24 months' probation, 40 hours community service, $500 restitution |
| Doyle, Danielle | 1:21-CR-00324-TNM | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 probation | 2 months' probation, $3,000 fine, $500 restitution |
| Bennett, Andrew | 1:21-CR-00227-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 3 months of home detention, 24 months' probation, 80 hours community service, $500 restitution |
| Mazzocco, Matthew | 1:21-CR-00054-TSC | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 45 days incarceration, 60 hours community service[2], $500 restitution |
| Rosa, Eliel | 1:21-CR-00068-TNM | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution | 12 months' probation, 100 hours community service, $500 restitution |
| Gallagher, Thomas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, a fine, and $500 restitution | 24 months' probation, 60 hours community service, $500 restitution |
| Vinson, Thomas | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 3 years' probation, 60 hours community service, $500 restitution | 5 years' probation, $5,000 fine, $500 restitution, 120 hours community service |

---

[2] The government believes the Court's 10/4/2021 minute entry in this case is incorrect and the sentence requires 60 *hours* of community service, not 60 *months*.

2

**JA82**

EXHIBIT TWO - Table of probation HD incarceration sentences.

USCA Case #24-3011      Document #2049915      Filed: 04/16/2024      Page 87 of 356

| | | | | |
|---|---|---|---|---|
| Dillon, Brittiany | 1:21-CR-00360-DLF | 40 U.S.C. § 5104(e)(2)(D) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months home detention, 3 years' probation, $500 restitution |
| Sanders, Jonathan | 1:21-CR-00384-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 36 months' probation, 60 hours community service, $500 restitution |
| Fitchett, Cindy | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Sweet, Douglas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Cordon, Sean | 1:21-CR-00269-TNM | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months' probation, $4000 fine |
| Wilkerson, John IV | 1:21-CR-00302-CRC | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 36 months' probation, $2500 fine, 60 hours community service, $500 restitution |
| Jones, Caleb | 1:21-CR-00321-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months home detention, 24 months' probation, $500 restitution, 100 hours community service |
| Brown, Terry | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, $500 restitution, 60 hours community service |
| Wrigley, Andrew | 1:21-CR-00042-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 18 months' probation, $2000 fine, $500 restitution, 60 hours community service |

**JA83**

EXHIBIT TWO - Table of probation HD incarceration sentences.

| Parks, Jennifer | 1:21-CR-00363-CJN | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution | 24 months' probation, $500 restitution, 60 hours community service |
|---|---|---|---|---|
| Reimler, Nicholas | 1:21-CR-00239-RDM | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Miller, Brandon | 1:21-CR-00266-TSC | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 20 days incarceration, 60 hours community service, $500 restitution |
| Miller, Stephanie | 1:21-CR-00266-TSC | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 14 days incarceration, 60 hours community service, $500 restitution |
| Hatley, Andrew | 1:21-CR-00098-TFH | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 36 months' probation, $500 restitution |
| Pert, Rachael | 1:21-CR-00139-TNM | 18 U.S.C. § 1752(a)(1) | 3 months home detention, 24 months' probation, 40 hours community service, $500 restitution | 24 months' probation, 100 hours community service, $500 restitution |
| Winn, Dana | 1:21-CR-00139-TNM | 18 U.S.C. § 1752(a)(1) | 3 months home detention, 24 months' probation, 40 hours community service, $500 restitution | 10 days incarceration (weekends), 12 months' probation, 100 hours community service, $500 restitution |
| Wickersham, Gary | 1:21-CR-00606-RCL | 40 U.S.C. § 5104(e)(2)(G) | 4 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 3 months home detention, 36 months' probation, $2000 fine, $500 restitution |
| Schwemmer, Esther | 1:21-CR-00364-DLF | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution | 24 months' probation, 60 hours community service, $500 restitution |

EXHIBIT TWO - Table of probation HD incarceration sentences.

| Kelly, Kenneth | 1:21-CR-00331-CKK | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months home detention, 12 months' probation, 60 hours community service, $500 restitution |
| Straka, Brandon | 1:21-cr-00579-DLF | 40 U.S.C. § 5104(e)(2)(D) | 4 months home detention 3 years probation | 3 months home detention 3 years probation |
| Sizer, Julia | 1:21-CR-00621-CRC | 40 U.S.C. § 5104(e)(2)(G) | 60 days home detention 3 years probation | 12 months probation $2,000 fine |
| Blauser, William | 1:21-CR-00386-TNM | 40 U.S.C. § 5104(e)(2)(G) | 90 days home detention 3 years probation | $500 fine |

Table 3: Cases in which the government recommended a sentence of incarceration

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Curzio, Michael | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | Not applicable | 6 months incarceration (time served), $500 restitution |
| Hodgkins, Paul | 1:21-CR-00188-RDM | 18 U.S.C. § 1512(c)(2) | 18 months incarceration | 8 months incarceration, 24 months' supervised release, $2000 restitution |
| Dresch, Karl | 1:21-CR-00071-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 6 months incarceration (time served), $500 restitution | 6 months incarceration (time served), $500 restitution |
| Jancart, Derek | 1:21-CR-00148-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months incarceration, $500 restitution | 45 days incarceration, $500 restitution |
| Rau, Erik | 1:21-CR-00467-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months incarceration, $500 restitution | 45 days incarceration, $500 restitution |
| Hemenway, Edward | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 45 days incarceration, 60 hours community service, $500 restitution |
| Reeder, Robert | 1:21-CR-00166-TFH | 40 U.S.C. § 5104(e)(2)(G) | 6 months incarceration, $500 restitution | 3 months incarceration, $500 restitution |
| Bauer, Robert | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 45 days incarceration, 60 hours community service, $500 restitution |
| Smocks, Troy | 1:21-CR-00198-TSC | 18 U.S.C. § 875(c) | Low end of sentencing guidelines as determined by | 14 months incarceration, 36 months supervised release |

**JA85**

EXHIBIT TWO - Table of probation HD incarceration sentences.

| | | | the court, 36 months supervised release | |
|---|---|---|---|---|
| Vinson, Lori | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 5 years' probation, $5,000 fine, $500 restitution, 120 hours community service |
| Griffith, Jack | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 3 months incarceration, $500 restitution | 90 days home detention, 36 months' probation, $500 restitution |
| Torrens, Eric | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 2 weeks incarceration, $500 restitution | 90 days home detention, 36 months' probation, $500 restitution |
| Gruppo, Leonard | 1:21-CR-00391-BAH | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 90 days home detention, 24 months' probation, $3,000 fine, $500 restitution |
| Ryan, Jenna | 1:21-CR-00050-CRC | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 60 days incarceration, $1000 fine, $500 restitution |
| Croy, Glenn | 1:21-CR-00162-BAH | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 90 days home detention, 14 days community correctional facility, 36 months' probation, $500 restitution |
| Stotts, Jordan | 1:21-CR-00272-TJK | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 60 days home detention, 24 months' probation, $500 restitution, 60 hours community service |
| Fairlamb, Scott | 1:21-CR-00120-RCL | 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1) | 44 months incarceration, 36 months' supervised release, $2000 fine | 41 months incarceration, 36 months supervised release, $2000 restitution |
| Camper, John | 1:21-CR-00325-CKK | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 60 days incarceration, $500 restitution, 60 hours community service |
| Rukstales, Bradley | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Cordon, Kevin | 1:21-CR-00277-TNM | 18 U.S.C. § 1752(a)(1) | 30 days incarceration, 12 months supervised release, $500 restitution | 12 months' probation, 100 hours community service, $4000 fine, $500 restitution |
| Chansley, Jacob | 1:21-CR-00003-RCL | 18 U.S.C. § 1512(c)(2) | 51 months incarceration, 36 months supervised release, $2000 restitution | 41 months incarceration, 36 months supervised release, $2000 restitution |
| Mish, David | 1:21-CR-00112-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |

**JA86**

USCA Case #24-3011      Document #2049915      Filed: 04/16/2024      Page 91 of 356

| Lolos, John | 1:21-CR-00243-APM | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 14 days incarceration, $500 restitution |
|---|---|---|---|---|
| Scavo, Frank | 1:21-CR-00254-RCL | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 60 days incarceration, $5000 fine, $500 restitution |
| Abual-Ragheb, Rasha | 1:21-CR-00043-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 60 days home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Peterson, Russell | 1:21-CR-00309-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Simon, Mark | 1:21-CR-00067-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 35 days incarceration, $500 restitution |
| Ericson, Andrew | 1:21-CR-00506-TNM | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 20 days incarceration (consecutive weekends), 24 months' probation, $500 restitution |
| Pham, Tam Dinh | 1:21-CR-00109-TJK | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 45 days incarceration, $1000 fine, $500 restitution |
| Nelson, Brandon | 1:21-CR-00344-JDB | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 24 months' probation, $2500 fine, $500 restitution, 50 hours community service |
| Markofski, Abram | 1:21-CR-00344-JDB | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 24 months' probation, $1000 fine, $500 restitution, 50 hours community service |
| Marquez, Felipe | 1:21-CR-00136-RC | 18 U.S.C. § 1752(a)(2) | 4 months incarceration, 1 year supervised release, $500 restitution | 3 months home detention, 18 months' probation, $500 restitution |
| Meredith, Cleveland | 1:21-CR-00159-ABJ | 18 U.S.C. § 875(c) | Midrange of 37-46 months incarceration | 28 months incarceration, 36 months supervised release |
| Sorvisto, Jeremy | 1:21-CR-00320-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Mariotto, Anthony | 1:21-CR-00094-RBW | 40 U.S.C. § 5104(e)(2)(G) | 4 months incarceration, 36 months' probation, $500 restitution | 36 months' probation, 250 hours community service, $5000 fine, $500 |
| Courtright, Gracyn | 1:21-CR-00072-CRC | 18 U.S.C. 1752(a)(1) | 6 months incarceration, 12 months' supervised release, 60 hours community service, $500 restitution | 1 month incarceration, 12 months' supervised release, 60 hours community service, $500 restitution |

**JA87**

EXHIBIT TWO - Table of probation HD incarceration sentences.

USCA Case #24-3011      Document #2049915      Filed: 04/16/2024      Page 92 of 356

| Palmer, Robert | 1:21-CR-00328-TSC | 18 U.S.C. § 111(a) and (b) | 63 months incarceration, 36 months supervised release, $2000 restitution | 63 months incarceration, 36 months supervised release, $2000 restitution, |
| Thompson, Devlin | 1:21-CR-00461-RCL | 18 U.S.C. § 111(a) and (b) | 48 months incarceration, 36 months supervised release, $2000 restitution | 46 months incarceration, 36 months supervised release, $2000 restitution |
| Edwards, Gary | 1:21-CR-00366-JEB | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, 24 months' probation, $500 restitution | 12 months' probation, $2500 fine, 200 hours of community service, $500 restitution |
| Tutrow, Israel | 1:21-CR-00310-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 2 months home detention, 36 months' probation, $500 restitution |
| Ridge IV, Leonard | 1:21-CR-00406-JEB | 18 U.S.C. § 1752(a)(1) | 45 days incarceration, $500 restitution | 14 days consecutive incarceration, $1000 fine, 1 year supervised release, 100 hours community service, $500 restitution |
| Perretta, Nicholas | 1:21-CR-00539-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Vukich, Mitchell | 1:21-CR-00539-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Spencer, Virginia | 1:21-CR-00147-CKK | 40 U.S.C. § 5104(e)(2)(G) | 3 months incarceration, 36 months' probation, $500 restitution | 90 days incarceration, $500 restitution |
| Kostolsky, Jackson | 1:21-CR-00197-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days home detention, 36 months' probation, $500 restitution |
| Rusyn, Michael | 1:21-CR-00303-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 60 days home detention, 24 months' probation, $2000 fine |
| Tryon, William | 1:21-CR-00420-RBW | 18 U.S.C. § 1752(a)(1) | 30 days incarceration, 12 months supervised release, $500 restitution | 50 days incarceration, 12 months supervised release, $1000 fine, $500 restitution |
| Sells, Tanner | 1:21-CR-00549-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, 36 months' probation, 60 hours community service, $500 restitution | 90 days incarceration, 24 months' probation, 50 hours community service, $1500 fine, $500 restitution |
| Walden, Jon | 1:21-CR-00548-DLF | 40 U.S.C. § 5104(e)(2)(G) | At least two weeks incarceration, 60 hours | 30 days home detention, 36 months' probation, 60 hours community service, $500 restitution |

**JA88**

EXHIBIT TWO - Table of probation HD incarceration sentences.

| | | | community service, $500 restitution | |
|---|---|---|---|---|

USCA Case #24-3011        Document #2049915        Filed: 04/16/2024        Page 93 of 356

EXHIBIT TWO - Table of probation HD incarceration sentences.

USCA Case #24-3011      Document #2049915      Filed: 04/16/2024      Page 94 of 356

| Wiedrich, Jacob | 1:21-CR-00581-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months incarceration, 36 months' probation, $500 restitution | 3 months home detention, 36 months' probation, 100 hours community service, $500 restitution |
|---|---|---|---|---|
| Stepakoff, Michael | 1:21-CR-00096-RC | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration | 2 months home detention 12 months probation; $500 restitution; $742 fine |
| Scirica, Anthony | 1:21-CR-00457-CRC | 40 U.S.C. § 5104(e)(2)(G) | 15 days incarceration; 4 months' home detention | 15 days incarceration $500 restitution; $500 fine |
| Crase, Dalton | 1:21-CR-00082-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration 36 months probation | 15 days intermittent incarceration as a condition of 36 months probation; $500 restitution; 60 hours community service |
| Williams, Troy | 1:21-CR-00082-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration 36 months probation | 15 days intermittent incarceration as a condition of 36 months probation; 60 hours community service |
| Languerand, Nicholas | 1:21-CR-00353-JDB | 18 U.S.C. § 111 (a) and (b) | 51 months incarceration 36 months supervised release | 44 months incarceration 24 months supervised release |
| Wilson, Zachary | 1:21-CR-578 - APM | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration 36 months probation | 24 months probation; 45 days home detention; 60 hours community service; $500 restitution |
| Wilson, Christine | 1:21-CR-578 - APM | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration 36 months probation | 24 months probation 30 days home detention; 60 hours community service; $500 restitution |
| McAuliffe | 1:21-CR-608 - RCM | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration 36 months probation | 36 months probation; 60 days home detention; 60 hours community service; $500 restitution |

1              UNITED STATES DISTRICT AND BANKRUPTCY COURTS
                    FOR THE DISTRICT OF COLUMBIA

2

3    UNITED STATES OF AMERICA        Criminal No.  21-CR-00315

4         v.                         Washington, D.C.

5    JAMES LITTLE,                   March 14, 2022

6              Defendant.            10:00 a.m.

7    --------------------------/

8                   TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE ROYCE C. LAMBERT
9               UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:   DOJ-USAO
                           By: MICHAEL G. JAMES, ESQUIRE
12                         310 New Bern Avenue
                           Suite 800
13                         Raleigh, North Carolina 27601

14

15

16   For the Defendant:    Federal Public Defender
                           By: PETER S. ADOLPH, ESQUIRE
17                         129 West Trade Street
                           Suite 300
18                         Charlotte, North Carolina 28202

19

20
     Court Reporter        Lisa K. Bankins RMR FCRR RDR
21                         United States District Court
                           District of Columbia
22                         333 Constitution Avenue, NW
                           Washington, D.C. 20001
23

24

25   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.

                                                              1

**JA91**

```
 1                  P R O C E E D I N G S
 2            THE CLERK:  Your Honor, we're on the record for
 3   Criminal Case 21-315, United States of America versus
 4   James Little.  Will counsel please identify yourselves for
 5   the record?  Starting with the government.
 6            MR. JAMES:  Michael James for the United States,
 7   Your Honor.
 8            MR. ADOLPH:  Peter Adolph for Mr. Little, Your
 9   Honor.
10            THE COURT:  Okay.  Mr. Little, can you hear me
11   okay?
12            THE DEFENDANT:  Yes, Your Honor.
13            THE COURT:  Okay.  I take it there's no dispute
14   over the final presentence report and both sides are
15   prepared to go forward this morning.  Am I correct?
16            MR. JAMES:  Yes, Your Honor.
17            MR. ADOLPH:  Yes, Your Honor.
18            THE COURT:  All right.  The government may
19   allocute first.
20            MR. JAMES:  Thank you, judge.  Your Honor, in
21   this matter the United States is asking for the Court to
22   impose a sentence -- a split sentence of one month
23   incarceration and 36 months probation.  And we're asking
24   for that for the following reasons.  First, Your Honor,
25   the defendant's baseline conduct, that is, the actual plea
```

2

**JA92**

1  to which he pleaded guilty to, the parading under 5104.

2  Well, as the Court knows, the rioting of January 6th was a

3  serious matter.  And, of course, various defendants have

4  various roles in this offense.  Now some had a more

5  violent role than Mr. Little.  However, Mr. Little's role

6  was not insignificant because defendants like Mr. Little

7  caused the drain on the resources of law enforcement to

8  arrest and stop the more violent rioters because they had

9  to deal with individuals like Mr. Little.

10         Now in the case of Mr. Little, this is a case in

11  which Mr. Little when he went to Washington, D.C. on

12  January 5th, he went there already thinking there was

13  going to be violence.  He told the FBI agents that he

14  thought we'd have to fight Antifa and Black Lives Matter.

15         On the date of January 6th, he heard the speech

16  and he marched with others to the Capitol.  According to

17  his statement to the FBI, at about a hundred yards away

18  from the Capitol, he saw law enforcement officers deploy

19  tear gas.  He also asserted in his statement to the FBI

20  that he saw law enforcement officers fire rubber bullets

21  at the crowd to keep the protesters back.  He also saw

22  individuals climbing the scaffold to enter the Capitol.

23  Now none of that deterred him from what was coming.  None

24  of that deterred him from entering the Capitol illegally.

25         He also received a call from emergency medical

3

**JA93**

1    service personnel in North Carolina that his mother had

2    fallen ill.  And that itself didn't deter him.  I believe

3    the EMS individuals told him that his mother had

4    stabilized, but still his mother at the time I believe was

5    85 years old.  He didn't turn around and try to go back

6    and leave the event.  No.  He went into the Capitol

7    because that was what his desire was.

8           He entered at about 2:20 p.m. to the upper

9    terrace, above the upper terrace and he then walked into

10   the Capitol.  He was in the rotunda area.  He was fist

11   bumping and smiling at other rioters because they were

12   celebrating that they had stopped what he believed was a

13   steal of the general election.  He then went and made his

14   way to the senate gallery area.  He saw all the others

15   were going in.

16          And just to preface this, before Mr. Little got

17   there, the officers had tried to secure the doors to the

18   senate gallery.  They secured one door.  An officer had

19   attempted to secure another door and he was pushed back by

20   other rioters.  Now this was before Mr. Little got there.

21   So I'm not making the assertion that Mr. Little saw that.

22   I can't establish that part.  But they pushed another

23   officer away preventing him from securing the gallery and

24   then rioters started entering the gallery.  Mr. Little

25   then came along and he, too, entered the gallery with

4

**JA94**

1    other rioters.  He then took a photograph of himself while

2    in the gallery.

3              Now I note in the reply memorandum by -- excuse

4    me -- the response memorandum by Mr. Little's counsel that

5    he notes that Mr. Little would not have known that was the

6    senate gallery.  Well, when he entered the gallery, he

7    didn't immediately leave.  He was there for a number of

8    minutes.  He would have seen and he did see the floor of

9    the senate chamber because in his statements to the FBI,

10   he referred to it as the senate chamber.  He talked about

11   how small it actually was.  But he was looking down from

12   the gallery to the floor of the senate chamber.

13             And Mr. Little at some point left the senate

14   gallery.  I believe he re-entered briefly and then left

15   again and then he left the Capitol.  Once he got out of

16   the Capitol, he was on the Capitol steps and I believe he

17   and others were singing a song I noted it in our

18   memorandum by Twisted Sister, "We're Not Going To Take It

19   Anymore" and then he departed.  So that is his baseline

20   conduct.

21             Now Mr. Little prior to the January 6th rally

22   and the January 6th riot, Mr. Little and he still does I

23   believe maintain a YouTube channel called Little Drummer

24   Boy 1970.  And in a posting on November 30th, Mr. Little

25   made reference to civil war and then the context of it was

5

**JA95**

1    if the Supreme Court did not rule in favor of the former

2    president, that there were conservative members of the

3    military law enforcement and supporters of the former

4    president who had firearms.  And during the course of

5    that, he stated "and God forbid me to ever have to use

6    them on you," referring to what he referred to as members

7    of the political party opposing the former president.

8           And when he was interviewed by the FBI on

9    January 13th, that's the date that the FBI went to

10   interview him, it was of consent that interview with some

11   conditions.  Mr. Little had told the FBI agents he didn't

12   trust them because he believed they had tripped up General

13   Flynn and therefore, he interviewed with them, had to give

14   a little bit of consideration to it, but they couldn't ask

15   him followup questions on his interview.  And so they took

16   down what he had to say.

17          And during the course of that, as I relayed he

18   stated that he saw the law enforcement officers deploy

19   tear gas and according to him, fire rubber bullets.  He

20   saw the individuals climbing the scaffolding when he

21   entered.  The reference of civil war though he again

22   repeated that there will be a civil war between the

23   Americans and different political persuasions.  So that is

24   the nutshell basis of the government's recommendation,

25   judge.

6

**JA96**

1          THE COURT:  Anything else?

2          MR. JAMES:  No, Your Honor.

3          THE COURT:  Okay.  Mr. Adolf?

4          MR. ADOLPH:  Thank you, Your Honor.

5          I just have to start by saying that I feel

6  privileged and honored to be representing Les Little in

7  this matter.  I know that that is a corny thing that some

8  lawyers say in a lot of cases, particularly down here in

9  the south where I've been working for the last 15 or so

10  years.  But I've never said it before, never once in my 30

11  years of doing this.  And that's because this case is

12  different.  It's obviously different for the whole

13  country.  It's a unique experience for Mr. Little, the

14  like of which he's never been before and it's a unique

15  experience for me.  It's been a real opportunity for

16  personal and professional growth I have to say and that

17  means sometimes things that you don't expect or don't even

18  want.

19          I've represented people for the last three

20  decades on everything from DUI cases to capital murder and

21  everything in between.  Complex frauds, people stealing

22  last dime from old folks.  But I have never had a client

23  before who there are days that I'd wake up mad in the

24  morning at him, just annoyed at him and I don't really

25  know why even.  And I've had to really think about what it

1   is about this case that's not about him that makes me

2   angry sometimes in ways I don't even understand.

3          And I've had to look at that because, you know,

4   this is my first time appearing before, Your Honor.  This

5   is actually my first sentencing on video I've ever done

6   because down here in western North Carolina, we have been

7   live, in person throughout the pandemic.

8          THE COURT:  Yeah.  Yeah.

9          MR. ADOLPH:  I actually tried a jury trial a

10  year ago September in, you know, unvaccinated peak COVID

11  and, you know, nothing -- it's just in one room.  Nothing

12  on video or extra rooms or any of that.  So one

13  opportunity for professional growth I've had in this case

14  is getting to know a new courthouse culture.  I've never

15  appeared -- still haven't appeared in the District of

16  Columbia District Court.  But I have probably worked in

17  more places than any other public defender you will ever

18  meet.

19         I've worked in eight public defender offices in

20  four states.  County, state and federal.  I've done

21  everything from trials to appeals, post convictions, you

22  name it.  And what I have learned over those years and in

23  those different experiences is that every courthouse,

24  every courtroom has some culture.  The written law is just

25  the starting point really and everywhere you go, you know

1   what, judge, there are something like 17,000 courtrooms in

2   America.  And what I have found is that every judge does

3   it differently and every judge thinks that their way to do

4   it is the only way.  And they very often don't even know

5   what's going on down the hall because, of course, you're

6   on the bench while your colleagues are on the bench and

7   much less what's going on in the next county or the next

8   district.

9          So I've had to sort of come to grips with

10  figuring out how this all works, both in terms of the

11  procedure and in terms of the outcomes and what I learned

12  pretty early on is that it's not just this courthouse that

13  had some culture, this case has its own culture.  You

14  know, trying to keep up with these cases is drinking from

15  a fire hose basically.  I guess you're up to like 800

16  cases now.  Something like 600 misdemeanors.  I think I

17  read this morning that something close to 200 folks have

18  pled guilty.  Most of them are the misdemeanors.  And you

19  know what, that's more cases than my entire district

20  handles of all kinds of cases in two years.  Just these

21  related cases.  And I know that if I'm dealing with a fire

22  hose of information, I know the Court is and the

23  government is.

24         And I have kind of unusual sympathy for the

25  government in this case.  That's not something again that

9

**JA99**

1    I say very often.  But what I see is that if you just look

2    at the numbers and you look at the recommendations, if you

3    don't dig in and try to figure out what's happening in

4    these cases and what's happening in the Department of

5    Justice, you start to think why is the government randomly

6    asking for jail time for petty offenses when there are so

7    many cases where they don't and where the Court is

8    following those recommendations.  And I know there's lots

9    of, you know -- they have been saying in papers that they

10   don't want the default to be probation for these kinds of

11   cases.  But that was not always the government's position.

12            And I know that Mr. James is in the same

13   position I'm in.  He doesn't practice before this court

14   and he came into the case late.  We already had a plea

15   offer by that point and it was months in and I know he's

16   taking a bunch of cases at once.

17            But the problem is you're dealing with what is

18   sort of treated as a single case, 800 defendants.  There

19   are so many AUSA's involved from across the country, so

20   many levels of the Department of Justice, that really the

21   hardest thing for anybody to do is keep track of them and

22   make sure that the recommendations comport with 18 USC,

23   3553(a)(6).  It's never been as important as it is in this

24   case that similar defendants with similar records are

25   treated similarly as the statute demands.

10

**JA100**

1          And part of trying to figure out what the

2     culture of this case is as involved, you know, just trying

3     to sift through everything the judges are saying about

4     folks who are similarly situated to Mr. Little.  And it's

5     bizarre to me.  I've heard rhetoric even from Your Honor's

6     brethren and sisters on the bench that I've never heard

7     before, particularly in petty offense cases.  I've handled

8     a number of petty offenses.

9          I was the defender for a summer for Yosemite

10    National Park at the magistrates court out there in the

11    Eastern District of North Carolina and we'd go through

12    seven or eight petty offenses in a morning and be done by

13    lunch from start to finish in the entire case and nobody

14    got jail time.  That was never even an issue.  These are

15    petty offenses.

16         But what I heard was -- and it's important to

17    look at the sequence of events because I think the

18    government has tried to obscure it a little bit.  I was

19    surprised, frankly, when I got my plea offer for

20    Mr. Little and it did not include a recommendation of

21    probation because there had been a whole series of those

22    early on in the case.  I've identified about a half of

23    dozen of them.  Honestly, like I said, there's no way for

24    me to keep track of 600 misdemeanors at this point.  But

25    it was those early cases where the government was asking

1    for probation.  And I think it's important to look at what

2    the government was looking at then and how that changed.

3            Your Honor, in my sentencing memorandum, I

4    quoted an article in the Washington Post from I guess a

5    few weeks ago now, a month ago that included the people of

6    the District of Columbia and how the offense -- I'm

7    sorry -- the events of January 6th affected them

8    personally and they interviewed a reporter who sort of

9    embedded herself with the January 6th folks who were going

10   into the Capitol and was inside watching them.  And she

11   said something that I think is so important in this case.

12   It really goes to the heart of the problems with how these

13   cases are being handled.  And what she said was what

14   people don't understand is the diversity of people in

15   there and she said I'm not talking about racial diversity,

16   religious diversity, whatever; I'm talking about the

17   people who were in there, why they were in there and how

18   they were behaving.  There were certainly people in there

19   who were bent on acts of violence, who were angry and who

20   were looking to take out that anger on the people and the

21   property of the United States Capitol.  And then she said

22   there were a lot of people who just looked in her words

23   shell shocked to be in the building, like they had no idea

24   what they were doing in there, they couldn't even -- it

25   just sort of happened and they couldn't figure out how

12

**JA102**

1   they had been there.  People were asking her where the

2   bathroom is.  It was at that level.

3          And I think what you saw early in the cases was

4   the Department of Justice looking at this unprecedented

5   volume of cases, unprecedented volume of discovery and all

6   the mechanics that had to be dealt with on these cases and

7   looking at the people who were in there.  And, you know,

8   there's been a lot of criticism about how D.O.J. handled

9   these cases from early on.  And it just -- it amazed me.

10  Do people really think that Merrick Garland is somehow in

11  league with Donald Trump supporters and that he wants to

12  go easy on them?  It doesn't make any sense.

13         What was going on was the Department of Justice

14  looked at these cases and said, look, we've got a whole

15  mess of people that we have to deal with.  Some of those

16  people are dangerous people.  Some of those people

17  participated in conspiracies to overthrow the election.

18  Some of those people went in with building plans and

19  targets of where they were going and what they were trying

20  to do.  Some of those people showed up with guns and

21  nooses and zip ties and gas masks prepared for violence.

22  There were people who broke doors, broke windows, went

23  looking for people, went into private offices and stole

24  things and tore the place up.

25         And then there were a lot of people who were

13

**JA103**

1    just clueless, who were outside, saw open doors, went in

2    through the open doors, wandered around and wandered back

3    out.  And what the D.O.J. decided early on was we need to

4    concentrate on the folks who were dangerous and the rest

5    of them, get them through the system.  Misdemeanors,

6    pleas, probation.  Puts it on their record.  They're going

7    to suffer some consequences, but we need to save our

8    powder for the people who need it.  And I think that was

9    absolutely -- I think it was the right decision.  I think

10   it was the pinnacle of the kinds of decisions that we ask

11   prosecutors to make in terms of prosecutorial discretion,

12   in terms of using resources wisely and also recognizing

13   that, you know, whatever D.O.J. did in these cases, they

14   couldn't win because on the one hand, you are going to

15   have frankly, the large majority of the country who

16   thought that they were going too easy on folks.  And then

17   you have on the other side, our elected officials, the

18   same people who were in the building when people started

19   coming in.

20           I mean, you know, thanks to re-districting, my

21   next representative is probably going to be Madison

22   Cauthen.  And he's out there saying that the people who

23   are being held in pretrial detention are political

24   prisoners.  I mean you can't make this stuff up.

25           So I understand that D.O.J. was getting it from

14

**JA104**

1    every side and they decided to make these judgments and

2    part of that was because the problem is if you punish

3    everybody the same and if you punish people not for what

4    they actually did, but for what they think and what they

5    say, you are running into real problems, first of all,

6    with the First Amendment.  And second of all, if your goal

7    is to promote respect for the law, when you treat people

8    like a mob instead of as individuals, by all means, go

9    over after the people who broke things and hurt people and

10    had plans to go in there and disrupt the government and

11    knew they were going in from the day they showed up.  But

12    if you treat everybody the same, if you treat them as a

13    mob, what you are really doing is you are vindicating the

14    most paranoid fantasies of the conspiracy theories of the

15    people who show up.  That a lot of these folks are people

16    who don't think the government cares about them and don't

17    think that other people and other places they've never

18    been treat them like human beings.  And so making those

19    sensitive judgments, the D.O.J. decided early on they were

20    going to just get the pleas done.  The problem was by the

21    time it got to Mr. Little's plea, they had been getting

22    push back, not just from the public or from politicians,

23    but, frankly, from the judges of this court.

24         I mean I was just amazed at the things that the

25    media was reporting about judges saying that this needs to

15

**JA105**

1    hurt, talking to the -- to somebody who is being sentenced

2    for a petty offense.  Saying that we're -- that if we

3    don't punish these people, we are going to turn into a

4    banana republic.  And for trying to justify punishment for

5    somebody who committed a petty offense saying that, well,

6    they didn't actually break anything or they didn't plan to

7    do anything, they didn't bring weapons and violence, steal

8    anything, but their presence emboldened others to commit

9    violence.

10           And I understand that somebody who is as upset

11   on January 6th as anybody else in this country that it's

12   tempting to talk about this kind of collective

13   responsibility, but that's not what our legal system is

14   about.  There are legal systems in the world and in

15   history where we hold people accountable by virtue of

16   relationships or being in the same village or whatever,

17   that we believe in collective responsibility.  We don't

18   believe in that in the United States.  You're responsible

19   for your own actions.  If you conspire with other people,

20   then obviously, you have made yourself responsible for

21   other people's actions because that's what you wanted.

22   But we punish people individually.  That's what this is

23   supposed to be about.

24           And when you look at what Les Little did, he

25   walked in through open doors and I don't think this is

16

**JA106**

1    really seriously disputed, he didn't know what was going

2    on before those doors opened inside and --

3          THE COURT:  I can't agree with that.  He knew

4    exactly what was going on.  He saw -- from the

5    government's description of that evidence, he saw that

6    people were fighting with the police before he ever walked

7    in.  So I don't think you can mischaracterize it that way.

8    He walked through open doors.  They were open because the

9    police had been overwhelmed.  So don't misstate things

10   there.

11         MR. ADOLPH:  Your Honor, I'm going to play --

12   just so we're really clear because I really -- I don't --

13   I'm not saying that the government misstated what he said.

14   But what they did was pick little bits out of context and

15   just --

16         THE COURT:  I understand.  But he didn't walk

17   through open doors that were open voluntarily.  He walked

18   through open doors that were open because the police had

19   been overwhelmed and he saw it.  He knew that when he

20   walked through those doors.  So don't play him as some

21   innocent guy here.

22         MR. ADOLPH:  Judge, when I'm done speaking

23   shortly, I'm going to play the tape of his interrogation

24   by the FBI because I want his words to be a hundred

25   percent clear.  I think there's no dispute about the fact

17

**JA107**

1    that he was being a hundred percent honest with them and

2    the good and the bad.  And being honest, you will hear

3    things that will be upsetting when he talks about what he

4    saw and when he repeats a lot of the stuff that he's seen

5    on Fox News and social media and whatnot.  But it's a

6    pretty short interview and --

7                THE COURT:  Okay.

8                MR. ADOLPH:  -- it will be up to Your Honor to

9    characterize it for yourself.

10               So in any event, his words will speak for him

11   and I'll get to that.  But when we're talking about what

12   he actually did and the factors and, look, judge, I can't

13   account for every case.  And I don't have presentence

14   reports for all these other folks.  But I listed everybody

15   I could find who the government did recommend jail time

16   for and who judges went along with and those were 25 folks

17   who if you look through what they did, it is as bad or

18   worse than anything Les did.  And why did the government

19   recommend probation for those folks and judges go along

20   with it when they are recommending something differently

21   in his case?

22               And I hate last-minute filings, Your Honor.  I

23   hate doing them.  I hate getting them.  But I did file

24   something on Friday because I found out that on Thursday,

25   there was a sentencing in a higher grade of crime, Class A

18

**JA108**

 1    misdemeanor, that actually, you know, gives you the right

 2    to a jury trial.  That was otherwise pretty similar to his

 3    case in a lot of particulars.  But again that guy pled to

 4    a higher grade of crime.  Government recommended 14 days

 5    in jail and the judge rejected that and sentenced to

 6    probation.  So I'm doing what I can.  I apologize for the

 7    late filing.

 8          But what my point was that the recommendations

 9    we're getting seem to be based less on the original

10    considered judgment of the Department of Justice in trying

11    to deal with these cases, trying to separate out the

12    different levels of culpability and more with the huge

13    push back that they've gotten from, you know, the majority

14    of people in this country who were upset about this and I

15    count myself in that, Your Honor.  I don't think it's an

16    accident that there were mornings I was waking up mad at

17    Les Little at least when I first got the case and

18    certainly before I knew I was going to be representing

19    anybody on it.  I was as mad as anybody else.

20          So what are the criteria the government are

21    using and what should the Court be using?  I think what

22    they talked about in their pleadings and again here today

23    is the fact that he went in to the senate gallery as being

24    an aggravating factor that somehow separates him from the

25    other people who were wandering around inside the Capitol,

19

**JA109**

1   not knowing where they were.

2          And, judge, I was also privileged to take a tour

3   of the Capitol given by the Capitol Police a few weeks ago

4   so I could see what they were talking about.  And that is

5   absolutely -- it's the most confusing building I've ever

6   been in.  It's a maze.  The minute you get in there and

7   lose sight of the window by where you came in, you have no

8   idea where you are.  And people like Les had no idea they

9   were going in that day.  They didn't have blueprints in

10   advance or anything like that and you are immediately

11   lost.  I mean there is no way -- if I lost sight of the

12   police officers that were walking us around, I never could

13   have found where I came in nor found my way back out.

14          The senate gallery itself, what you're talking

15   about is you are walking down a big hallway, a main

16   hallway and there's a set of double doors.  There's no

17   marking that says it's the senate gallery.  There's no

18   marking that says it's a restricted area or anything else

19   about it.  It's actually kind of like experience of a

20   walking into a football stadium and you walk through a

21   door and all of a sudden the seats are all around you.

22   And if you are not paying attention to the signs or if

23   there are no signs, until you walk through that door, you

24   have no idea where you are.

25          And as I said in my memo, if you walk into

20

**JA110**

1     that -- you know, I guess that building sure was built in

2     a different era.  Things aren't like they are today.  And

3     I think if it was built today, you wouldn't have a public

4     gallery.  But looking at that architecture, the first

5     thing you think when you walk in is this is where the

6     people sit.  That's where he is.  He wasn't trying to go

7     down on the senate floor and tear anything up or sit in

8     anybody's chair or go through people's private notes.  He

9     was just wandering around, wandering in the door.  He was

10    amazed by the spectacle of this beautiful building and

11    this august chamber and was kind of stunned by it.  Stayed

12    in there for a little while.  I guess took a selfie and

13    wandered back out.  The idea that that in some way

14    distinguishes him from all those other folks who got

15    probation recommendations, I don't believe that comports

16    with the 3553(a) factors.  And particularly, Your Honor,

17    at the end, when I'm done talking, what you will hear Les'

18    description to the FBI a week after these incidents and he

19    hadn't talked to a lawyer or hadn't talked to anybody

20    about what he should say and was just trying to be honest

21    about what happened and how he felt about it.  And so

22    that's the senate gallery.

23            I think the rest of what the government talks

24    about, the YouTube channel and the social media post, I'm

25    not going to play the one video that they managed to find

21

**JA111**

1    from I guess a few weeks after the election, so months

2    before January 6th where he got on there and spent a few

3    minutes repeating slogans that he had heard on Fox News.

4    And, look, he was very candid with me.  And if you know

5    Les, you know that he's nothing but candid all the time.

6    He really is not capable of anything else.

7            But he told me back at that time he was

8    listening to seven hours of conservative talk radio every

9    day, just had it on all day and then at night he was

10   watching four or five Fox News shows on top of that.  And

11   when you see that and you see that one video he posted --

12   and you know what, most of his YouTube channel, judge,

13   that's the one video that the government pulled out.  The

14   rest of it is him and his dog trying to do a duet of "Who

15   Let The Dogs Out" I saw on there.  There was some footage

16   of his local, the Bunker Hill High School Marching Band

17   that was on there that he shot on his cell phone.  A video

18   of him out on his brother's boat.  And you know, it's kind

19   of cute.  Honestly, nobody paid much attention to it.  He

20   was sort of trying to get people to subscribe to his

21   channel.  It didn't really work out.  It didn't really

22   manage to connect with much.

23           But what the government is talking about is

24   looking at what people post on social media, look at the

25   things they said.  And again, we have to be careful with

22

1    that because there's a difference between looking at the

2    things people say and post to gauge is this a dangerous

3    person, is this a person who's likely to engage in

4    behavior or is it just stuff that makes us mad because I

5    know it makes me mad sometimes.  And the danger is that

6    that's when people get into their conspiracy theories and

7    think the government is attacking them because of their

8    political beliefs.  So I think it's very important to look

9    at not just the words, but the context and always keep in

10   mind what is this really telling me about this person?  Is

11   this a dangerous person?

12           Because you know that video the government

13   talked about from just after the election, you know, Lez

14   is -- he was trying to reach out and connect with people

15   as I'll talk about a little more.  And one of the people I

16   mentioned in my memo is a Qanon influencer.  I can't

17   remember his name now, Brandon something or other, who is

18   actually -- has thousands or millions of followers and is

19   exhorting people to go to the Capitol and was out on the

20   steps of the Capitol exhorting people to go in.  And I

21   guess he only got charged with a misdemeanor because he

22   didn't go in himself.  He was clever enough to convince

23   other folks to walk in while he kept his hands clean

24   outside.  You know what, government recommended probation

25   for him.  And contrast that with Les who posted this video

1    about his deep fears and feelings about the election and

2    how America was being taken away from him.  Do you know

3    how many likes he got on that, judge?  Two.  Not two

4    million.  Not two thousand.  Two people watched that video

5    and clicked the little like button under it as some sort

6    of show of support.

7            And I know in their memo, the government as they

8    have in all these cases, they talked about who are the

9    people that these folks communicated with while they were

10   inside and they talk about the text messages where he

11   texted somebody and said, you know, we just took the

12   Capitol and then they quote the fact that he then said,

13   you know, stealing elections is treason and you're going

14   to thank me.

15           And they never say much about what happened in

16   between those two texts because he was texting a relative

17   in the case and I'm not sure if that's the person who

18   actually turned him in or not, but it sounds like they

19   might have because he was inside the Capitol and he was

20   trying to share this feeling that he had of connectiveness

21   with the people around him of being part of something

22   bigger than himself and he reached out to a couple of

23   people and that person was a relative of his.  And he said

24   we just took the Capitol and that person texted back, are

25   you kidding, are you a part of this, this is treason.  And

24

**JA114**

1   this was in all caps.  If you do not disavow this, don't

2   ever speak to me again.  And that was when he texted back,

3   well, you're going to thank me one day because stealing

4   elections is treason or whatever.

5        And I remember him telling me sort of in a

6   off-handed way months ago that he also called his brother

7   at some point in there.  I can't remember if it was before

8   he went in or afterward and said -- called his brother and

9   said, man, you got to turn your T.V. on, you can't believe

10  what's happening here, it's crazy.  And his brother as he

11  recounted said now, Les, you have done some dumb things

12  before, don't do anything stupid.  And as Les related it

13  to me, he was like, well, I guess that went in one ear and

14  out the other because he knows.

15       And, you know, judge, I hate to even bring it up

16  this crazy letter that got sent to the Court that got

17  posted last week.  That, you know, just to give you an

18  idea of what he's going through, that letter ended up

19  being on the T.V. news here in Charlotte about how

20  somebody was saying he was a terrible person, whatever.

21  You know, in his worst conspiratorial paranoid fantasies

22  he could not have imagined that local T.V. news would be

23  broadcasting about somebody saying what a bad person he is

24  in the letter.  It's just crazy.  And what irritated me

25  the most is a ten-second Google search would have revealed

25

1    that that individual is actually a political operative, a

2    self-described Christian conservative Republican who works

3    for as the head of an anti-Trump group and he chose not to

4    mention that in the letter or tell anybody and I expect

5    this is not the last of those letters that you are going

6    to see.  But --

7         THE COURT:  I will say the reason for my posting

8    that is I don't believe in any kind of private

9    communications on any kind of sentencing matter.  I always

10   make public and put on the public record.  Anyone who

11   tries to communicate with me about a sentencing matter, I

12   always file it just like I did that.  I don't want there

13   to be any sense that I have had any private communications

14   with anyone about any sentencing matter.

15         I understand that is awkward, the timing, and

16   I'm sorry the news media covered it that way.  But I don't

17   want there to ever be any notion that I have looked at any

18   or seen any private communication about any sentencing

19   matter.  That's why I fiated that in.

20         MR. ADOLPH:  I understand, judge, and we are all

21   dealing with unique situations here.  I've never seen a

22   letter like that before in all my years of doing this.

23   Maybe from a --

24         THE COURT:  Well, I do see them occasionally and

25   I always make them public.

26

**JA116**

1          MR. ADOLPH:  I understand.  It's taken some

2    getting used to how to handle this case for sure.

3          But I guess my point in all this, judge.  Is

4    that when you look at the context of these remarks and the

5    videos and the fact that Les was repeatedly sort of

6    reaching out to people and getting shut down and having

7    the people who are closest to him or who he perceived as

8    closest to him just smacking him down for saying these

9    things and that, you know, some of the people he

10   considered closest to him have cut themselves off from

11   him, I think it's important to understand what the

12   function is of these postings, of the texting and what it

13   actually says about him.

14         Now I know the sentencing guidelines don't apply

15   in these cases which makes it certainly unusual for me and

16   I'm guessing for Your Honor as well to be dealing with

17   cases where we don't have sentencing guidelines.  And

18   being honest, I'm not a fan of the sentencing guidelines,

19   all 700 pages of it.  But the Sentencing Commission has

20   done some interesting work on trying to figure out in

21   other kinds of cases what courts should be looking at or

22   not.  And what I'm talking about is -- I understand this

23   may sound completely from left field, but hear me out.

24         They put out a report some years ago about child

25   pornography cases and how the current guidelines we have

27

**JA117**

1     really don't match up with what judges ought to be looking
2     at in terms of how to distinguish people in these cases.
3     And one of the things they said is because these are
4     crimes that are committed on the Internet mostly or as a
5     result of downloading things from the Internet.  And what
6     the commission said is when you have somebody who is just
7     sitting there and downloading things, that's one thing.
8     But when you have someone who participates in a community,
9     an online community where people encourage each other and
10    embolden each other to commit these crimes, that's
11    different and that's what makes somebody more dangerous,
12    more of a recidivist.  And to just put out and say this
13    person said this and this person said that, that Brandon
14    Qanon person is different.  He is a person who is leading
15    and is part of a huge online community where people
16    embolden each other.

17          What you see with Les is these social media
18    things where he posts something, just what he's feeling at
19    the moment, reaching out to other people and just gets
20    slapped down.  And what that means is going forward when
21    we're worried about is he, you know, when he talks about
22    his fears of a civil war, is he talking about signing up
23    for it or is he just talking about being afraid of it and
24    has he connected with other people, you know, the Proud
25    Boys, the Oath Keepers, all these folks to try to actually

28

**JA118**

1    make that happen.  The answer is absolutely not.  The

2    people around him.

3           I mean I thought it was remarkable.  I don't

4    know why I've never heard this before in all the

5    presentence interviews I've ever done.  When the probation

6    officer asked him, you know, what are the names and ages

7    of your siblings and where do they live.  And he said,

8    well, my siblings have not authorized me to talk about

9    them in any way.  They told him flat out we want no part

10   of this, you got yourself into it, you're not dragging us

11   into it.

12          You have to look at the community that someone

13   is in.  The support they find.  And whenever he steps out

14   of line like this, he's not part of a big group of people

15   looking to egg him on.  The people around him think it was

16   a huge mistake and don't approve of it.  And we've seen

17   that even in the presentence report.

18          And the reason I brought up that crazy letter,

19   judge, is because that whole thing happened because he had

20   posted on Facebook -- I guess at some point he was asking

21   people who knew him to write letters to Your Honor and

22   wasn't getting responses and he was hurt and scared.

23   Every time I talked to him on the phone, he's nothing but

24   scared of this whole situation of what is going to happen

25   today and felt as alone as he's ever felt when he was

1    like, hey, y'all, you know, can somebody help me out, let

2    the judge know that I'm not this horrible person and was

3    greeted with crickets.  He ended up being a news story.  I

4    mean it's just crazy.

5            And, judge, so, you know, I've talked about the

6    acts he committed.  I think the presentence report if you

7    look through it and actually sort of connect the dots, it

8    tells you a lot about Les that -- one of the privileges of

9    my job, judge, and I did a lot of Capitol work in the past

10   is that a lot of times I get to look through somebody's

11   life and see where things went wrong and sort of connect

12   the dots about how that happened in ways that they didn't

13   even know themselves.  And, you know, I guess Capitol with

14   an "O" has something in common with capital with an "A"

15   because, you know, I've got to look at the challenges and

16   the things that Les, the hand he's been dealt and put

17   together what's really going on in ways that he's never

18   really understood.

19           The presentence interview in this case was the

20   most remarkable one I've ever done, not just for the fact

21   that I was here in my office, he was at home, an hour or

22   so away and the probation officer was in Puerto Rico for a

23   case in the District of Columbia which is remarkable

24   enough.  But I really wish I had recorded it.  I might

25   have played it for the Court.

30

**JA120**

1           Les, as you know, lives in the family home that
2    he has lived in basically his whole life.  It's his
3    mother's house.  He lives there with her and has for I
4    guess most of his life, taking care of her at least
5    nominally and in certain specific ways.  But it's a very
6    small house out in the country in the western Carolina
7    piedmont and there's no privacy in that house.  It's very
8    small.  It turned out we learned later that his mother and
9    his sister were there just to make sure everything was
10   okay while he was doing this because his sister had to
11   bring her laptop over to show him because he has trouble
12   with the technology as he did this morning.  Before Your
13   Honor got in, we had a mini crisis where he was trying
14   different devices.  I think he's on his mother's phone
15   right now to try to even get on the Zoom.

16           But his mother and sister turned out were
17   waiting in the living room to make sure everything was
18   going okay.  He was in the bathroom sitting on the closed
19   toilet lid doing his presentencing review with the laptop
20   on his lap and whenever he would move or breathe, it would
21   sort of bounce up and down.

22           And it wasn't just the setting that was
23   remarkable.  But also some of the things he told us like
24   when the probation officer asked him about if he's ever
25   had mental health treatment and he talked about the fact

31

**JA121**

1    that he suffers from clinical depression.  He was

2    diagnosed for many years with ADHD.  He's on medication

3    for that, for the depression.  And in fact after

4    January 6th, that summer right after that, I guess it was

5    last summer, just because of everything that's going on,

6    the pressure he was feeling, the disapproval, the feeling

7    that people hated him that he didn't even know and his

8    depression got worse.  He was having suicidal thoughts.

9    They upped his medication.  That wasn't terribly

10   remarkable from what I have seen.

11           But he mentioned something to the probation

12   officer that when he was eight years old I guess it was,

13   his parents took him to see a child psychologist and it

14   was because he was -- in school, he was having trouble

15   focusing on what was going on.  He was very sort of

16   distracted and overwhelmed.  And what he found that he

17   used to do is he would cut out pictures from a magazine

18   and bring them with him to class and wave them in front of

19   his own face.  (Indicating.)  I'm doing that on camera.

20   I'm sorry for folks who can't see that.  But it's a

21   remarkable behavior.  And he was doing this -- and he

22   found that it soothed him and helped him concentrate.  And

23   it was going on so much that he was getting bullied in

24   school for it and so his parents were concerned, took him

25   to a child psychologist.  I'm not sure if that's when he

32

**JA122**

1    was diagnosed with ADHD.  But it's pretty clear to me that

2    there was something else going on.  It wasn't just

3    attention deficit, that kind of self-soothing repetitive

4    behavior.

5              And we got some more clues about other things

6    that might be going on with him.  He gave some really

7    strange and awkward answers and, you know, the thing about

8    Les I guess that anybody will tell you is is if you ask a

9    question, he will give you the answer.  And it doesn't

10   matter if it's embarrassing or awkward or, you know,

11   something maybe you didn't want to hear.  He's going to

12   tell you.  That's how he is and it's remarkable when you

13   hear it.

14             And I remember him telling us about the

15   probation officer asked do you have any physical problems

16   and he mentioned that he was in a car accident and he

17   rolled the truck over when he was a kid.  He was 17 and

18   how his shoulder still hurts from it.  And I'll come back

19   to that.  It's important.

20             But I remember the probation officer asking him

21   so who are the people who you are closest to.  And he

22   thought about it for a minute and he said, well, I guess

23   my mother and my Jack Russett terrier, Lady and that was

24   the dog I saw him on YouTube trying to do the duet with,

25   which and it was kind of remarkable for his -- just the

33

**JA123**

1    fact that that was just sort of the matter of fact answer.

2    You know, that it didn't -- he didn't perceive it as being

3    awkward or anything.

4         And when the probation officer asked him, well,

5    are you in a relationship with anyone?  The answer is no.

6    But what he said was, you know, well, there was this one

7    lady who, you know, I know through local politics who I

8    was interested in having -- it was a friend who I was

9    interested in having a romantic relationship with, but she

10   wasn't.  She made it very clear from the beginning that

11   she wasn't interested.  That question did not call for,

12   you know, relationships that you wanted to have or didn't.

13   But that is what popped into his head and that was what he

14   was going to talk about.  And when the probation officer

15   asked about, well, what are your plans for the future, and

16   he said, well, you know -- the first thing he said was,

17   you know, well, I pray to God every day to bring me a wife

18   and a family and I hope it's not too late for me.  You

19   know, he's in his 50's now.  And then beyond that, he said

20   that, you know, I'd like to start my own business and be

21   able to make enough money to buy my mother's house, you

22   know, to give her something to live in so I can be less of

23   a burden and more of a benefit to her.

24         If you read through the presentence report

25   unbeknownst to him I guess, that's already been taken care

34

1    of.  The house is in his sibling's name now.  I guess they

2    didn't feel the need to let him know that.  But a number

3    of those ships have sailed at this point.

4         But you start to put all that together and you

5    start to look at the repetitive compulsive behaviors, the

6    self-soothing, the constant sort of reaching out to other

7    people in ways that seem awkward or don't really land.

8    And I include all the social media and the texting and

9    everything else.

10        At one point the probation officer asked him,

11   well, what are your monthly expenses.  A pretty standard

12   question.  And he said, oh, well, my mother keeps track of

13   that for me so I'm going to have to go ask her.  So he got

14   up off the toilet, picked up the laptop and we all saw the

15   laptop bounce its way into the living room where his

16   mother and his sister were in there.  And it turns out

17   that, yes, his -- I mean he, you know, he works every day

18   all he can.  He's working two jobs, sometimes three jobs.

19   But his mother makes -- you know, has the check book and

20   pays his bills.  And so she had to get on the video and

21   explain what his bills were.

22        And it's not that the bills are all that

23   complicated.  He has three bills that he has to pay every

24   month.  He has to pay his cell phone bill.  It's like

25   forty-some dollars.  $60 to the YMCA so he can go swim

**JA125**

1    laps and $28 a month for Obamacare.  And his sister

2    clarified that that's going to go up probably because he's

3    gotten more work within this past year and he's going to

4    have to pay more for Obamacare next time out.

5            But while he was in the living room, his sister

6    also sort of whispered to him to remind him of something.

7    And when he turned to us, he said was, oh, well, my

8    sister -- because he had talked about the car wreck he was

9    in when he was 17 and how he hurt his shoulder.  And what

10   he said with no hint of irony was he said, oh, my sister

11   wanted me to tell you that when I was in that car wreck

12   when I was 17, I was in a coma for three days.  But, you

13   know, I don't remember that.

14           So I think there's -- you know, I'm privileged

15   to be able to connect the dots.  But when I see those

16   behaviors going back to childhood, when I hear about the

17   fact that he had a severe head injury and was in a coma

18   when he was a teenager, I think you have a couple of

19   different things going on.

20           Number one, you know, judge, I'm not a mental

21   health professional.  But I'm in a family of them.  And,

22   you know, the good part of that is I've picked up a thing

23   or two of what to look for in people.  It's useful in my

24   practice.  I mean, of course, the down side of it is if I

25   step out of line at home, instead of getting yelled at, I

36

**JA126**

1    get diagnosed.  So I have to deal with that.

2             But it's pretty clear that he meets all the

3    criteria if you were going to sit and diagnose him for

4    autism spectrum difference or disorder.  And maybe they

5    are willing to call it Asperger's at some point.  They

6    didn't have names for that, you know, back in the late

7    '70s when he was getting diagnosed with this type of

8    thing.  But he shows all of those same behaviors.

9             And honestly Your Honor saw it, too, looking

10   back on it at the plea.  Because one thing that people who

11   have that disorder and I have friends who do, I have

12   colleagues who do, they have a very intense sense of

13   fairness.  I've heard it described as like almost like a

14   child's sense of fairness, you know.  As we grow up, we

15   learn and deal with the fact that life isn't fair.  But

16   some people don't and, you know, if you've ever been with

17   a little kid who some other kid at the birthday got a

18   bigger slice of cake than they did, you know that children

19   have a very acute sense of is everybody being treated

20   fairly.  And there are some folks that just can't get past

21   that.  That when something doesn't match up with how they

22   see the world and how people are supposed to be treated,

23   it's just like a pebble in their shoe.  They can't let it

24   go.

25             And, you know, one of the things in this case,

37

**JA127**

1    judge, was we agreed to restitution.  That's been the

2    standard part of every misdemeanor petty offense plea

3    offer that I'm aware of is $500 of restitution.  And, you

4    know, make no mistake, $500 is a lot of money for Les.

5    Like, you know, I've heard some people say that this is a

6    pittance and that people get off easy.  But that's a

7    week's wages for hum in a good week.  Even working all the

8    jobs that he does, that's a big hit.  You know

9    fortunately, unlike a lot of folks in his financial

10   situation, you know he's not going to miss a rent payment

11   and get put out on the street because, of course, he lives

12   in his mother's home that was long ago paid for.

13        But the money was not the point.  You know, like

14   I said, he doesn't even keep track of his own finances.

15   The point was he said, well, and he actually said it to

16   Your Honor, we discussed it half a dozen times.  But when

17   Your Honor asked him, do you have any questions, he said,

18   well, I don't understand why I have to pay $500 for

19   something someone else did.

20             THE COURT:  I recall that.

21        MR. ADOLPH:  Yes.  And, you know, I got a little

22   lump in my throat at the moment and, you know, I have been

23   in many situations where I'm standing next to a client and

24   I'm not afraid to step on their toe pretty hard under the

25   table if you need to.  You can't do that on Zoom.  But

38

**JA128**

1     that was not reflecting any kind of disrespect for the

2     Court or minimizing his conduct.  He genuinely couldn't

3     understand it.  He was like, you know, there is people

4     that broke windows and stole things and hurt people.

5            And, you know, I look through it.  In one of

6     these hearings, the government figured out how they came

7     up with that number.  They basically figured out about how

8     many protesters there were who went in, roughly how many

9     they expected might get charged and divided it up by

10    everybody.  It's not an unreasonable way to do it.  But

11    what it is not is a way that it is individuated to the

12    people and what they actually did.  Somebody broke those

13    windows.  And those people are probably going to be

14    charged with felonies.  So the problem is it feeds into

15    the paranoia and it feeds into the idea that the

16    government doesn't see him as a person.  That it sees him

17    as part of a mob and I understand that.

18            And I'll tell the Court what I told him.  I

19    said, you know what, not everything is worth fighting

20    about.  I understand that, you know, it may be that if we

21    actually did an analysis to proximate cause and so forth,

22    you know, it's debatable whether he would have to pay

23    $500.  But that -- you know what, life isn't fair.  That's

24    not how it works.  The damage was done.  You were there.

25    You were in the group, whatever your role may have been

39

**JA129**

1   and you are going to pay the $500 and keep it moving.  And

2   he accepted that.  But, you know, it still sticks.

3   Honestly, judge, I can't step on his toe where I am right

4   now.  I'm hoping he's not going to say anything about it

5   now, but I can't guarantee it.  I really can't.

6           And that's just -- you know, it's part of the

7   challenges that he's had to deal with.  And, judge, I know

8   that, you know, I'm not an expert and there was a part of

9   me at some point that said, you know, maybe I should get

10  him evaluated and have this to present to the Court about

11  autism spectrum disorder and traumatic brain injury, get

12  testing done.  But at some point I had to say, you know

13  what, at the end of the day this is a petty offense and I

14  can't see spending five or ten thousand more dollars of

15  government money for this diagnosis when the diagnosis is

16  not the point.  The point is the behavior and who he is.

17          And also, you know, I asked some of my family

18  members and they said you do not diagnose 50-some-year-old

19  men with autism spectrum disorder.  You just don't do it.

20  There's no reason.  He's not in a school.  He's not going

21  to get services.  He's not getting disability.  What you

22  do is you treat the symptoms.  And what the symptoms are

23  is you have a person who is reaching out for people.  It's

24  awkward.  He has trouble sometimes reading the room, if

25  you will, and has trouble connecting with people.  And,

40

**JA130**

1     you know, and has at the end of the day a loneliness that

2     he doesn't understand why it's happening and why, you

3     know, people aren't trying to connect with him, you know,

4     when he reaches out to them and we see it even in this

5     case even when he was at the Capitol that was happening.

6            So and the other symptoms you get are you get

7     depression because of his pervasive feeling of feeling

8     isolated.  And you get people posting this stuff on social

9     media just to try to connect with people and it's not

10    working out.

11           And he is going to -- thanks to his Obamacare,

12    he's getting mental health treatment.  He takes his

13    medication.  You know, and that -- he'll be able to

14    continue with that.  You know, he suffered from alcoholism

15    and that's something Your Honor knows is one actual prior

16    conviction that means anything is the DUI from I guess

17    it's getting on a decade ago.  I can't remember what year

18    it was.  And he goes to AA meetings regularly.  He's in

19    recovery.  He has a sponsor.  He even got himself out to a

20    rehab facility in California maybe three or four years

21    ago.  And, you know what, he still owes money on that

22    apparently because apparently insurance didn't cover it

23    all and that was one of the bills his mother talked about

24    that somehow they're still trying to collect on him for

25    that.  So at the end of it, I just had to let that go and

41

**JA131**

1    say he is who he is.  I think that's clear from what we

2    have in there.

3           So going forward, you know, what is the way

4    forward for dealing with someone like him?  I know in

5    trying to link these things up, what the government says

6    are the factors Your Honor ought to use.  What they seem

7    to talk about a lot is the need to -- for respect for the

8    law.  And what they really do a lot of the times is they

9    conflate respect for the law with the terms, with fear of

10   the law because those are really two different things.

11   And, you know, Your Honor is dealing with many, many, many

12   more cases than I am.  But I don't think the problem with

13   people who went into the Capitol is that they weren't

14   afraid enough of their government.  I think Les is a

15   person who is afraid all the time.  And unfortunately, you

16   know, with everything he hears on Fox News and the people,

17   you know, with the -- and some people in the community

18   he's learned that the fear is directed at the government.

19   The fear is not the problem.  The problem is people

20   thinking that the government or whoever, whatever other

21   marginalized group it is doesn't respect them and doesn't

22   value them.  And, you know, the theory I guess is that we

23   need more punishment because people need to fear more when

24   I think the opposite is true.  You know, these are not new

25   ideas.  Two thousand years ago, Seneca, The Younger told

42

**JA132**

1    his emperor let them hate as long as they fear.  And it

2    was Emperor Nero he told that to.  We knew that didn't

3    work out very well.

4         I think the model going forward is a different

5    model and again it's nothing original.  It's, you know,

6    everybody from Jesus to Gandhi to Dr. King, whether you

7    characterize it as turning the other cheek, as

8    self-purification, it's all about recognizing and valuing

9    the humanity of the people who believe that they oppose

10   you and teaching them that we're not enemies.

11        You know, we think that we're a nation divided,

12   judge.  We're not.  We are a nation united in fear of each

13   other.  And I know it sounds Pollyannish and it sounds

14   like I'm just sort of preaching, but I have seen it in

15   this case with Les Little because at every turn, he's been

16   surprised when he actually meets the government and meets

17   the people who work for the government.  It's totally

18   different from what he has been told on T.V. and on the

19   radio.

20        You know, God bless him.  Every time he calls me

21   when he's, you know, scared about something or upset about

22   something, pretty much every time he begins the phone call

23   like this.  He says, well, you know, I hate talking on the

24   phone because I'm sure the FBI is listening in on me and

25   tapping my phone and, you know, they are out to get me.

43

**JA133**

1    But then he always stops and he also says but I don't mean

2    the local guys, those are nice guys and then sings the

3    praises of the local FBI agents who came and interrogated

4    him.

5            Now the reason that's so remarkable to me is

6    Your Honor is going to hear the tape.  Those FBI agents

7    and they had every reason to do what they did and I don't

8    have a problem with it, but they violated his rights under

9    Edwards versus Arizona blatantly.  First thing at the door

10   he said I want to talk to a lawyer before I talk to you

11   and it took them sixty seconds as you will hear of just

12   being nice to him, as just being respectful for him to

13   change his mind.  Like that is all it took.  And they

14   went -- he said okay, well, I'll pray about it and they

15   said do you mind -- we'll just go back to our car and wait

16   for him while he prayed and he said okay.  And then they

17   walked back to the car and walked back to the door and he

18   let them in, welcomed them into his living room with us

19   mother and his dog and sat down and told them everything

20   as best he could remember including his feelings about it

21   and everything else.

22           So when you see that -- and he knows that now.

23   He knows that these people violated his rights as a

24   technical matter.  I have no doubt, the government was not

25   going to use that tape if for some reason we ended up at

44

**JA134**

1   trial.  It was pretty clear.  But here we are at

2   sentencing.  And I think it gives a really good snapshot

3   of where his mind was going forward and all that.  But it

4   also shows you how he deals with people who he has been

5   taught were his enemies and it turns out they're just

6   regular people and he recognizes it like that.

7            The other thing he always does when he calls up

8   and reports on his progress, you know, how things are

9   going, you know, how his -- whether he has enough hours of

10  his job.  He loves to talk about every furniture delivery,

11  the dollar value of the furniture that he carried in that

12  particular load which, you know, again I think he's

13  connecting the dots when you have somebody, you know, who

14  his mother, his 86-year-old mother does his check book for

15  him.  But he is very excited about that.  And history is

16  what he's really about and can recite his family history

17  going back generations and all that.

18           One thing he always said when he talks about how

19  things are going is his probation officer, Mr. Horton.  He

20  said, you know, he's such a great guy.  He's so nice to

21  me, he's really looking out for me and trying to help me

22  out and he feels the need to mention that every time he

23  talks to him and every time he interacts with him.  And I

24  think part of it is because it's such a surprise.  That

25  he's so been taught to fear officials and fear the

45

**JA135**

1   government and, you know, fear law enforcement.  And so

2   but now whenever he talks about it, he says oh, well, you

3   know, I don't mean the guys I talk to, I don't mean this

4   probation officer.  I mean, you know, those people in

5   Washington who are trying to take our rights away, whoever

6   it was.

7            You know, and, judge, you know, I know it sounds

8   like sucking up, but, you know, I'm going to say it that

9   he's been comforted by seeing Your Honor in court and I

10  think it's just because Your Honor, you know, seems like a

11  regular person and treats him like a regular person and

12  that is not what he was led to believe by all the media he

13  had been digesting and everything.  It's just -- it's a

14  big shock for him.  And I think at this point what that

15  means is when you look at all the people who are similarly

16  situated to him, I don't know what their criminal records

17  are.  We get hints of it in the file pleadings.

18           But given what he actually did, walked in,

19  wandered around for about half an hour, took selfies,

20  whatever it was and wandered back out and you look at the

21  person he is, where he was in his life and the thing that

22  had happened to him up to that day in light of how the

23  other cases have all been treated, I think it becomes

24  pretty clear that whatever Your Honor wants to sentence

25  him to in terms of probation, in terms of house arrest --

46

**JA136**

1    and that was another thing he kept asking me over and over

2    again is if I do get probation, can I keep the same

3    probation officer because I really like him and I think

4    he's really been helping me out.

5              The bottom line, judge, is that looking at

6    all -- at the acts he committed, not treating him as part

7    of a mob or as someone who emboldened others, but looking

8    at what he did, what his responsibility was in those acts

9    and looking at him as a person under the 3553(a) factors,

10   all I'm going to say is there is no reason to put him in

11   jail at this point.  You know, forgetting the

12   practicalities.

13             He's in Catawba County.  At least our bigger

14   jail in our district in Mecklenburg County in Charlotte,

15   they are doing what they can in terms of COVID, isolating

16   pod -- different pods of people and keeping us updated

17   what's going on, there has never been any COVID protocol

18   that I can tell in the Catawba County Jail.  I don't go to

19   that jail because they don't wear masks, they don't

20   separate people.  And when people get COVID, they don't

21   tell us.  So, you know, they talk about testing once in a

22   while.  But they're testing you if they have to take you

23   to the hospital.  I mean that's the level we are operating

24   under.  And so I think, I think we all have to really take

25   a look before we talk about a short jail sentence and what

1  other alternatives there might be where we are in this

2  district.

3          So, judge, that's the bulk of what I have to

4  say.  What I would like to do is like I said, play for the

5  Court his interactions with the FBI.  It's about 20

6  minutes long.  I think it gives you a really solid picture

7  of where his head was in the days following those events

8  before he is -- and honestly, he's not a guy who can

9  rehearse anything anyway.  He's going to tell you exactly

10  what flips through his mind at the moment.  I don't think

11  his sincerity can ever be questioned.  Maybe his

12  perception of what happened and the conclusion he draws

13  from it as a factual matter can certainly be questioned

14  and will be.

15          And I know I take a risk because, you know, he

16  says a lot of things on that tape about his paranoia that

17  he's repeating from what he heard in the media that we

18  know aren't true.  But, you know, I'm trusting the Court

19  to take that as really being more about him and who he is

20  and less about what is really going on in terms of his

21  future and his risk of actually doing anything ever in

22  this again because, you know, whatever he felt about at

23  the time, he has told me over and over again, he can't

24  even see pictures of the Capitol on T.V.  He has to change

25  the channel because he's so shaken by it, you know, by

48

**JA138**

1    that experience and the last 14 months of just feeling

2    like the whole world is against him.

3         So, Your Honor, again this is my first video

4    sentencing.  I am going to attempt to play this audio.  So

5    I would ask for the Court's indulgence on that at this

6    point.

7         THE COURT:  Go ahead.

8         MR. ADOLPH:  Thank you.  Oh, I'm sorry, Your

9    Honor.  One other thing.  It's actually two recordings

10   because you have the first recording when the FBI walk up

11   to his door and knock and first talk to him.  And you have

12   his assertion of his right to counsel and then that's only

13   about two minutes and then the second one where they

14   actually talk to him in his living room.

15        THE COURT:  Okay.

16        (Video played.)

17        MR. ADOLPH:  Your Honor, you know, every time I

18   listen to that, it's a little hard for me to hear the

19   paranoia and the conspiracy theories and repeating all the

20   stuff on T.V.  And it's also, you know, when he said near

21   the end that the only reason he was able to even go or

22   even thought of going was because he had just got his

23   stimulus check with no sense of irony.

24        You know, what you're not going to get is I know

25   in a lot of cases like this, people have been coming in

49

**JA139**

1    with like scripted things about how remorseful they are

2    and everything and then they turn around the next day they

3    are on T.V. recanting all of it.  And it's a problem when

4    people are dissembled that way.  There is nothing about

5    Les that's ever going to be telling you anything other

6    than what is on his mind.  And he is never going to lie to

7    you or try to sell you anything that he doesn't a hundred

8    percent believe for better or worse.

9           And what I guess I ask the Court to do is

10   listening to all that recognize that there's a difference

11   between, you know, believing whatever it is that you see

12   on T.V. and being a person who is a danger in the future

13   and acting on it.  The reality of Les Little is that the

14   only risk that he presents to anybody in the future is a

15   risk that he can yell at the T.V. some more and that's

16   something I do as well.  I guess we just look at different

17   channels.

18          And for somebody like him, the way everybody

19   else has been treated, the 25 cases that I listed, people

20   say all kinds of things that are inflammatory and

21   upsetting, frankly, to a lot of us, but that's not what

22   we're here to punish for.  It's for folks who have done

23   things and what those things mean and who they are.  And I

24   really don't believe there's any reason any more than with

25   those other folks to put him in jail.  And that's all I

1    have to say, Your Honor.  Thank you.

2            THE COURT:  All right.  Before I hear from the

3    defendant, does the government want to say anything

4    further?

5            MR. JAMES:  Yes, Your Honor.  I would like to go

6    through a few things based on the representations of

7    counsel.  First, judge, with regard to the treatment

8    whether there's any disparity between the defendant and

9    others, I pointed out in our memorandum, initial

10   memorandum, there are only really a handful -- excuse

11   me -- our reply memorandum.  There are only really a

12   handful of cases initially in which individuals receive a

13   sentence of probation.  And I would point out with regard

14   to Mr. Little, the government sent the plea agreement to

15   counsel in August.  The signed plea agreement was returned

16   in November, on November 8th I believe of 2021.  So there

17   was time for Mr. Little to send the plea agreement much

18   earlier than he had.

19            With regard to those handful of cases and also

20   the other cases cited by opposing counsel, none of those

21   cases occurred where an individual had entered a sensitive

22   area such as the senate gallery.

23            Now I know counsel has repeated that he didn't

24   know where he was.  He thought he might have been at the

25   House.  But even if he had been somehow into the House

51

**JA141**

1    chamber, he would again be in a sensitive area.  So that

2    does not weigh in his favor.

3         Secondly, Your Honor, in looking at these cases,

4    counsel started talking about petty offenses and his

5    history here in North Carolina of not seeing jail time.

6    Well, I'll be candid with the Court, my first federal

7    trial was a petty offense.  It was in Elizabeth City,

8    North Carolina before Judge Boyle.  I don't know if you

9    know Judge Boyle.  But Judge Boyle loves to handle the

10   petty offense calendar, so to speak, and involved a case

11   of someone taking federal birds.  And there was a trial

12   and that person I believe received some jail time.  So

13   it's not totally unusual that there could be jail time

14   with regard to a petty offense.

15        Also I'd like to point out, judge, that the

16   statement that you can't treat the defendant as part of a

17   mob.  And while that's true to some extent, one thing

18   under the 3553(a)(6) is looking at the nature and

19   circumstances of the offense.  And the offense in this

20   case was something that was unprecedented in American

21   history.  Literally, the taking of and the siege of the

22   Capitol government, the stopping of the certification, the

23   stopping of democracy itself.  And so that is a factor

24   that the Court should weigh.  Mr. Little as I stated in my

25   earlier presentation, he played a part to that because

1  individuals like Mr. Little if they were not there, law

2  enforcement could have handled the more violent, the more

3  extremist ones.  In fact if they were not there, the

4  likelihood of these others even succeeding at all in

5  breaching the Capitol probably would have been nil.

6       Now with regard to the fact that the

7  representation about how Mr. Little apparently is somewhat

8  not well informed or clueless, he was not clueless.  He

9  knew, for instance, that the purpose of the initial rally

10  was The Stop The Steal rally and the steal being the fact

11  that his belief that former President Trump had won the

12  election and that it had somehow stolen from former

13  President Trump.

14       And the march to the Capitol came -- he marched

15  to the Capitol with others.  And while there, he saw and

16  you heard it yourself from his audio tape, he saw rubber

17  bullets being fired.  According to him, he saw tear gas.

18  As the Court noted, he's not a guy who just walked into an

19  open door.  There was violence there.  He got a call.  He

20  could have tried to go back to see his mother, but he

21  didn't.  He proceeded forward because he was excited.  He

22  was excited.  He wanted to do it.

23       Mr. Little is not a child.  He does not --

24  there's no record of him suffering from anything of

25  autism.  There was talk from opposing counsel about

53

**JA143**

1    Mr. Little's mental state as if he was autistic or

2    something in the PSR.  So just so that the record is

3    clear, in the PSR, there is nothing about that.  In fact

4    in the PSR, it says he's emotionally stable because of the

5    treatment that he's receiving currently.  Of course, he's

6    anxious about sentencing as every defendant who has ever

7    appeared before this Court for sentencing is anxious

8    about.  So he's not someone who is so blindly led that he

9    didn't know what was going on.

10           Furthermore, he pointed out in the reply

11   memorandum it was well known what the purpose of

12   January 6th was, the business of before our elected

13   officials in certifying the electoral ballots.  That was

14   clear.  It was clear that there would be opposition by

15   certain members of Congress in the House of

16   Representatives.  It was clear that there were certain

17   senators that would support those ballots.  And in the

18   normal course of business without a rally, it would have

19   been heard and it would have been dealt with by our

20   elected officials and the government would go on.

21           Now what Mr. Little and others like him did,

22   they took it into their own hands that they would decide

23   to stop the orderly transfer of power.  Mr. Little was

24   part of that group.  He fist bumped others.  He smiled

25   with others when he was in there and therefore, Your

                                                              54

**JA144**

1    Honor, and it was not addressed by opposing counsel, we

2    believe that the Court does have the power to impose a

3    split sentence and the Court should actually impose a

4    split sentence.  Thank you.

5            THE COURT:  All right.

6            MR. ADOLPH:  Your Honor, I'm sorry.  There's one

7    thing the government said that I do feel the need to

8    respond to if I could.

9            THE COURT:  Okay.

10           MR. ADOLPH:  When the government talked about

11   the months of time delay between receiving the plea

12   agreement and accepting it, this has been the government's

13   principal argument to try to distinguish Mr. Little from

14   all the folks who were sentenced to probation on the

15   government's recommendation and Chief Judge Howell

16   disposed of that argument pretty thoroughly.  I quoted a

17   part of that transcript in my memo.

18           But in case I didn't make it clear, you know,

19   the government tries to sort of throw out the word "fast

20   track" or there were certain pleas that were fast tracked

21   or something like that.  Nothing was fast tracked.  That

22   is a red herring.  What happened was originally people

23   were getting straight probation offers.  When I got one

24   that wasn't a straight probation offer, I spent a lot of

25   time trying to research what people were getting and came

55

**JA145**

1    back to the prosecutor with a list of cases where they had

2    been willing to recommend probation in writing and asked

3    why is Mr. Little any different.  These are people who are

4    just as culpable or more culpable than him.  I never got

5    an answer to that.  So once it became clear that the offer

6    was what it was and he was not going to get the same offer

7    that other folks had gotten, then he took the plea.

8          But there's been this sort of -- and they always

9    hint at it, but they don't say it because they know it's

10   not true that these early people pled quickly, relatively

11   quickly and Chief Judge Howell went through the actual

12   numbers and refuted it.  Those people pled -- well, sure,

13   they pled early because they were at the top of the pile

14   just as cases were going through.  They got plea offers

15   early on when the government was still -- hadn't yet sort

16   of backed off of giving those type of offers and they took

17   them because they got probation offers.  The government is

18   essentially saying that you should distinguish Mr. Little

19   for turning down an offer he never got.

20         And I think it's important to recognize not just

21   that there is no difference, but that that's all the

22   government could come up with to distinguish him from all

23   those folks and that is a distinction without a

24   difference.  So I think it would be consistent with --

25         THE COURT:  Well, that's all in the section of

1    what the government is recommending which really I'm

2    not -- you know, I mean the government can recommend what

3    they want to recommend.  I don't want to denigrate it,

4    but, you know, that's not the most significant thing in

5    the world to me.

6            MR. ADOLPH:  Thank you, Your Honor.  I'll leave

7    it at that.

8            THE COURT:  All right.

9            MR. JAMES:  Your Honor, if I may?  I apologize.

10   I just want to quickly state one thing with regard to the

11   claims that -- I just don't want this to go over on the

12   public record without there being a statement regarding.

13   Opposing counsel claimed that the officers had violated

14   the defendant's rights and --

15           THE COURT:  Right.

16           MR. JAMES:  -- and the government protests that

17   strenuously.  Opposing counsel did not file a motion at

18   all to suppress the evidence.  And this Court would have

19   to decide at a hearing or on papers whether it was clearly

20   both rights whether the officers violated.  From hearing

21   the interview again, we contend that there was no

22   violation by the FBI agents.  Thank you.

23           THE COURT:  All right.  In any event,

24   Mr. Little, anything you want to say on your own behalf?

25   I'm certainly interested in hearing you at this stage.

57

**JA147**

1              THE DEFENDANT:  Yes, Your Honor.  There's a few

2      things I would like the Court to know.  One thing is I

3      don't know how consequential it is at this point.  Maybe,

4      you know, you'd want to consider in your sentencing.  But

5      at no point did the FBI or Catawba County Sheriff's Deputy

6      or the federal marshals in Charlotte read my Miranda

7      rights to me.

8              Secondly, I would want you to know about my

9      service work that I've done.  I checked with the Red Cross

10     last week and I've given 17 pints of blood in my lifetime.

11     I have volunteered at the Corner Table Soup Kitchen

12     Ministry in Newton, North Carolina.  I have -- I used to

13     be -- do ministry work at the Bryan Center East Nursing

14     Home in Hickory, North Carolina before this shutdown

15     because now it's very hard to get in the nursing homes to

16     do anything.  And I've been on mission trips to Ukraine,

17     Russia and two in West Virginia.  And so I have a history

18     of service work to others and I'd like you to consider

19     that.

20             And also with me being in the media, there's

21     been on social media and stuff, I've gotten a lot of hate

22     from people that, you know, see me on the news and they

23     characterize me about that, even though they don't know

24     me.  And I would ask that since I've pled to a

25     misdemeanor, not a felony and I've never used guns for

58

**JA148**

1    nefarious purposes, never would use them for nefarious

2    purposes, that my Second Amendment rights be restored to

3    me so I can protect myself and my mother.  Thank you, Your

4    Honor.

5              THE COURT:  I guess the basic difference I have

6    with what your attorneys argued on your behalf and what

7    the Court views as the difference between the parties here

8    is I believe some term of imprisonment is essential in

9    these cases now to reflect the seriousness of the offense,

10   to promote respect for the law and to provide just

11   punishment for the offense.

12             In one of these cases early on, I did give a

13   sentence of probation and I said it would not be the

14   routine but it would be an unusual sentence.  The very

15   next day, the defendant in that sentence contradicted

16   statements she had made at the sentencing on national

17   television and caused me to really reflect on whether or

18   not I was acting in a fashion that was reflecting the

19   seriousness and whether my sentence was reflecting the

20   seriousness of the offense of those in this position.

21             And when I reflected on that and reflected on

22   the law as I did in the government's suggestion that there

23   be a split sentence, I have decided to follow the

24   government's recommendation here of a split sentence.  And

25   I expect to issue an opinion today endorsing the

59

**JA149**

1    government's suggestion that there be a period of

2    incarceration followed by a period of supervised release

3    or probation rather for a period of three years.

4         That's partly because with the comments that

5    were replayed today by your attorney that you made at this

6    time, the Court does not have confidence that the same

7    would not happen in the next election cycle.  And you're

8    going to be on probation during the next election cycle

9    and there will not be -- you will not be without court

10   supervision during the next election cycle.

11        I'll issue a written opinion with findings and

12   conclusions supporting what I'm doing today.  But pursuant

13   to the Sentencing Reform Act of 1984 and in consideration

14   of provisions of 18 USC, Section 3553 as well as the

15   advisory sentencing guidelines, it's the judgment of the

16   Court that you, James Little, are hereby committed to the

17   custody of the Bureau of Prisons for a term of 60 days

18   followed by 36 months, three years of probation on Count

19   Four.  The memorandum opinion explaining the Court's

20   reasoning as to this sentence is authorized by law and

21   I'll issue that separately today.

22        In addition, you are ordered to pay a special

23   assessment of $10 in accordance with 18 USC, Section 3013.

24   while on probation, you shall abide by the following

25   mandatory conditions as well as the standard conditions of

60

**JA150**

1    probation which are imposed to establish the basic

2    experience for your conduct while on supervision.

3         The mandatory conditions include, one, you must

4    not commit another federal, state or local crime; two, you

5    must not unlawfully possess a controlled substance; three,

6    you must refrain from any unlawful use of a controlled

7    substance.  You must submit to one drug test within 15

8    days of placement on supervision and at least two periodic

9    drug tests thereafter determined by the Court; and four,

10   you must make restitution in accordance with 18 USC,

11   Section 3663 and 3663(a) or any other statute authorizing

12   a sentence of restitution.

13        The Court authorizes supervision of the case to

14   be transferred to U.S. District Court for the Western

15   District of North Carolina.  The Court will not transfer

16   jurisdiction.  The Court finds you do not have the ability

17   to pay a fine.  Therefore, waives imposition of a fine in

18   this case.  It is ordered that you make restitution to the

19   Architect of the Capitol building in the amount of $500.

20   The Court determines you do not have the ability to pay

21   interest and therefore, waives any interest or penalties

22   that may accrue on the balance of the restitution.

23        Restitution payments shall be made to the Clerk

24   of the Court of the U.S. District Court in the District of

25   Columbia for distribution to the following victims:

**JA151**

1    Architect of the Capitol, Office of the Chief Financial

2    Officer, Attention: Kathy Sherrill, CPA, Courthouse Office

3    Building Room H2205-B, Washington, D.C., 20515 in the

4    amount of $500.

5          A special condition of probation will be a

6    social media restriction.  You shall not access, view or

7    use any online social media, chat services, blogs, instant

8    messages, SMS, MMS, digital photos, video sharing

9    websites, emails or any other interactive online or

10   electronic communication applications or sites without the

11   prior approval of the probation officer.

12         Financial obligations are payable to the Clerk

13   of Court of the District of Columbia for the District

14   Court, 333 Constitution Avenue, N.W., Washington, D.C.

15   20001.  Then 30 days of any change of address, you should

16   notify the Clerk of Court of any change until such time as

17   the financial obligation is paid in full.

18         The probation office shall release the

19   presentence investigation report to all appropriate

20   agencies which includes the probation office and the

21   approved district of residence in order to execute the

22   sentence of the Court.  Treatment agencies shall return

23   the presentence report to the probation office upon

24   completion of termination from treatment.

25         Pursuant to 18 USC, Section 3742, you may have

**JA152**

1   the right to appeal the sentence imposed by the Court.  If

2   you choose to appeal, you must file your appeal within 14

3   days after the Court enters judgment.  If you are unable

4   to afford the cost of an appeal, you may request

5   permission from the court to file an appeal without cost

6   to you.

7           As defined in 28 USC, Section 2255, you also

8   have the right to challenge the conviction entered and the

9   sentence imposed if new and currently unavailable

10  information becomes available to you or on a claim that

11  you received ineffective assistance of counsel in entering

12  the plea of guilty or in connection with your sentencing.

13          Subject to the D -- presented to the D.C.

14  Circuit opinion in U.S. v. Hunter, are there any

15  objections by either counsel to the sentence imposed that

16  are not already noted on the record?  Mr. James?

17          MR. JAMES:  No, Your Honor.

18          THE COURT:  Mr. Adolf?

19          MR. ADOLPH:  Your Honor, I think my objection to

20  the Court's power to impose both probation and a sentence

21  of incarceration is sufficiently noticed in my --

22          THE COURT:  In the record.  Okay.

23          MR. ADOLPH:  -- in the record.

24          THE COURT:  Now I will allow self-surrender.

25  Did you want me to recommend Mecklenburg for a place of

63

**JA153**

1    confinement?

2              MR. ADOLPH:  Judge, I guess Catawba County is

3    probably the best place since that will be the closest to

4    where he lives.

5              THE COURT:  Okay.

6              THE CLERK:  Counsel, could we have you spell

7    that for the record, please?

8              MR. ADOLPH:  C-A-T-A-W-B-A.

9              THE COURT:  Okay.  He can self-surrender then

10   upon designation of a place and they'll send a notice of

11   time and place.

12             MR. ADOLPH:  And judge --

13             THE CLERK:  One second, Mr. Adolf.  Your Honor,

14   we do need a date for self-surrender.

15             THE COURT:  I added a date to be set upon

16   designation.

17             THE CLERK:  Thank you, Your Honor.

18             MR. ADOLPH:  Judge, I would object to the social

19   media ban and the electronic communication.  I think Your

20   Honor included things like text messaging in there.  It

21   sounded pretty broad to me to encompass, you know,

22   communication that is necessary for the -- in our modern

23   world for the basics of life.  And I understand that there

24   were some social media issues.  But he didn't conspire

25   with anyone or threaten anyone or anything of that nature

64

**JA154**

1  using social media.  So that would be my objection.

2          THE COURT:  Okay.  That's denied.  Okay.  Thanks

3  very much, counsel.  Court will be in recess.

4          MR. JAMES:  Thank you, Your Honor.

5          (Proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA155**

1                    CERTIFICATE OF REPORTER

2

3              I, Lisa K. Bankins, an Official Court Reporter

4     for the United States District and Bankruptcy Courts for

5     the District of Columbia, do hereby certify that I

6     reported, by machine shorthand, in my official capacity,

7     the proceedings had and testimony adduced upon the

8     sentencing in the case of the United States of America

9     versus James Little, Criminal Number 21-cr-00315, in said

10    court on the 14th day of March, 2022.

11

12             I further certify that the foregoing 65 pages

13    constitute the official transcript of said proceedings, as

14    taken from my machine shorthand notes, together with the

15    backup tape of said proceedings to the best of my ability.

16

17             In witness whereof, I have hereto subscribed my

18    name, this 18th day of March, 2022.

19

20

21                              Lisa K. Bankins

22                              Lisa K. Bankins
                                Official Court Reporter
23

24

25

**JA156**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 1:21-cr-315-RCL** |
| **JAMES LESLIE LITTLE,** | |
| *Defendant.* | |

### MEMORANDUM OPINION

Defendant James Leslie Little pleaded guilty in this matter for his participation in the unsuccessful insurrection at the United States Capitol on January 6, 2021. In its sentencing memorandum, the government requested that the Court impose a "split sentence"—thirty days of imprisonment followed by thirty-six months of probation. Gov't Sentencing Mem. ("Gov't Mem.") 17, ECF No. 31. The Court ordered Little to respond to the issue of whether the Court has authority to impose a split sentence. Order, ECF No. 34. Little responded, Def.'s Mem., ECF No. 37, and the government replied, ECF No. 39.

Upon consideration of the parties' filings, applicable law, and the arguments set forth at the sentencing hearing, the Court sentenced Little to sixty days' imprisonment and thirty-six months' probation. This memorandum opinion elaborates on the Court's reasoning as to why a split sentence is permissible under law and warranted by the circumstances of this case.

### I. BACKGROUND

January 6, 2021, marked a tragic day in American history. The peaceful transfer of power—one of our most important and sacred democratic processes—came under a full-fledged assault. While the immediate threat may have subsided, the damage from January 6 persists. Rioters interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred law enforcement officers, and caused more than a million dollars of property damage

1

**JA157**

to the U.S. Capitol. Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

For certain types of offenses, the Court may sentence a defendant to a term of imprisonment followed by a term of supervised release, which serves as "a form of postconfinement monitoring overseen by the sentencing court." *Johnson v. United States*, 529 U.S. 694, 697 (2000). Offenders on supervised release must abide by certain conditions specified by statute or imposed by the court. *Id.* This monitoring is designed to prevent the offender's recidivism. *See United States v. Cary*, 775 F.3d 919, 923 (7th Cir. 2015).

Petty offenders, however, are not eligible for supervised release. *See* 18 U.S.C. § 3583(b)(3). Little pleaded guilty to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Plea Agr. 1, ECF No. 25. The statutory maximum term of imprisonment for this offense is six months. 40 U.S.C. § 5109(b). Under the U.S. Code, Little's offense is a petty offense. *See* 18 U.S.C. § 3559(a)(7) (offense with a six-month maximum term of imprisonment is classified as Class B misdemeanor); 18 U.S.C. § 19 (Class B misdemeanors are "petty offense[s]"). So supervised release is not available in Little's case.

There is no question that the Court has the authority to sentence Little to a term of imprisonment or probation. *See, e.g.*, 40 U.S.C. § 5109(b); 18 U.S.C. § 3561(c). And for defendants who are sentenced to probation, it is also well-established that the Court may impose "intervals" of imprisonment—like "nights" or "weekends"—as a condition of probation.

2

**JA158**

18 U.S.C. § 3563(b)(10). But the government did not make this request in Little's case, given the COVID-19 safety concerns inherent in repeatedly entering and leaving detention facilities. Gov't. Mem. 24. The Court agrees that imposing such a sentence would be unwise. Instead, the government requested a "split sentence"—a term of imprisonment followed by a term of probation. *Id.* at 1, 17 (quoting *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011)).

January 6 defendants like Little present a unique challenge for the Court at sentencing. On one hand, the Court believes that *some* term of imprisonment is essential to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The nature and circumstances of Little's offense are serious. Little unlawfully entered the Capitol despite conceding that he witnessed law-enforcement officers deploy tear gas and fire rubber bullets to disperse rioters attempting to enter the Capitol. He did not turn back after seeing protestors attempting to unlawfully enter the Capitol by scaling the still-under-construction Inauguration scaffolding. Nor did he turn back when his mother had a medical emergency. Little then entered the Senate Gallery—one of the Capitol's most sensitive areas. It cannot be understated that participation of rioters like Little—while not necessarily violent or destructive—was essential in empowering rioters to interrupt the Electoral College certification. His conduct calls for a period of imprisonment.

On the other hand, many of these cases—Little's included—demand lengthier involvement from the Court to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553; *see United States v. Wiedrich*, No. 1:21-cr-581 (TFH), 1/27/2022 Tr. 23 (D.D.C.), ECF No. 33 ("I am purposely making the probation to cover the next general election, in 2024, to ensure you do not fall victim to following false Gods again."). The Court often finds it difficult to ascertain the sincerity of these particular defendants' remorse.

Many defendants appear sincere at sentencing, boasting of their purportedly deep shame, regret, and desire to change and be law-abiding citizens. But this Court is all too familiar with crocodile tears. Indeed, one day after being sentenced to probation, another January 6 defendant made statements in an interview that directly conflicted with the contrite statements that she made to the undersigned.

Fortunately, Little's sentencing does not present this dilemma. He is not remorseful for his conduct. Little boasted to others during and after the attack that, "We took the Capitol," and "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!" And in his statements to the Federal Bureau of Investigation, Little continued to deflect responsibility for the violence onto Antifa, Black Lives Matter, and even the law enforcement officers overwhelmed by the rioters. He blamed *Capitol Police officers* for failing to prevent him from entering the Capitol. The letter that this Court received with excerpts from Little's social media further suggests that Little may not fully comprehend the wrongfulness of his actions. Little's criminal conviction is not the result of a "setup" or "trap," ECF No. 40 at 3—*he* chose to engage in criminal conduct on January 6, despite the obvious indicators at the Capitol that his conduct was wrongful. And contrary to his Facebook post and the statements he made to the FBI, the riot was not "patriotic" or a legitimate "protest," *id.* at 5—it was an insurrection aimed at halting the functioning of our government. At his sentencing, Little did not retract any of his prior statements. He didn't apologize or acknowledge in any way that what he had done was wrong. Instead, he chose to criticize the FBI agents for not reading him his *Miranda* rights and requested that he be permitted to continue using firearms.

Only a split sentence would adequately serve the goals of sentencing described in 18 U.S.C. § 3553. Stated plainly, the Court must not only punish Little for his conduct but also ensure that

4

**JA160**

he will not engage in similar conduct again during the next election. Some term of imprisonment may serve sentencing's retributive goals. But only a longer-term period of probation is adequate to ensure that Little will not become an active participant in another riot.

The Court now turns to explaining why a split sentence is legally permissible when the defendant is sentenced to imprisonment for a petty offense.

## II. DISCUSSION

Whether courts have the authority to impose a "split sentence"—or a term of imprisonment followed by a term of probation—in petty offense cases is an open question in this Circuit. In fact, there's a dearth of authority on the issue nationwide. The Fourth Circuit is apparently the only Court of Appeals to address the issue and concluded that the practice is permitted. *United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) ("Unquestionably, the magistrate judge had the statutory authority under § 3561(a)(3) to sentence Posley to a term of six months of continuous imprisonment plus probation.").[1] The only other decision to address this issue, to the Court's knowledge, is *United States v. Spencer*. No. 1:21-cr-147 (CKK), slip op. at 6 (D.D.C. Jan. 19, 2022), ECF No. 70. There, another member of this Court reached the opposite conclusion, holding that the imposition of a split sentence for a petty offense is not permitted by statute. *Id.* In the absence of binding authority, the Court must determine for itself whether this practice is permitted. Upon consideration of the relevant statutory provisions, the Court concludes that split sentences in petty offense cases are authorized by statute.

The Court begins, as it must, with the text. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language

---

[1] The government also cites two treatises that agree with the Fourth Circuit. But neither contains any additional analysis beyond that in *Posely* and one relies explicitly on *Posely* for its conclusion. *See* Cyclopedia of Federal Procedure, § 50:203 (citing *Posely*); Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 547 n.13 (4th ed. 2021).

accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175

(2009) (internal quotation marks omitted)). A Court must first determine whether the disputed

statutory language "has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*,

519 U.S. 337, 340 (1997) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).

"[I]f the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'"

a court need look no further. *Id.* at 340. Here, the statutory language, read in context, is dispositive.

### A. Overview Of Sentencing In The Federal System And The General Rule in 18 U.S.C. § 3551

The Court begins with an overview of the relevant statutory scheme. Chapter 227 of Title

18 of the U.S. Code governs sentencing in the federal system. *See* 18 U.S.C. §§ 3551–3586. The

chapter is split into four subchapters: subchapter A contains general provisions, *id.* §§ 3551–3559;

subchapter B governs probation, *see id.* §§ 3561–3566; subchapter C governs fines, *see id.*

§§ 3571–3574; and subchapter D governs imprisonment, *see id.* §§ 3581–3586.

Two sections speak directly to the issue in this case. First, 18 U.S.C. § 3551, found in

subchapter A (general provisions), states that "[e]xcept as otherwise specifically provided, a

defendant who has been found guilty of an offense described in any Federal statute, . . . shall be

sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth

in . . . section 3553(a)(2)." *See id.* § 3551(a). It continues:

> An individual found guilty of an offense shall be sentenced, in
> accordance with the provisions of section 3553, to—
>
> > (1) a term of probation as authorized by subchapter B;
> >
> > (2) a fine as authorized by subchapter C; *or*
> >
> > (3) a term of imprisonment as authorized by subchapter D.
>
> A sentence to pay a fine may be imposed in addition to any other
> sentence. . . .

*Id.* § 3551(b) (emphasis added).

6

**JA162**

The parties agree that § 3551(b) sets out probation and imprisonment as two mutually exclusive options. Congress's use of the word "shall," as opposed to "may," "usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016). Here, § 3551(b) states that a defendant "shall be sentenced" to a term of probation, a fine, "or" a term of imprisonment. The "or" is "a function word [that] indicate[s] an alternative." *Or*, Webster's Third New International Dictionary 1585 (1961). Section 3551(b) concludes by stating that "[a] sentence to pay a fine may be imposed in addition to any other sentence." § 3551(b). Accordingly, the government concedes that "as a general matter . . . 'a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment.'" Gov. Mem. 18 (quoting *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019)). And the terms of § 3551(b) permit the imposition of a fine in addition to a sentence of probation or imprisonment. Thus, § 3551(b) ordinarily makes probation and imprisonment mutually exclusive.

**B. 18 U.S.C. § 3561 Specifically Authorizes Sentencing Courts To Impose A Term Of Probation If The Defendant Is Sentenced To Imprisonment For Only Petty Offenses**

The second relevant section, 18 U.S.C. § 3561, is found in the probation subchapter (subchapter B). It provides:

> (a) In General.—A defendant who has been found guilty of an offense may be sentenced to a term of probation unless—
>
> > (1) the offense is a Class A or Class B felony and the defendant is an individual;
> >
> > (2) the offense is an offense for which probation has been expressly precluded; or
> >
> > (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense *that is not a petty offense*.

*Id.* § 3561(a)(3) (emphasis added). Section 3561 largely reiterates the same rule found in § 3551: a defendant who is sentenced "at the same time to a term of imprisonment" is ordinarily not eligible

7

**JA163**

for probation. *See id.* § 3561(a)(3); *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004). But the government contends that the phrase at the end of § 3561(a)(3)—"that is not a petty offense"— provides an exception to that general rule. Gov. Mem. 20. The Court agrees.

To begin, the Court will divide Section 3561 into its component parts. The statute begins with a grant of authority: when a defendant has been found guilty of a federal offense, he "may be sentenced to a term of probation." *Id.* § 3561(a). The next word—"unless"—signals that this grant of authority persists "except on the condition[s] that" are listed. *Unless*, Webster's Third New International Dictionary 2503 (1961). The relevant condition here is found in § 3561(a)(3). It states that the authority to impose probation does not extend to circumstances where "the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." *Id.* § 3561(a)(3). The language "that is not a petty offense" modifies the language preceding it. Thus, while a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.

There are two possible ways that the petty-offense clause may interact with the language preceding it. Under the grammatical rule of the last antecedent, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)) (ellipsis in original). The last antecedent here is the noun "offense." But is the "offense" in question "the same or a different offense" or only "a different offense"? Grammatically speaking, the "offense" at issue—and the backward reach of the petty-offense clause—turn on whether the word "same" functions as an adjective or a pronoun. If "same" is a pronoun, then the petty-offense clause would apply only to "a different offense" because a limiting clause will not ordinarily extend to another, earlier noun. But if "the same" functions as an

8

**JA164**

adjective, the petty-offense clause would extend to "the same or a different offense" because the adjectival phrase "the same or a different" identifies which "offense" is at issue. The court's determination about how to apply the petty offense clause modifier is "context dependent." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021).

Here, the petty-offense clause extends to the "the same or a different offense" in its entirety because "same" functions as an adjective. The Court begins with the phrase itself. The phrase lacks "unexpected internal modifiers or structure." *Lockhart v. United States*, 577 U.S. 347, 352 (2016). No comma separates the phrases "the same" and "or a different offense." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 161 (2012) (explaining that punctuation "will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part"). While "different offense" is set off by the word "a," the Court agrees with the government that this indefinite article is grammatically necessary. The determiner "the" preceding the word "same" would not naturally apply to an otherwise undefined "different offense." Stated differently, the sentence would be grammatically incorrect without the "a," and drafters are "presumed to be grammatical in their compositions." Scalia & Garner, *supra*, at 140. The phrase thus lacks obvious indicators that "same" is functioning as a pronoun or that the backward reach of the petty-offense clause should be limited to only "a different offense."

Moving beyond the phrase itself, there are additional indicators in the text that "same" is functioning as an adjective. First, the last antecedent rule would apply with equal force to "the same" if it was a pronoun. Thus, the reader would be required to look backward to determine the what "the same" is referring to. *See* Scalia & Garner, *supra*, at 144 ("A pronoun . . . generally refers to the nearest reasonable antecedent"). Here, that is a "heavy lift." *Lockhart*, 577 U.S. at 351. The reader would be required to reach back across several nouns within the

9

**JA165**

subprovision (i.e., "imprisonment," "defendant"), across two subprovisions within the section, and past another noun found in the section's introductory language (i.e., "term"). It may be improbable that "same" would refer to these other words in the context of the statute, but the clearest and closest indicator that "same" is referring to "offense" is the *subsequent* reference to "offense." Second, "same" is not used as a pronoun in the two preceding provisions to describe the instant offense for which the defendant is being sentenced. *See* § 3561(a)(1)–(2). Instead, the preceding provisions say "the offense." *Id.* And third, "same" is used in the same subprovision as an adjective. *See* § 3561(a)(3) ("the defendant is sentenced at the *same time*"). "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). All these textual clues support the Court's conclusion that Congress used "same" as an adjective in this context, and that the reach of the petty-offense clause should not be limited to only "a different offense."

When determining the meaning of statutes, courts also "may consider the common usage" of the relevant terms or phrases. *Inner City Broad. Corp. v. Sanders*, 733 F.2d 154, 158 (D.C. Cir. 1984) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 109 (1980). Congress's common usage of the phrase "the same or a different" in other statutes also supports the Court's conclusion. When used as part of the phrase "the same or a different" in other provisions of the U.S. Code, Congress consistently uses "the same" as an adjective modifying the noun following it. *See, e.g.*, 34 U.S.C. § 12475 ("[A]ssisting victims who need to leave a public housing, tribally designated housing, or assisted housing unit quickly to protect their safety, including those who are seeking transfer to a new public housing unit, tribally designated housing unit, or assisted housing unit, whether in *the same or a different neighborhood or jurisdiction* . . . .")

10

**JA166**

(emphasis added)); 5 U.S.C. § 8412a(b)(3) ("A phased retiree . . . may transfer to another position in *the same or a different agency*, only if the transfer does not result in a change in the working percentage." (emphasis added)); 10 U.S.C. § 1447(11)(B) ("A child who is a student is considered not to have ceased to be a student during an interim between school years if the interim is not more than 150 days and if the child shows to the satisfaction of the Secretary of Defense that the child has a bona fide intention of continuing to pursue a course of study or training in *the same or a different school* during the school semester . . . immediately after the interim." (emphasis added)).

A survey of the phrase's common usage across other legal contexts also confirms the Court's interpretation. Again, when used in the phrase "the same or a different," the "same" is consistently used as an adjective to modify the subsequent noun. *See, e.g.*, FRE 804(b)(1) ("Testimony given as a witness in *the same or a different* proceeding . . ." (emphasis added)); *Currier v. Virginia*, 138 S. Ct. 2144, 2155 (2018) (Gorsuch, J.) ("If issue preclusion really did exist in criminal law, why wouldn't it preclude the retrial of any previously tried issue, regardless whether that issue stems from *the same or a different* 'criminal episode'? (emphasis added)); Restatement (Second) of Judgments § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on *the same or a different* claim." (emphasis added)); *United States v. Mendoza*, 464 U.S. 154, 159 n.4 (1984) (Rehnquist, J.) ("Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against *the same or a different* party." (emphasis added)).

Having considered these textual indicators, context, and common usage, the Court is persuaded that "same" is functioning as an adjective in this context. The petty-offense clause

**JA167**

clearly modifies "offense," and the particular "offense" at issue is described in the preceding phrase—"the same or a different." "When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (quoting *Porto Rico Railway, Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)); *see* 2A Shambie Singer & Norman J. Singer, Sutherland Statutes and Statutory Construction § 47:33 ("The last antecedent is 'the last word, *phrase*, or clause that can be made an antecedent without impairing the meaning of the sentence.'" (emphasis added)). Thus, the reach of the petty-offense clause extends all the way to "the same or a different offense."

While § 3561(a) limits a court's authority to impose a sentence of imprisonment followed by probation, this limitation does not apply if the underlying offense (or a different offense for which the defendant is sentenced to imprisonment in the same sentencing) is petty. In other words, § 3561(a) affirmatively authorizes a sentencing court to impose a sentence of probation when the defendant has been sentenced to imprisonment and the offenses for which he has been sentenced to imprisonment are petty.

The Court respectfully disagrees that "a plain reading" of § 3561 requires "a district court [to] choose between probation and imprisonment when imposing a sentence for a petty offense." *Spencer,* slip op. at 5 (quoting *Martin*, 363 F.3d at 35). Section 3561(a)(3) begins with a default rule—a court must choose between imprisonment and probation when sentencing a defendant. But the phrase "that is not a petty offense" qualifies that default rule with an exception. Interpreting § 3561 to treat imprisonment and probation as mutually exclusive under all circumstances renders the phrase "that is not a petty offense" meaningless. But courts "presume that Congress did not 'include words that have no effect,' and so [they] generally 'avoid a reading that renders some

words altogether redundant.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (citation omitted). The Court's interpretation here gives full meaning and effect to all the words in § 3561(a).

Finally, Little proposes another interpretation of § 3561(a)(3) divorced from any of these textual possibilities. He contends that when a federal judge sentences a defendant on multiple counts, the judge "decides on a sentence on the more serious counts . . . and then considers the sentences for any petty offenses separately, without being bound in any way by the decision on the more serious counts." Def.'s Mem. 3. This argument is meritless. Little focuses primarily on how the applicable Sentencing Guidelines are calculated when there are multiple counts, and the fact that the Sentencing Guidelines do not apply to petty offenses. *See* Def.'s Mem. 2–3. But the text of § 3561(a)(3) forecloses Little's interpretation. When a defendant is sentenced to imprisonment for a non-petty offense—whether that be for the same "or a different offense"— probation is not authorized. 18 U.S.C. § 3561(a)(3). But when the defendant is sentenced to imprisonment for petty offenses, a sentence of probation is permissible.

### C. Section 3561(a)(3) Provides An Exception To Section 3551's General Rule That Imprisonment and Probation Are Mutually Exclusive

Having determined the meaning of § 3561(a)(3), the next issue for the Court is how to interpret this provision in conjunction with § 3551(b). As explained below, § 3561 provides an exception to § 3551(b)'s default rule that imprisonment and probation are mutually exclusive. When the terms of § 3561's exception are met—that is, the defendant is sentenced to imprisonment only for a petty offense or offenses—§ 3561(a)(3) authorizes a sentencing court to impose a sentence of imprisonment and probation, despite the language in § 3551(b). This interpretation is consistent with the statutory text, structure, and context.

13

**JA169**

First, a plain-text reading of the statute leaves open the possibility of exceptions to the default rule that imprisonment and probation are mutually exclusive. Recall the opening provision of § 3551(a). The provisions within its chapter apply "except as otherwise specifically provided." 18 U.S.C. § 3551(a). So, by the terms of the statute itself, the default rule that imprisonment and probation are mutually exclusive will not apply if another provision "otherwise specifically provide[s]" an exception to that default rule. For the reasons explained above, the text of § 3561(a)(3) contains a specific provision that exempts petty offenses from this default rule and authorizes split sentences in petty-offense cases.

To the extent that there is any lingering ambiguity, other canons of interpretation only reinforce this conclusion. Even without the "otherwise specifically provided" language, "it is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). This canon is "most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *Id.* (citing *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974)). That is the case here: Section 3561(a)(3)'s grant of authority provides a narrow exception to Section 3551(b)'s general rule.

This canon ensures that *all* of Congress's goals set forth in the text are implemented. As a leading treatise explains, "the specific provision comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence." Scalia & Garner, *supra*, at 183. The context of these statutes illustrates this principle. A court sentencing a defendant to a term of imprisonment may generally "include as part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment." 18 U.S.C. § 3583(a).

But supervised release is *not* authorized for petty offenses. *See id.* § 3583(b)(3). Thus, the authorization in Section 3561 provides an alternative way for the Court in petty-offense cases to engage in "postconfinement monitoring" after the defendant is released from imprisonment—by sentencing the defendant to a split sentence. *Johnson*, 529 U.S. at 697.[2]

A contrary interpretation—that the Court must "choose between probation and imprisonment when imposing a sentence for a petty offense," *Spencer,* slip op. at 5—results in surplusage. But the Court must be careful to, if possible, give meaning and effect to every word and provision. *Mercy Hosp.*, 891 F.3d at 1068. If Section 3551 requires imprisonment and probation to be mutually exclusive in *all* circumstances, then there are *no* circumstances in which Section 3561's narrow carveout for petty offenses would apply. Stated differently, the language in Section 3561(a)(3) would cease to have any meaning. The Court will not adopt such an interpretation. *See* 2A Singer & Singer, Sutherland Statutes and Statutory Construction § 46:6 ("It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute."). Treating Section 3561(a)(3) as a narrow exception to the rule in Section 3551 avoids that outcome.[3]

---

[2] A peek at the provisions' relative placement within Chapter 227 and the titles of the two relevant subchapters reinforces the idea that § 3561 functions as the specific exception to § 3551. While "subchapter heading[s] cannot substitute for the operative text of the statute," "statutory titles and sections are tools available for the resolution of a doubt about the meaning of a statute." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (internal quotation marks and citation omitted). Section 3551 is placed in Subchapter A, which is titled "General Provisions," while § 3561 is placed in Subchapter B, which is titled "Probation." It is not surprising that the particular contours of when probation may and may not be imposed would be found in the subchapter focused exclusively on that subject of probation.

[3] While not raised by Little, the Court will note briefly here that the rule of lenity does not affect the Court's decision because the issue in this case is resolved entirely by reference to the statutory text and context. *See Moskal v. United States*, 498 U.S. 103, 108 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute." (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980)))

In sum, despite the language in Section 3551, Section 3561(a)(3) permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses.

### III.    CONCLUSION

For the foregoing reasons, the Court concludes that imposition of sixty days' imprisonment and thirty-six months' probation is permitted by statute and warranted by the circumstances of this case.  The Court will also impose a ten-dollar special assessment and $500 restitution, payable to the Architect of the Capitol.

Date:  _3/14/22_

Royce C. Lamberth
United States District Judge

16

**JA172**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| JAMES LITTLE | Case Number: 21-CR-315 (RCL) |
| | USM Number: 26667-509 |
| | Peter Stewart Adolf |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   Four (4) of the Information

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 40 USC § 5104(e)(2)(G) | Parading, Demonstrating or Picketing in a Capitol Building | 1/6/2021 | 4 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   One through Three   ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/14/2022
Date of Imposition of Judgment

*Royce C. Lamberth*
Signature of Judge

Honorable Royce C. Lamberth, U.S.D.C. Judge
Name and Title of Judge

3/17/22
Date

**JA173**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:   JAMES LITTLE
CASE NUMBER:   21-CR-315 (RCL)

## IMPRISONMENT

      The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

60 days

☑ The court makes the following recommendations to the Bureau of Prisons:

    Placement for the Defendant at Catawba County Jail.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☑ as notified by the United States Marshal or as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**JA174**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 4—Probation

| | Judgment—Page __3__ of __7__ |
|---|---|

DEFENDANT:  JAMES LITTLE
CASE NUMBER:  21-CR-315 (RCL)

## PROBATION

You are hereby sentenced to probation for a term of:

   36 months (3 years)

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.
        ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*
7.   ☑ You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(check if applicable)*
8.   You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9.   If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10.  You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**JA175**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 4A — Probation

| | | |
|---|---|---|
| | Judgment—Page | 4 of 7 |

DEFENDANT: JAMES LITTLE
CASE NUMBER: 21-CR-315 (RCL)

## STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____        Date _____

**JA176**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 4B — Probation

Judgment—Page ___5___ of ___7___

DEFENDANT:  JAMES LITTLE
CASE NUMBER:  21-CR-315 (RCL)

## ADDITIONAL PROBATION TERMS

The Court authorizes supervision of this case to be transferred to the United States District Court for the Western District of North Carolina.

You are ordered to make restitution to Architect of the Capitol Building in the amount of $500. Restitution payments shall be made to the Clerk of Court for the United States District Court, District of Columbia.
SEE PAGE 6 FOR DISBURSEMENT DETAILS.

You shall abide by the following special condition:

Social Media Restriction -- You shall not access, view or use any online social media, chat services, blogs, instant messages, SMS, MMS, digital photos, video sharing websites, emails or any other interactive, online or electronic communication applications or sites without the approval of the Probation Officer.

The Probation Office shall release the presentence investigation report to all appropriate agencies, which includes the United States Probation Office in the approved district of residence, in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the Probation Office upon the defendant's completion or termination from treatment.

NOTICE OF APPEAL

Pursuant to 18 USC § 3742, you may have a right to appeal the sentence imposed by this Court . If you choose to appeal, you must file any appeal within 14 days after the Court enters judgment.

As defined in 28 USC § 2255, you also have the right to challenge the conviction entered or sentence imposed if new and currently unavailable information becomes available to you or, on a claim that you received ineffective assistance of counsel in entering a plea of guilty to the offense(s) of conviction or in connection with sentencing.

If you are unable to afford the cost of an appeal, you may request permission from the Court to file an appeal without cost to you.

**JA177**

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __6__ of __7__

DEFENDANT: JAMES LITTLE
CASE NUMBER: 21-CR-315 (RCL)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 10.00 | $ 500.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Architext of the Capitol | $500.00 | $500.00 | |
| Office of the Chief Financial Officer | | | |
| Attention: Kathy Sherrill, CPA | | | |
| Ford House Office Building | | | |
| Room H2-205B | | | |
| Washington, DC 20515 | | | |
| **TOTALS** | $ 500.00 | $ 500.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑ the interest requirement is waived for the ☐ fine ☑ restitution.

    ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**JA178**

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT: JAMES LITTLE
CASE NUMBER: 21-CR-315 (RCL)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___510.00___ due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

      The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333
      Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk
      of the Court of the change until such time as the financial obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

      Case Number
      Defendant and Co-Defendant Names                                  Joint and Several           Corresponding Payee,
      (including defendant number)              Total Amount                Amount               if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**JA179**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

JAMES LESLIE LITTLE,

        Defendant.

DOCKET NO. 1:21 CR 315

## NOTICE OF APPEAL

James Leslie Little, by and through his attorney of record, Assistant Federal Public

Defender Peter Adolf, hereby gives notice, pursuant to Rule 4(b) of the Federal Rules of

Appellate Procedure, that he is appealing the conviction and sentence announced on

March 14, 2022 and entered March 18, 2022 by the Honorable Royce C. Lamberth to the

United States Court of Appeals for the District of Columbia Circuit.


        Respectfully submitted:

        _s/ Peter Adolf
        Peter Adolf
        Assistant Federal Public Defender
        North Carolina Bar No. 37157
        Attorney for James Leslie Little
        Federal Public Defender, Western District of North Carolina
        129 West Trade Street, Suite 300
        Charlotte, NC 28202
        (704) 374-0720 (phone)
        (704) 374-0722 (fax)
        Peter_Adolf@fd.org

DATE: March 21, 2022

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. ) | |
| JAMES LITTLE ) | Case Number:  21-CR-315 (RCL) |
| ) | USM Number:  *36398-509 |
| ) | Peter Stewart Adolf |
| ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   Four (4) of the Information

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 40 USC § 5104(e)(2)(G) | Parading, Demonstrating or Picketing in a Capitol Building | 1/6/2021 | 4 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   One through Three   ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/14/2022
Date of Imposition of Judgment

Signature of Judge

Honorable Royce C. Lamberth, U.S.D.C. Judge
Name and Title of Judge

3/24/22
Date

**JA181**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    2    of    7

DEFENDANT:  JAMES LITTLE
CASE NUMBER:   21-CR-315 (RCL)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

60 days

☑  The court makes the following recommendations to the Bureau of Prisons:

Placement for the Defendant at Catawba County Jail.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at  _____  ☐  a.m.  ☐  p.m.   on  _____

☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on  _____ .

☑  as notified by the United States Marshal or as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

**JA182**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 4—Probation

| | Judgment—Page | 3 | of | 7 |

DEFENDANT:  JAMES LITTLE
CASE NUMBER:  21-CR-315 (RCL)

## PROBATION

You are hereby sentenced to probation for a term of:

   36 months (3 years)

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on
    probation and at least two periodic drug tests thereafter, as determined by the court.
       ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future
          substance abuse. *(check if applicable)*
4.  ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*)
       as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
       reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*
7.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(check if applicable)*
8.  You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9.  If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10. You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution,
    fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached
page.

**JA183**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 4A — Probation

| | Judgment—Page | 4 | of | 7 |

DEFENDANT: JAMES LITTLE
CASE NUMBER: 21-CR-315 (RCL)

## STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

**JA184**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 4B — Probation

| | Judgment—Page | 5 | of | 7 |
|---|---|---|---|---|

DEFENDANT:  JAMES LITTLE
CASE NUMBER:  21-CR-315 (RCL)

## ADDITIONAL PROBATION TERMS

The Court authorizes supervision of this case to be transferred to the United States District Court for the Western District of North Carolina.

You are ordered to make restitution to Architect of the Capitol Building in the amount of $500. Restitution payments shall be made to the Clerk of Court for the United States District Court, District of Columbia.
SEE PAGE 6 FOR DISBURSEMENT DETAILS.

You shall abide by the following special condition:

Social Media Restriction -- You shall not access, view or use any online social media, chat services, blogs, instant messages, SMS, MMS, digital photos, video sharing websites, emails or any other interactive, online or electronic communication applications or sites without the approval of the Probation Officer.

The Probation Office shall release the presentence investigation report to all appropriate agencies, which includes the United States Probation Office in the approved district of residence, in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the Probation Office upon the defendant's completion or termination from treatment.

NOTICE OF APPEAL

Pursuant to 18 USC § 3742, you may have a right to appeal the sentence imposed by this Court . If you choose to appeal, you must file any appeal within 14 days after the Court enters judgment.

As defined in 28 USC § 2255, you also have the right to challenge the conviction entered or sentence imposed if new and currently unavailable information becomes available to you or, on a claim that you received ineffective assistance of counsel in entering a plea of guilty to the offense(s) of conviction or in connection with sentencing.

If you are unable to afford the cost of an appeal, you may request permission from the Court to file an appeal without cost to you.

**JA185**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 6 | of | 7 |

**DEFENDANT: JAMES LITTLE**
**CASE NUMBER: 21-CR-315 (RCL)**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 10.00 | $ 500.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Architext of the Capitol | $500.00 | $500.00 | |
| Office of the Chief Financial Officer | | | |
| Attention: Kathy Sherrill, CPA | | | |
| Ford House Office Building | | | |
| Room H2-205B | | | |
| Washington, DC 20515 | | | |
| **TOTALS** | $ 500.00 | $ 500.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑ the interest requirement is waived for the   ☐ fine   ☑ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT: JAMES LITTLE
CASE NUMBER: 21-CR-315 (RCL)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __510.00__ due immediately, balance due

     ☐  not later than _____ , or
     ☐  in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
     term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

     The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333
     Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk
     of the Court of the change until such time as the financial obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Case Number
Defendant and Co-Defendant Names                                   Joint and Several       Corresponding Payee,
*(including defendant number)*          Total Amount                     Amount             if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**JA187**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JAMES LESLIE LITTLE,

        Defendant.

DOCKET NO. 1:21 CR 315

**MOTION TO AMEND JUDGMENT AND TERMINATE PROBATION**

James Leslie Little, by and through his counsel of record, Assistant Federal Public Defender Peter Adolf, respectfully requests that this Court amend the judgment in his case to remove the term of probation and/or terminate his term of probation.

Mr. Little's case is before this Court on remand from the United States Court of Appeals for the District of Columbia, following that court's ruling that Mr. Little's sentence is illegal in that it includes both a term of incarceration and a term of probation when "probation and imprisonment may not be imposed as a single sentence. They are separate options on the menu." *United States v. Little,* 78 F.4th 453, 455 (D.C. Cir. 2023).

Mr. Little has already served the sentence of imprisonment and is currently serving the term of probation. An unbroken line of Supreme Court authority stretching back 150 years deprives this Court of jurisdiction to impose any punishment beyond the term of imprisonment Mr. Little has already served. Accordingly, this Court is constrained to strike and therefore terminate the term of probation. But even if the Court were to have discretion

**JA188**

to conduct a resentencing hearing, it should preserve judicial resources by declining to do so and by, instead, terminating the probationary term.

**I.    Because Little has fully served his term of imprisonment, the Double Jeopardy Clause bars the Court from imposing additional punishment at a resentencing.**

In *Ex Parte Lange,* 85 U.S. (18 Wall.) 163 (1873), the defendant was convicted of a theft offense,

> the punishment for which offence, as provided in said statute, [was] imprisonment for not more than one year ***or*** a fine of not less than ten dollars nor more than two hundred dollars.... [T]he judge presiding sentenced the petitioner under said conviction to one year's imprisonment, ***and*** to pay two hundred dollars fine. The petitioner was, on said day, committed to jail in execution of the sentence, and on the following day the fine was paid to the clerk of the court, who, in turn ... paid the same into the Treasury of the United States.

*Id.* at 164 (emphasis in original).  The very next day, the trial judge, realizing his mistake, vacated the judgment and substituted a judgment and sentence consisting of one year's imprisonment and no fine.  *Id.*

The Supreme Court vacated the sentence, holding that the sentencing judge violated the Double Jeopardy clause by sentencing the defendant to both punishments, and that the sentencing judge had no jurisdiction to re-impose the jail term after the fine had already been paid:

> We are of [*sic*] opinion that when the prisoner, as in this case, by reason of a valid judgment, had fully suffered one of the alternative punishments to which alone the law subjected him, the power of the court to punish further was gone. That the principle we have discussed [i.e. double jeopardy] then interposed its shield, and forbid that he should be punished again for that offence. The record of the court's proceedings, at the moment the second sentence was rendered, showed that in that very case, and for that very offence, the prisoner had fully performed, completed, and endured one of the alternative punishments which the law prescribed for that offence, and had suffered five days' imprisonment on account of the other. It thus showed the court that its power to punish for that offence was at an end.

*Id.* at 176 (emphasis added).  The Court continued:

> Unless the whole doctrine of our system of jurisprudence, both of the Constitution and the common law, for the protection of personal rights in that regard, are a nullity, the authority of the court to punish the prisoner was gone. The power was exhausted; its further exercise was prohibited.  It was error, but it was error because the power to render any further judgment did not exist.

*Id.*

The Supreme Court reaffirmed the holding of *Lange* some 70 years later in *In re Bradley,* 318 U.S. 50 (1943).  The defendant in *Bradley* was sentenced to a fine and imprisonment when the statute allowed one or the other.  *Id.* at 51.  The defendant was taken into custody, and three days later his attorney paid the fine.  *Id.*  Later the same day, the judge issued an order amending the sentence to omit the fine and instructed the clerk to return the money to the attorney, who refused to accept it.  *Id.* at 51-52.

> The substantive portion of the Court's opinion is worth reviewing in its entirety:

> When, on October 1, the fine was paid to the clerk and receipted for by him, the petitioner had complied with a portion of the sentence which could lawfully have been imposed. As the judgment of the court was thus executed so as to be a full satisfaction of one of the alternative penalties of the law, the power of the court was at an end.  It is unimportant that the fine had not been covered into the treasury; it had been paid to the clerk, the officer of the United States authorized to receive it, and petitioner's rights did not depend upon what that officer subsequently did with the money.

> It follows that the subsequent amendment of the sentence could not avoid the satisfaction of the judgment, and the attempt to accomplish that end was a nullity.  ***Since one valid alternative provision of the original sentence has been satisfied, the petitioner is entitled to be freed of further restraint.***

*Id.* at 52 (emphasis added; footnotes omitted).

The Supreme Court reaffirmed the holdings of *Lange* and *Bradley* in *Jones v. Thomas,* 491 U.S. 376 (1989).  Defendant Thomas shot and killed a store customer during a robbery and was convicted in state court of felony murder and attempted robbery.  He was sentenced

**JA190**

to fifteen years' imprisonment for the attempted robbery count and life imprisonment for the felony murder count, with the sentences to run consecutive and the attempted robbery sentence to run first. The state supreme court later ruled that the state legislature had not intended multiple punishments in such situations, and the trial court vacated the attempted robbery conviction and fifteen-year sentence while retaining the life sentence for felony murder, ordering that the time the defendant had already served be credited against the felony murder sentence. By then the defendant had served out the attempted robbery sentence and was already serving the felony murder sentence of life.

Relying on *Lange* and *Bradley,* the defendant claimed that he had already served one of the two sentences for his crime, and since he could only be punished once his punishment was at an end. The Supreme Court rejected the argument and upheld the single life sentence:

> *Bradley* and *Lange* both involved alternative punishments that were prescribed by the legislature for a single criminal act. The issue presented here, however, involves separate sentences imposed for what the sentencing court thought to be separately punishable offenses, one far more serious than the other. The alternative sentences in *Bradley*, moreover, were of a different type, fine and imprisonment. While it would not have been possible to 'credit' a fine against time in prison, crediting time served under one sentence against the term of another has long been an accepted practice.

*Thomas,* 491 U.S. at 384.

It noteworthy that four justices – in an opinion by Justice Scalia – dissented, finding the case indistinguishable from *Lange* and *Bradley* and calling for the life sentence to be vacated. *Id* at 388-96 (Scalia, J., with Stevens, Brennan, and Marshall, JJ., dissenting). The division among the justices was whether the *Lange/Bradley* principle would be extended to multiple-count situations; the viability of *Lange* and *Bradley* was never in doubt.

Indeed, ten of the twelve federal circuit courts, including the D.C. Circuit, have had occasion to rely on the *Lange/Bradley* line of cases. *See, e.g., United States v. Holmes,* 822 F.3d 481 (5th Cir. 1987) (discharging term of imprisonment where punishments were available in the alternative and fine was already paid); *United States v. DiGirlomo,* 548 F.2d 252, 254-55 (8th Cir. 1977) (same); *United States ex rel. Kanawha Coal Operators Ass'n v. Miller,* 540 F.2d 1213 (4th Cir. 1976) (same); *United States v. Sampogne,* 533 F.2d 766 (2d Cir. 1976) (same); *United States v. White,* 980 F.2d 1400 (11th Cir. 1993) (discharging fine where punishments were available in the alternative and term of imprisonment was already served); *Tatum v. United States,* 310 F.2d 854, 855 (D.C. Cir. 1962); *Dye v. Frank,* 355 F.3d 1102, 1108 (7th Cir. 2004); *Breest v. Helgemoe,* 579 F.2d 95, 101 n.12 (1st Cir. 1978); *Warnick v. Booher,* 425 F.3d 842, 847 (10th Cir. 2005); *United States v. Edick,* 603 F.2d 772, 776-78 (9th Cir. 1979).

The United States opposes this motion, and filed a memorandum last week in another similar case laying out its position. *See United States v. Pryer,* 1:21 CR 667, doc. no. 80 (D.D.C. Dec. 1, 2023) (government's opposition to early termination of probation and motion for resentencing). In the interest of judicial economy, those arguments are addressed here.

The government apparently believes that this Court can increase the term of imprisonment Mr. Little has already served and therefore order him re-incarcerated. *See id.* at 1, 8-17. The *Lange* court considered this precise scenario and provided the answer in no uncertain terms:

**JA192**

[I]f the judgment of the court is that the convict be imprisoned for four months, and he enters immediately upon the period of punishment, can the court, after it has been fully completed…vacate that judgment and render another, for three or six months' imprisonment, or for a fine? Not only the gross injustice of such a proceeding, but the inexpediency of placing such a power in the hands of any tribunal is manifest.

*Lange,* 85 U.S. (18 Wall.) at 168.  And later:

But if, after judgment has been rendered on the conviction, and the sentence of that judgment executed on the criminal, he can be again sentenced on that conviction to another and different punishment, or to endure the same punishment a second time, is the constitutional restriction [against double jeopardy] of any value?

*Id.* at 173.

The dissenting judge in Mr. Little's case before the Court of Appeals suggested that Mr. Little could be sentenced to additional jail time on remand, citing *Davenport v. United States,* 353 F.2d 882 (D.C. Cir. 1965) and *Hayes v. United States,* 249 F.2d 516 (D.C. Cir. 1957). *See Little,* 78 F.4th at 469 n.3 (Wilkins, J., dissenting).  *Davenport* presented a similar multi-count issue to the Supreme Court's later decision in *Jones v. Thomas* and anticipated the Supreme Court's ruling.  *Hayes* involved a defendant inadvertently sentenced under a statute which had been superseded, and the question was whether he could be sentenced anew under the correct statute.  The *Hayes* court discussed and distinguished *Lange* on the very basis that the punishment of a fine in *Lange,* by itself, was a lawful sentence and "had been valid and had been satisfied before the addition to the sentence of a discretionary prison term as well," *Hayes,* 249 F.2d at 518, just as in Mr. Little's case.  Neither case provides any support for the possibility of additional incarceration for Mr. Little.

The government's position seems to rely principally on (1) cases dealing with multiple counts rather than a single count, as noted above, (2) cases addressing the omission of mandatory portions of a sentence at the outset, and/or (3) the argument that *Lange* and

**JA193**

*Bradley* only prohibit resentencing beyond the statutory maximum. The first two are irrelevant; the third is simply false.

The Supreme Court's decision in *Jones v. Thomas* discussed *supra* addressed whether to extend the principle of *Lange* and *Bradley* to multi-count cases, which split the Court 5-4. All nine justices agreed on the continuing viability of *Lange* and *Bradley* regarding a single count of conviction.

*United States v. DiFrancesco*, 449 U.S. 117, 132 (1980) addressed whether a statutorily-authorized government appeal of a sentence was unconstitutional. The *DiFrancesco* opinion in fact reaffirmed *Lange,* discussing its holding at some length. *See id.* at 138-39.

*Bozza v. United States*, 330 U.S. 160 (1947) dealt with the sentencing judge's inadvertent omission of a mandatory fine along with the lawful sentence of imprisonment. "This Court has rejected the doctrine that a prisoner, whose guilt is established by a regular verdict, is to escape punishment altogether because the court committed an error in passing the sentence." *Id.* at 166.

In *Burns v. United States*, 552 F.2d 828, 831 (8th Cir. 1977), the sentencing judge initially imposed a determinate sentence of three years' imprisonment, while the statute required an indeterminate sentence of up to four years' imprisonment. The judge then changed the sentence to conform to the statute, adding a recommendation that the defendant be released after no more than three years. Substituting a lawful sentence for the unlawful sentence was upheld on appeal.

*United States v. Rosario*, 386 F.3d 166, 170 (2d Cir. 2004) addressed whether requiring sex offender registration violates the Tenth Amendment. The opinion listed

situations in which sentences can be increased after pronouncement, none of which apply here.

   *United States v. Townsend*, 178 F.3d 558 (D.C. Cir. 1999) dealt with multiple counts, just as in *Jones v. Thomas,* and distinguished *Lange* and *Bradley* on the same basis.  *See id.* at 570.

   *Greenlaw v. United States*, 554 U.S. 237, 253 (2008) dealt with whether the Court of Appeals can increase a defendant's sentence where the defendant appeals but the government does not.  It cannot.

   *United States v. Versaglio*, 85 F.3d 943, 949 (2d Cir. 1996) dealt with an appeal by the defendant that the sentencing judge had unlawfully imposed a fine and imprisonment, requiring vacatur of the term of imprisonment, and an appeal by the government that the fine imposed was too low due to a guidelines error.  The Court of Appeals agreed with both parties, even as it discussed and reaffirmed the holdings of *Lange* and *Bradley.  See Versaglio,* 85 F.3d at 947-48.

   In *United States v. Bohn*, 959 F.2d 389, 394–95 (2d Cir. 1992) the plea agreement limited the fine but not the term of imprisonment.  The sentencing judge imposed probation, but also a fine above the agreed-upon maximum.  The Court of Appeals ruled that the defendants could either withdraw their pleas or be resentenced to a fine within the agreed-upon range, in which case the judge could potentially impose imprisonment, as the agreement allowed.  There was no discussion of *Lange, Bradley,* or double jeopardy at all.

   *Christopher v. United States*, 415 A.2d 803 (D.C. 1980) dealt with the fallout from the D.C. Court of Appeals' prior ruling that D.C. Superior Court judges were barred by statute from partially suspending sentences of imprisonment, and it ordered the outstanding

suspended portion of the sentence unsuspended, as the statute required.  This was precisely the kind of problem Congress eliminated when it barred "split sentences" for people like Mr. Little.  *See Little,* 78 F.4th at 455, 458-60.

   *United States v. Johnson*, 378 F.3d 230 (2d. Cir. 2004) addressed, in relevant part, whether the sentencing judge could order restitution for the first time on remand when restitution was required by statute and the failure to impose it was an oversight.  It could.  *See id.* at 243-44.

   *United States v. Lominac*, 144 F.3d 308 (4th Cir. 1998), *abrogated on other grounds by Johnson v. United States*, 529 U.S. 694 (2000) addressed whether a new term of supervised release could be imposed under the statute in force at the time following revocation and incarceration.  It could not.  The majority's remarks about the possible sentence on remand were *dicta*, and the suggestion that the defendant could be sentenced to additional imprisonment indeed drew a separate opinion citing *Lange* and *Bradley, see id.* at 318-19 (Widener, J., concurring and dissenting) ("When Lominac completed the imprisonment portion of the dual sentence, the power vested in the court with regard to punishment was extinguished").  Further, the *Lominac* court directed the sentencing judge to credit the time spent on impermissible supervised release against any additional imprisonment imposed, essentially mooting the issue.  *See id.* at 317.

   Perhaps most disturbing is the government's assertion in last week's filing that "the *Lange/Bradley* rule applies only where the alternative penalty imposes the maximum authorized sentence and is satisfied in full."  *United States v. Pryer,* 1:21 CR 667, doc. no. 80 at 13 (D.D.C. Dec. 1, 2023) (government's opposition to early termination of probation and motion for resentencing).  The government cites only *United States v. Holmes*, 822 F.2d 481

(5th Cir. 1987) for this principle.  In fact, *Holmes* simply held that a defendant sentenced illegally to a fine and imprisonment who had already paid the fine could not be sentenced to imprisonment, just as *Lange* and *Bradley* had held.  The contempt statute at issue did not set a limit on the fine that could be imposed, and thus a higher fine would have been authorized on remand if the government's theory was correct.  Any lack of clarity in the opinion seized upon and misinterpreted by the government is not merely *dicta;* the government's reading is directly contrary to the holding of the case.

Moreover, in *Tatum v. United States* the D.C. Circuit held – citing, *inter alia*, *Lange* and *Bradley* – that "[i]f appellant's first sentence was lawful a second sentence could not lawfully be imposed which increased it or made it more severe, once he had commenced serving confinement under it."  *Tatum,* 310 F.2d at 855.  Unlike the cases cited by the government, *Tatum* is binding on this Court.  Mr. Little's jail sentence was lawful in and of itself and has already been served; it cannot now be increased.  All that remains is his partially completed term of probation, which is illegal and must be vacated.

**II.      Alternatively, even if Double Jeopardy does not require it as a matter of law, the Court should exercise its discretion to strike and/or terminate the probation term in the circumstances of this particular case.**

Setting aside the question of the legality of a resentencing, this Court has the power to terminate Mr. Little's probation pursuant to 18 U.S.C. § 3564(c), and the circumstances of the case would support termination even absent the remand from the Court of Appeals.  Mr. Little was released from prison and began serving his three-year term of probation on July 8, 2022, nearly a year-and-a-half ago.  He has been compliant with the terms of probation as far as counsel is aware, and presents no future danger to the community.

**JA197**

Indeed, even if resentencing to additional prison time were permissible, the government would apparently admit that the restriction on Mr. Little's time already spent on probation should offset any potential additional incarceration. *See Pryer,* doc. no. 80 at 14-15 (defendant's "term of supervised release restrained his liberty for a known period of time that can be credited against any future sentence of imprisonment") (quoting *Lominac,* 114 F.3d at 318); *Lominac,* 144 F.3d at 317 ("[b]ecause the Attorney General, under the statutory framework, cannot credit Lominac for time served on the unconstitutional term of supervised release, the district court on remand will give Lominac credit for that time against any new prison sentence").[1] And the term of incarceration Mr. Little already served was

---

[1] The government then backtracks and suggests that the time spent on probation need not be credited day-for-day, but declines to propose a ratio or explain how this Court should decide on an appropriate ratio. *See Pryer,* doc. no. 80 at 16 n.5. Once again, the government cites only inapposite cases for principles that are the opposite of their actual holdings.

The government cites *United States v. Martin*, 363 F.3d 25 (1st Cir. 2004), where the First Circuit agreed with the government that the sentencing judge incorrectly calculated the guidelines and that the defendant's sentence needed to be increased from probation to imprisonment. The *Martin* court simply directed the District Court to fashion a downward departure to account for the punishment already illegally imposed. *Martin* has no application to this case, and indeed the *Martin* court discussed *Lange* and *Bradley* at length, distinguishing them as having no application to correction of an illegally lenient sentence. *See Martin,* 363 F.3d at 34-37. *Martin* in fact held the opposite of what the government argues: The *Martin* court held that whatever the correct prison sentence would have been at the outset, the sentence after remand would now have to be lower to account for the already-served illegal time on probation. The government now somehow claims that *Martin* counsels this Court to **raise** Mr. Little's already-served lawful sentence to account for the illegal probation term he has already partially served.

Worse, the government then cites *Lominac* to say that a one-to-one ratio need not be used, *see Pryer,* doc. no. 80 at 16 n.5, when the actual holding of *Lominac* was to require a one-to-one ratio. *See Lominac,* 144 F.3d at 317 ("On remand, however, any prison time that Lominac receives under a resentence must be reduced by the time he has already served for violating his release, that is, his six months in prison and the time he has served under the (new) unconstitutional term of supervised release."). The government's argument is pure sleight-of-hand.

significantly more onerous and punitive than anticipated by the Court or counsel: Rather than serving the time at a local county facility near his home as this Court recommended, he was designated to FCI Jesup, where he spent half of his 60-day sentence in COVID isolation in the medium security prison – two weeks on either end of the sentence – and suffered from repeated panic attacks as a result.

In short, the Court should exercise its discretion to preserve judicial resources by striking the probation term in this case without a resentencing hearing.

**WHEREFORE,** James Leslie Little respectfully requests that this Court amend the judgment in his case to strike and/or terminate the term of probation.

Respectfully submitted:

_s/ Peter Adolf_
Peter Adolf
Assistant Federal Public Defender
North Carolina Bar No. 37157
New Jersey Bar No. 038911999
New York State Bar No. 2729671
Attorney for James Leslie Little
Federal Public Defender, Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 375-2287 (fax)
Peter_Adolf@fd.org

DATE: December 6, 2023

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:21-cr-315 (RCL) |
| | : | |
| JAMES LITTLE, | : | |
| | : | |
| *Defendant.* | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO LITTLE'S**
**MOTION TO AMEND JUDGMENT AND TERMINATE PROBATION**

The D.C. Circuit vacated defendant James Little's split sentence of imprisonment and probation, holding that a defendant convicted of a single petty offense may not be sentenced both to imprisonment and to probation for that offense. *United States v. Little*, 78 F.4th 453, 454 (D.C. Cir. 2023). The Circuit did not find one part of the sentence lawful and one part unlawful, but rather vacated the split sentence in its entirety and remanded "to the district court for resentencing." *Id*. at 461. Unhappy with the prospect of resentencing, Little instead moves this Court to "amend the judgment in his case to remove the term of probation and/or terminate his term of probation." ECF 58. But this Court should reject Little's attempt to circumvent the mandate and should instead do exactly what the Circuit ordered it to do—resentence Little to a lawful term. Indeed, given that the Circuit vacated the entire sentence, there is nothing for this Court to "amend."

Without addressing the mandate rule, Little advances two arguments in favor of amending the judgment and terminating probation. *First*, he argues that that the Double Jeopardy Clause "bars the Court from imposing additional punishment at a resentencing," because he has been released from imprisonment and is now on probation. ECF 58 at 2. Not so. As explained in detail below, when a defendant's sentence is vacated as illegal, double jeopardy does not bar resentencing even if the sentence is increased. *See Hayes v. United States*, 249 F.2d 516, 517 (D.C. Cir. 1957) (upholding

**JA200**

resentencing by district court, noting that "if the sentence were invalid and defendant successfully attacked it, he could be validly resentenced though the resentence increased the punishment"); *see also United States v. Lominac*, 144 F.3d 308, 317-18 (4th Cir. 1998), *abrogated on other grounds by Johnson v. United States*, 529 U.S. 694 (2000); *United States v. Versaglio*, 85 F.3d 943, 949 (2d Cir. 1996); *United States v. Holmes*, 822 F.2d 481, 498 (5th Cir. 1987); *Christopher v. United States*, 415 A.2d 803 (D.C. 1980).

*Second*, Little argues that this Court should exercise its discretion to strike and/or terminate probation in the particular circumstances here, highlighting alleged compliance with the terms of his probation, asserted lack of danger to the community, and the allegedly unexpectedly onerous nature of the imprisonment due to the location of his incarceration and COVID isolation protocols during that incarceration. ECF 58 at 10-12. But even if this Court were to ignore the mandate and consider exercising its discretion to terminate probation, it should consider additional facts including: (1) Little's failure to pay the ordered $500 restitution to date; (2) Little's social media postings including (a) setting up a "J 6 Patriot James Leslie Little" public figure Facebook page, and (b) making various Facebook posts on his personal Facebook account discussing his activities on January 6, 2021, and his incarceration that appear to recant any personal acceptance of responsibility and call into question the deterrent effect, if any, his current sentence (including incarceration previously served) has had on him.

For all these reasons, Little's motion to amend judgment and terminate probation should be denied and the Court should proceed with Little's resentencing as presently scheduled.

## PROCEDURAL HISTORY

On January 6, 2021, James Leslie Little rioted inside the United States Capitol. In his own words, he "took over the Capital [sic]" because "[s]tealing elections is treason." ECF 26 at 4. He

2

**JA201**

pleaded guilty to a petty offense: Parading, Demonstrating, or Picketing in a Capitol Building. 40 U.S.C. § 5104(e)(2)(G). That crime carries a sentence of six months in prison, a fine, or both. *Id.* § 5109(b). As an alternative sentence, a court may sentence a defendant to up to five years of probation, with or without a fine. 18 U.S.C. §§ 3551(b), 3561.

The Government advocated for a split sentence combining imprisonment and probation. *See* ECF 31 at 1 (recommending a sentence of "a 1-month term of incarceration 36 months' probation, 60 hours of community service, and pursuant to the plea agreement order Little to pay $500 in restitution."). The Court held a sentencing hearing on March 14, 2022. *See* Tr. ECF 55. The Court entered judgment and sentenced Little to a 60-day imprisonment term, 36-month probation term, $500 in restitution (immediately payable to the Clerk of the Court), and a $10 special assessment. ECF 48.

Little appealed. ECF 51. Little argued the split sentence was "illegal" and that "[b]ecause Little has already served his entire term of imprisonment, the proper remedy is to reverse and remand with instructions that Little be immediately discharged from probation and that an amended judgment be issued reflecting no probationary term." Br. for Appellant, *United States v. Little*, No. 22-3018 (July 28, 2022) at 40. The Circuit agreed that the split sentence was unlawful, but rejected Little's request for reversal and immediate discharge, explicitly vacating Little's unlawful split sentence and remanding to this Court for resentencing. *Little*, 78 F.4th at 461.

This Court received the mandate of the Circuit on November 9, 2023. ECF 57. Little moved to alter judgment and terminate his probation on December 6, 2023, ECF 58, urging this Court to grant the same relief the Circuit rejected in its opinion and mandate. On December 11, 2023, this Court ordered a resentencing hearing to be held on January 25, 2024. This response to Little's motion follows.

3

**JA202**

## LITTLE'S STATUS

- Little has served the ordered sixty days of incarceration and was released on July 8, 2022.

- Little is currently on probation with special conditions as imposed by this Court, including a Social Media Restriction.  ECF 48 at 5.

- Little has not paid the ordered restitution or assessment.  *See* Ex. A.[1]  It has been twenty-one months since the restitution and assessment were ordered.

## ARGUMENT

### I.    *The Circuit's Mandate Requires Resentencing*

Quite simply, this Court has no discretion as to what it must do: it must carry out the mandate. And the Circuit was clear: "we vacate Little's sentence and remand to the district court for resentencing." *Little*, 78 F.4th 453, 461 (D.C. Cir. 2023), *see also* ECF 56.

"Under the mandate rule, 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'"  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 596 (D.C. Cir. 2001) (quoting *Briggs v. Pennsylvania R.R. Co.*, 334 U.S. 304, 306 (1948)).  The mandate rule requires that a "district court follow both the letter and spirit of the mandate by taking into account the appeals court's opinion and circumstances it embraces."  *United States v. Carales-Villalta*, 617 F.3d 342, 344 (5th Cir. 2010) (citation and internal quotation marks omitted).

"The mandate rule is a 'more powerful version' of the law-of-the-case doctrine, which prevents courts from reconsidering issues that have already been decided in the same case." *Babbitt*, 235 F.3d at 597 (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 & n.3 (D.C. Cir. 1996) (en banc)); *see also Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (describing the law-of-the-case doctrine). Thus, "'when a case is appealed and remanded, the decision of the appellate court establishe[s] the law

---

[1] Reconfirmed via phone on January 2, 2024.

4

of the case, which must be followed by the trial court on remand.'" *Griffin v. United States*, 935 F. Supp. 1, 5 (D.D.C. 1995) (quoting J.W. Moore, lB Moore's Federal Practice, ¶ 0.404[1] at p. 11-3 (2nd ed. 1994)); *see also Hoffman v. United States*, 266 F. Supp. 2d 27, 37 (D.D.C. 2003) (noting that because "the question at issue was expressly considered and decided by an appellate court, the mandate rule requires that this court, as an inferior court, honor that decision."). This includes not only matters decided expressly but also those decided by necessary implication in an earlier appeal of the same case. *See New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 141 (D.D.C. 2002). There is no discretion; the mandate of the Circuit must be executed as ordered. *See, e.g.*, *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1510-11 (11th Cir. 1987) ("A district court when acting under an appellate court's mandate, cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.")

Here, Little asks this Court to ignore the D.C. Circuit's express instruction to proceed to resentencing and revisit issues raised and rejected above. That the relief that Little seeks here is the same that he explicitly sought at the Circuit further undermines his position, as law of the case now applies to those exact issues. *See* Appellant Br. at 40, (Doc. No. 1956876), *United States v. Little*, Case. No. 22-3018 (filed July 28, 2023) ("Because Little has already served his entire term of imprisonment, the proper remedy is to reverse and remand with instructions that Little be immediately discharged from probation and that an amended judgment be issued reflecting no probationary term."). Simply put, the Circuit rejected Little's proposed remedy for the illegal split sentence and explicitly instructed this Court to resentence him. Little ignores these instructions and urges this Court to do the same. It should not. Rather, this Court should deny Little's motion as conflicting with the D.C. Circuit's lawful mandate and proceed to resentencing as currently scheduled.

**JA204**

Further, there is nothing for this Court to "amend."  As the prior sentence has been vacated, *see Little*, 78 F.4th at 461, there is no sentence currently in force; and resentencing is mandatory.  *See, e.g.*, *United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010) ("The original sentence had been vacated; accordingly, the district court was required to resentence [the defendant]."); *see also United States v. Hinds*, 713 F.3d 1303, 1305 (11th Cir. 2013) (". . . when a sentence is vacated, there is no sentence in effect and resentencing is required.") (citation omitted).  Accordingly, the mandate rule requires resentencing and compels denial of Little's Motion.

## II. *Resentencing Little As Mandated Will Not Violate Double Jeopardy Even If The Court Orders Additional Incarceration Or A Longer Period of Probation.*

Little seeks to avoid the mandated resentencing, arguing that because he has already served the incarceration portion of his original judgment, any additional penalty would violate double jeopardy. Not so. Where an appellate court overturns a sentence as invalid, the defendant may be resentenced without violating double jeopardy even if the result is to increase the sentence. *See Davenport v. United States*, 353 F.2d 882, 884 (D.C. Cir. 1965) ("defendant who successfully attacks an invalid sentence can 'be validly resentenced though the resentence increased the punishment'") (quoting *Hayes v. United States*, 249 F.2d 516, 517 (D.C. Cir. 1957)). Judge Wilkins acknowledged this law as applied to invalidated split sentences in his dissent in *Little*:

> Following vacatur of the sentence on remand, it appears that the district judge could impose a sentence of imprisonment or probation, and that he would not be limited to the 90 days or three years that were imposed before if he concluded that either a longer prison or probationary term were required to meet the goals of 18 U.S.C. § 3551.

*United States v. Little*, 78 F.4th 453, 469 n.3 (D.C. Cir. 2023) (Wilkins, J., dissenting) (citing *Davenport*, 353 F.2d at 884 and *Hayes*, 249 F.2d at 517).

And the majority implicitly rejected any double-jeopardy concerns when it remanded for resentencing despite Little's argument that the Circuit Court should instruct this Court to discharge him from probation because he had already served the originally imposed term of incarceration. *See*

6

**JA205**

*Little*, 78 F.4th at 461; Br. for Appellant, *United States v. Little*, No. 22-3018 (July 28, 2022) at 40; Reply Br. for Appellant, *id*. at 30 (October 7, 2022). Moreover, in vacating Little's sentence and remanding for resentencing, the majority did not dispute Judge Wilkins's acknowledgement that, at resentencing, this Court could impose a term of incarceration or a term of probation longer than that which was originally imposed. *See Little*, 78 F.4th at 469 n.3 (Wilkins, J., dissenting). The Circuit Court explicitly instructed this Court to resentence Little and rejected Little's request for immediate discharge of probation. His renewed attempt to win the same relief the Circuit Court rejected should meet the same fate.

And resentencing after the imposition of an unlawful sentence is especially appropriate where, as here, this Court imposed a split sentence of incarceration and probation for the commission of a single offense. Here, this Court crafted a sentence comprised of multiple components—inclusive of a term of incarceration and a term of probation—to best address Little's specific offense and ensure future deterrence after carefully considering the statutory sentencing factors of 18 U.S.C. § 3553(a). Both components of the sentence were integral parts of a unified package this Court constructed to fulfill its statutory responsibility to "impose a sentence sufficient, but not greater than necessary, to comply with the purpose of [the sentencing statute]." 18 U.S.C. § 3553(a). The components of Little's sentence were inextricably intertwined, and simply vacating the term of probation without any further consideration—as Little now requests—would undo the sentencing scheme carefully crafted by this Court.

Analogy to resentencing under the sentencing package doctrine underscores the need for resentencing here. "The sentencing package doctrine recognizes that when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan, and that if some counts are

7

**JA206**

vacated, the judge should be free to review the efficacy of what remains in light of the original plan."
*United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999) (internal quotation marks omitted). In
other words, where multiple counts of conviction are "properly viewed as a package," the "sentences
[are], in essence, one unified term of imprisonment." *Id.* at 570 (internal quotation marks omitted).
And "successful attack by a defendant on some but not all counts of conviction" may necessitate
"vacat[ing] the entire sentence on all counts so that, on remand, the trial court can reconfigure the
sentencing plan to ensure that it remains adequate to satisfy the sentencing factors in 18 U.S.C.
§ 3553(a)." *Greenlaw v. United States*, 554 U.S. 237, 253 (2008).

The logic underlying resentencing in the sentencing package context applies in the split
sentence context.  Little was only convicted of a single count, and the sentence this Court imposed can
only be attributed to that offense.  The two components of Little's prior sentence must be "properly
viewed as a package" tailored to the statutory sentencing factors as they relate to that single count of
conviction. *Townsend*, 178 F.3d at 570.  And since the *Little* decision unraveled the "overall plan"
this Court crafted, *id.* at 567, this Court has, appropriately, been given the opportunity (indeed,
commanded by the mandate), "on remand, [to] reconfigure the sentencing plan to ensure it remains
adequate to satisfy the sentencing factors in 18 U.S.C. § 3553(a)," *Greenlaw*, 554 U.S. at 253.

The connection between the two components of Little's split sentence is further evidenced by
the short term of incarceration originally imposed.  This Court imposed 60 days of imprisonment,
which is well below the statutory maximum sentence of six months, knowing that a significant period
of supervision in the form of probation would follow. *See also* Sentencing Hr'g Tr. 59-60 (Mar. 14,
2022).[2]  The sentence was fashioned holistically, and the probationary term was a companion to, and

---

[2] Tr. at 59:8-11 ("I believe some term of imprisonment is essential in these cases now to reflect the
seriousness of the offense, to promote respect for the law and to provide just punishment for the
offense."); *id*. at 59:24-60:10 ("And I expect to issue an opinion today endorsing the government's
suggestion that there be a period of incarceration followed by a period of supervised release or

arguably an offset for, the lenient term of imprisonment.  Now that the appellate decision in *Little* has invalidated the carefully balanced sentence originally imposed, this Court must address the interplay between these components and determine at resentencing how the initial sentence should be adjusted to bring it into conformity with what is legally authorized and to ensure that it achieves (or has achieved) the intended punitive effect and deterrence of future illegal action.[3]

Moreover, Little's position on double jeopardy is incorrect.  Imposition of a longer term of incarceration or a term of probation at resentencing would not violate double jeopardy.  Indeed, the Double Jeopardy Clause does not bar the imposition of an increased punishment at resentencing where a defendant does not have a legitimate expectation of finality in the sentence originally imposed.  *See United States v. Fogel*, 829 F.2d 77, 87 (D.C. Cir. 1987) ("If a defendant has a legitimate expectation of finality, then an increase in that sentence is prohibited by the double jeopardy clause. If, however, there is some circumstance which undermines the legitimacy of that expectation, then a court may permissibly increase the sentence."); *see also United States v. DiFrancesco*, 449 U.S. 117, 137 (1980) ("the Double Jeopardy Clause does not require that a sentence be given a degree of finality that prevents its later increase").

A defendant who successfully attacks an unlawful sentence—by appealing or otherwise

---

probation rather for a period of three years. That's partly because with the comments that were replayed today by your attorney that you made at this time, the Court does not have confidence that the same would not happen in the next election cycle. And you're going to be on probation during the next election cycle and there will not be -- you will not be without court supervision during the next election cycle.").

[3] To be clear, the Government does not argue that resentencing necessarily means that Little will face a longer term of incarceration or the imposition of a new term of probation. Upon review of the 18 U.S.C. § 3553(a) sentencing factors, this Court may decide that a new sentence of time served is appropriate.  But resentencing is appropriate as a sentence <u>must</u> be imposed given the *vacatur* of the original sentence.  The Government will advocate at the resentencing hearing for its recommended position on Little's new sentence; this briefing in support of resentencing is a separate, preliminary issue.

9

**JA208**

challenging the sentence, as Little did—can have no legitimate expectation of finality in the sentence originally imposed. A court thus may impose greater punishment at resentencing without violating the Double Jeopardy Clause. *See Fogel*, 829 F.2d at 87;[4] *see also Hayes*, 249 F.2d at 517 ("It also seems clear that, if the sentence were invalid and defendant successfully attacked it, he could be validly resentenced though the resentence increased the punishment."). "The defendant in such a case is held to have waived his protection against double jeopardy." *Hayes*, 249 F.2d at 517.[5] The fact that Little has already completed the term of imprisonment originally imposed does not change this calculus. Indeed, the Circuit and many others have recognized that a more severe punishment can be imposed at resentencing even after service of the original unlawful sentence has begun. *See, e.g.*, *Hayes*, 249 F.2d at 517-18 ("a sentence which does not conform with the applicable statute [because it is below the statutory minimum] may be corrected though defendant . . . has begun to serve it"); *United States v. Lominac*, 144 F.3d 308, 317-18 (4th Cir. 1998) (remanding to district court for resentencing after vacating supervised release component of split sentence, noting that term of incarceration could be adjusted upwards even after defendant completed originally imposed

---

[4] In *Fogel*, the Circuit found that the district court's *sua sponte* decision to increase the defendant's sentence violated double jeopardy where the "originally imposed sentence was not impermissible" and where "the increase in the original sentence [was] also not predicated on any action taken by the [defendant]." 829 F.2d at 88-89. In contrast, the split sentence imposed in this case is unlawful and the need for resentencing arises from Little's own actions—*i.e.*, his successful assertion to the Circuit that his split sentence is unlawful.

[5] As above, cases that address this issue in the sentencing package doctrine context are instructive. *See, e.g.*, *Townshend*, 178 F.3d at 570 ("we join the other circuits which have addressed this question in concluding that even where the term originally allocated to the remaining [unchallenged] counts of a package has been served, a defendant can have no legitimate expectation of finality regarding the sentence previously allocated to [those] counts while simultaneously challenging his sentence on other counts of the package"); *United States v. Brown*, 26 F.4th 48, 62 (1st Cir. 2022) ("'[w]hen a defendant elects to challenge one part of a sentencing package whose constituent parts are truly interdependent,' reconstituting 'the entire sentencing package does not constitute a double jeopardy violation'" (quoting *United States v. Mata*, 133 F.3d 200, 202 (2d Cir. 1998)).

term of incarceration), *abrogated on other grounds by Johnson v. United States*, 529 U.S. 694 (2000); *United States v. Versaglio*, 85 F.3d 943, 949 (2d Cir. 1996) (remanding to district court to consider imposition of increased fine after invalidating incarceration component of split sentence even after defendant already paid originally imposed fine in full); *United States v. Holmes*, 822 F.2d 481, 498 (5th Cir. 1987) ("Correction of a sentence can occur even if service of the sentence has begun, even if the correct sentence may be more onerous to the defendant than the original.") (citation omitted); *Christopher v. United States*, 415 A.2d 803 (D.C. 1980) (affirming sentencing court's *sua sponte* correction of illegal split sentence by eliminating probation component and imposing term of incarceration greater than that originally imposed where defendant had already begun serving sentence).

A line of Supreme Court cases—starting with *Ex parte Lange*, 85 U.S. 163 (1873), and including *In re Bradley*, 318 U.S. 50 (1943), relied on by Little in his motion (ECF 58 at 2-3)—does not hold otherwise. Little cites *Bradley* for the proposition that, where "one valid alternative provision of the original sentence has been satisfied, the petitioner is entitled to be freed of further restraint." *Bradley*, 318 U.S. at 52. But Little's reliance on this line of cases is misplaced. The Supreme Court has subsequently recognized the limited application of *Lange* and *Bradley*, and these cases are not controlling here. *See, e.g.*, *Jones v. Thomas*, 491 U.S. 376, 383 (1989) ("*Lange* therefore stands for the uncontested proposition that the Double Jeopardy Clause prohibits punishment in excess of that authorized by the legislature, and not for the broader rule suggested by its dictum.") (citation omitted); *id.* at 386 ("we do not think the law compels application of *Bradley* beyond its facts").[6]

---

[6] Little tacitly acknowledges *Thomas*'s restraint of the applicability of *Lange* and *Bradley*, Mot. at 4, but fails to apprehend the applicability of *Thomas* here: the time previously served by Little may be credited against any future term imposed, a "long [] accepted practice" that eliminates double jeopardy

*Lange* and *Bradley* involved defendants sentenced to a fine and imprisonment under statutes that permitted the imposition of either a fine or imprisonment. In *Lange*, the Supreme Court held that the defendant was entitled to immediate release because he had already paid the statutory maximum fine in full, stating that resentencing him to the alternate punishment of imprisonment would "punish[] [him] twice for the same thing." 85 U.S. at 175. Similarly, in *Bradley*, the Supreme Court held that the defendant "[wa]s entitled to be freed of further restraint" because he had already paid the fine in full. 318 U.S. at 52. The full payments of the fines in *Lange* and *Bradley* meant that those defendants had already fully suffered one of two authorized alternative penalties such that no additional punishment could be imposed because anything more would exceed the punishment that was statutorily authorized. In other words, these cases stand for the unassailable but narrow proposition that "a defendant may not receive a greater sentence than the legislature has authorized." *United States v. DiFrancesco*, 449 U.S. 117, 139 (1980).

But as recognized by the Supreme Court and multiple other courts, *Lange* and *Bradley* are a narrow exception to the general rule that allows for resentencing after a defendant successfully challenges an unlawful sentence, even if service of the sentence has already begun and even if the corrected sentence is more onerous than the original. For example, the Fifth Circuit has recognized that the *Lange/Bradley* limitation applies only where one of the alternative penalties imposes the maximum authorized sentence and is satisfied in full:

> The *Bradley* cases stand apart from this general rule, however. The contempt statute authorizes only a fine or imprisonment, and the full payment of a fine satisfies one lawful alternative sentence. Sentences involving imprisonment not yet fully served or a term of imprisonment below the maximum authorized by an offense statute are not analogous, nor are cases in which a defendant appeals a dual sentence before satisfying either prong. What differentiates the *Bradley*-type case from these other cases is that a

---

concerns (and directly address the different type of punishment concerns that underpinned the decision in *Bradley*). *Thomas*, 491 U.S. at 384.

**JA211**

> *Bradley* defendant who has paid his fine has suffered the maximum sentence authorized
> by the statutes.

*Holmes*, 822 F.2d at 498-99; *see also id.* at 499 n.30 (listing cases not controlled by *Bradley* because, among other things, they involved "resentencing . . . after sentences that were below the maximum authorized by offense statutes, or after a defendant appealed the entirety of his sentence or challenged a sentence but had not fully satisfied a sentence as great as the law allows").[7]

Courts have recognized other limitations to the *Lange*/*Bradley* rule that are relevant here. For example, in *Lominac*, the Fourth Circuit held that "*Bradley* does not bar resentencing" where two components of an unlawful split sentence are of the type that can be credited against each other. 114 F.3d at 318. The defendant in *Lominac* was originally sentenced to both imprisonment and supervised release even though the applicable statute only authorized the imposition of incarceration in the defendant's particular circumstances. *Id.* at 317-318. And by the time the Fourth Circuit heard the appeal, the defendant had already served the entire term of incarceration and some portion of the term of supervised release imposed under the unlawful split sentence. *Id.* at 317. Nevertheless, the Fourth Circuit found that remanding to the district court for resentencing was appropriate because, "[h]ad the court recognized that it lacked authority to impose the . . . term of supervised release, it might have validly concluded that a prison term of longer than six months was appropriate." *Id.* The Fourth Circuit distinguished *Bradley*, noting that while the "'alternative sentences in *Bradley*'" of imprisonment and a fine "'were of a different type' and it simply was not 'possible to credit a fine against time in prison,'" "it is possible to credit [defendant's] time served on supervised release

---

[7] Little mistakenly relies on *Holmes* in his motion (at 5, 10) to support his claim that the district court on remand would be prohibited from imposing an increased term of incarceration or the alternative punishment of probation because he already served the term of incarceration originally imposed. Little fails to recognize that the Fifth Circuit explicitly acknowledged that resentencing would be appropriate where, as here, the original term of incarceration imposed and served is below the statutory maximum. *Holmes*, 822 F.2d at 498-99.

**JA212**

against any time to be served in prison." *Id.* at 318 (quoting *Thomas*, 491 U.S. at 384). In other words, "[u]nlike the monetary sanction of a fine, which cannot be converted into an equivalent temporal sanction, [defendant's] term of supervised release restrained his liberty for a known period of time that can be credited against any future sentence of imprisonment." *Id.*

Similarly, in *Versaglio*, the Second Circuit held that *Lange/Bradley* does not prohibit resentencing a defendant to an increased fine on remand where the district court had originally imposed an unlawful split sentence of a fine and imprisonment and where the defendant had already paid the full amount of the originally imposed fine. 85 F.3d at 948. The Second Circuit vacated the term of imprisonment because the fine had already been paid and noted that "[n]o issue was raised in either *Lange* or *Bradley* as to a sentencing court's power to revise the *amount* of a fine in light of the unavailability of imprisonment." *Id.* (emphasis in original). Thus, recognizing that the two components of the original split sentence were intertwined, the Second Circuit remanded the case to the district court to "consider[] whether to make an upward adjustment in the amount of the fine" in order to maintain "the aggregate punitive effect of [the original] sentence." *Id.* at 949.

Here, *Lange/Bradley* provides no bar to resentencing Little to a longer term of incarceration, or alternatively to a term of probation, for at least two distinct reasons. First, unlike *Lange* and *Bradley*, the alternative sentences here do not involve penalties that are impossible to credit against each other. Rather, as in *Lominac*, any time previously served in prison and any time previously served on probation could be credited against any future sentence of imprisonment or probation imposed at resentencing. 144 F.3d at 318; *see also United States v. Martin*, 363 F.3d 25, 38 (1st Cir. 2004) ("we join other courts of appeals in holding that these similarities are sufficient to allow crediting of probation against imprisonment").[8]

_____

[8] Regardless of whether this Court imposes a sentence of incarceration or probation on remand,

Second, the term of incarceration that Little completed was well below the statutory maximum of six months, and resentencing him to a longer term of incarceration or alternatively to a term of probation (taking account of any time already served) would not exceed the maximum punishment authorized by statute. Indeed, this Court intentionally crafted a dual sentencing scheme suited to Little's specific offense and circumstances in which each component weighed against the other and played an integral part in the overall plan. "Had the court recognized that it lacked authority to impose the [split sentence], it might have validly concluded that a prison term of longer than [60 days] [or that a standalone probationary term] was appropriate." *Lominac*, 144 F.3d at 317. Thus, the district court "should have the option of considering whether to make an upward adjustment in the" term of imprisonment or whether to impose a standalone term of probation at resentencing. *Versaglio*, 85 F.3d at 948.

Little's *ad seriatim* approach to distinguishing the case law narrowing *Lange/Bradley*'s holding and permitting resentencing, Mot. at 7-9, does little to cast doubt on the constitutionality of the Circuit Court's mandate remanding for resentencing or the propriety of resentencing a defendant who has successfully attacked an illegal sentence on appeal. Each case undeniably presented the courts with the challenge of applying complex double jeopardy law to unique factual and legal

---

Little should receive credit for time already served. *See Martin*, 363 F.3d at 37-38 (unlawful term of probation must be credited against any subsequent sentence of incarceration); *Lominac*, 144 F.3d at 318 (unlawful term of supervised release must be credited against any subsequent sentence of incarceration). But because probation is a less restrictive penalty than incarceration, crediting time served on probation against a future term of incarceration, or crediting time incarcerated against a future term of probation, should not be "a day-to-day offset." *Martin*, 363 F.3d at 39. While the precise crediting ratio in this case is an open question for this Court to consider in the first instance, the specific ratio should derive from a "fact-based inquiry" that looks to "the specific conditions of [Little's] probation and the effect of [any crediting] on the underlying purposes of the [sentencing statute] as set out in 18 U.S.C. 3553(a)." *Id.*

**JA214**

scenarios. And each case obviously can be distinguished by pointing out those differences. But the broader principles have no less force merely because one can distinguish the facts.

Those broad principles and the Circuit Court's mandate give this Court a clear path forward. Little challenged his sentence on appeal and thereby undermined any legitimate expectation of finality that would raise double jeopardy concerns. The Circuit Court agreed with Little that his split sentence was illegal[9] but vacated the *entire* sentence, not just one component, and remanded for resentencing, rejecting Little's quest to merely wipe away his probationary term. If *Lange*, *Bradley*, or anything else required the Court to simply excise the probation component of the sentence, the Court could and would have done so. Instead, this Court starts with a clean slate and must impose a statutorily authorized sentence, applying the § 3553(a) sentencing factors and giving Little appropriate credit for time he already has served for his crime.

Accordingly, for all these reasons, double jeopardy concerns are not present here and Little's resentencing may result in Little serving additional incarceration or a longer period of probation.

---

[9] Indeed, Little advocated precisely for that result. *See* Br. for Appellant, *United States v. Little*, No. 22-3018 (July 28, 2022) at 37 ("In sum, the statute does not authorize the dual punishment of imprisonment and probation for a single petty offense. As result, the district court's sentence in this case is unlawful."); *see also Little*, 78 F.4th at 462 ("Little contends that his sentence of incarceration, followed by a term of probation (commonly called a 'split sentence') is illegal."). Little now argues that that "Mr. Little's jail sentence <u>was lawful in and of itself[.]</u>" Mot at 10 (emphasis added). This new position directly conflicts with the position taken on appeal and does not support application of *Tatum v. United States*, 310 F.2d 854 (D.C. Cir. 1962), here. Beyond the issue of Little's newly reversed position, the *Tatum* court explicitly found the sentence imposed to be lawful (if erroneous). 310 F.2d at 855. The Circuit made no such finding in this case, and in fact, found the opposite. *See Little*, 78 F.4th 454 ("The only question on appeal is whether that sentence is authorized by statute. It is not."). Accordingly, *Tatum* does not control here.

**III.    *Little's Post-Conviction Activities Should Be Considered At Resentencing, Or Alternatively, In Termination Proceedings.***

As discussed, this Court must resentence Little to a lawful penalty in light of the 18 U.S.C. § 3553(a) factors. But even if this Court accepts Little's request for early termination of probation under 18 U.S.C. § 3564(c), the Court must consider those same factors. So although Little argues in favor of termination of probation as "preserv[ing] judicial resources," ECF 58 at 12, the § 3553(a) factors need be considered in either resentencing or termination.

Equally unhelpful are Little's claims that he "has been compliant with the terms of probation as far as counsel is aware, and presents no future danger to the community." ECF 58 at 10. This Court was explicit in sentencing Little that in addition to a term of imprisonment to "reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense," Sentencing Hr'g Tr. 205:8-11, supervision was necessary to deter similar behavior: "partly because with the comments that were replayed today by your attorney that you made at this time, the Court does not have confidence that the same would not happen in the next election cycle. And you're going to be on probation during the next election cycle and there will not be -- **you will not be without court supervision during the next election cycle.**" *Id*. at 206:4-10 (emphasis added). And Little's post-conviction and post-incarceration conduct shows that the Court's original concern was justified.

*First*, he has not completed aspects of his sentence as ordered. As noted *supra*, this Court ordered restitution and a special assessment, combined totaling $510. To date, twenty-one months after this Court entered that order, Little has yet to make any payment towards the ordered amount, let alone complete payment. Ex. A.[10] And even if he completes payment before the resentencing hearing, any tardy actions should not overcome his disregard for his responsibilities in meeting this Court's orders.

---

[10] Reconfirmed via phone on January 2, 2024.

**JA216**

*Second*, Little's post-incarceration social media presence reflects a lack of respect to this Court, this judicial process, and any prior acceptance of responsibility for his actions. His social media activity shows that he believes his actions were at least partially, if not fully, justified and that these proceedings (and his guilty plea) constitute political persecution untethered from the criminal actions to which he earlier pled guilty.

Post-conviction and pre-incarceration, Little created a "public figure" Facebook page, apparently for himself, titled "J 6 Patriot James Leslie Little," on April 28, 2022. *Available at* https://www.facebook.com/profile.php?id=100083642910429 [https://perma.cc/LPE4-KF7A]. Little is active on that page, having posted to that account as recently as November 2023. In October 2023, he posted to that page a biblical quote insinuating justice is twisted in the courts:



**JA217**

Ex. B at B-29.[11]

Little also has maintained a personal Facebook account, https://www.facebook.com/jles.little [https://perma.cc/K483-PAS5], post-conviction through the present day where he has made comments inconsistent with his guilty plea and acceptance of responsibility. For example, on August 10, 2022, Little posted that his "MISDEMEANOR" arrest was for "peacefully protesting in our Capital [*sic*]." Ex. B at B-12. He considers himself (post-incarceration) to be a "persecuted and prosecuted J6 Patriot" who counts Jacob Chansley (of so-called "QAnon Shaman" fame) as a fellow patriot:



---

[11] An identical post was posted to his personal account the same day. Ex. B at B-28.

Ex. B at B-30.  Little also posted on other Facebook pages, such as the Catawba County News

page:[12]



YOUTUBE.COM

J6 Patriot: I Did NOT COMMIT Suicide!

😆👍 3                                                                    7 comments

👍 Like                    💬 Comment                   ↗ Share

Top comments ▾

I thought this was a news group, not a place for someone to post their diatribes.

1y   Like   Reply   Share                                          👍😆 3

---

[12] The post appears to have originally linked to a now-deleted youtube video apparently posted by Little titled "J6 Patriot: I Did NOT COMMIT Suicide!" apparently filmed and posted pre-incarceration.

**JA219**



Ex. B at B-4 to B-5.

Regarding this Court's expressed concern regarding future election interference from Little,

on October 21 of this year, he expressed support for #BeattheCHEAT[13] on his personal page:

---

[13] #BeattheCHEAT appears to be a reference to purported election integrity efforts undertaken in support of former President Trump. *See* Will Steakin, *Trump allies using false election claims, images of war to recruit ex-military as poll workers*, ABC News (Oct. 25, 2022) *available at*



Ex. B at B-26.

Further, Little posted a post and various comments on or about December 30 of 2022, less than six months after his release from incarceration.  In his comments, he asserts that he has "some libel lawsuits" against those who said he "broke into the Capital [*sic*]", that he was let into the Capitol, and that his guilty plea before this Court was because "they didn't like us singing 'We're not going to take it anymore' by Twisted Sister in the Capital [crying laughing emoji]," that "the Democrats put [him] in [prison] for not taking the jab[,]" and that "the public threw the thousand out of 330 million who tried to save our republic and freedom under the bus."  Ex. B at B-16 to B-18.

Accordingly, it appears that Little views his prior imprisonment as being a political event, not the result of his actions on January 6, which he apparently believes were justified.  This belief, that his prior actions were in any way justified, when paired with his October statements regarding anticipating

https://abcnews.go.com/US/trump-allies-false-election-claims-images-war-recruit/story?id=91412810 [https://perma.cc/TT5G-NS8X].

having to #BeattheCHEAT in the next election, may indicate potential future, similar illegal conduct—all of which are circumstances the Court should consider on resentencing.

Other posts containing other similar sentiments and/or information demonstrating Little's ownership of the "J 6 Patriot James Leslie Little" page are attached for reference, including multiple postings sharing letters he received from others thanking him for his actions on January 6 and offering support and encouragement during his time in prison. *See* Ex. B, *generally*, and at B-21, B-23. It also appears that Little is in communication with others on social media, both via public comments and private messages, who were present at the events January 6 and consider themselves to be "patriots" as a result:

23

**JA222**



[redacted]
Full pardon coming soon. Hold the line 👊
4w Like Reply 2

J Les Little
[redacted] and a lot more than that $$$! They not only attacked us, and trapped us, but they didn't allow us or our council to have the 42k hours of exculpatory video evidence that Speaker Johnson just released to the public today, almost three years after the fact. Thanks brother! Pray for us, our fearless leader God's anointed and appointed Donald John Trump the Trump of God sounding before the return of Jesus Christ and all presecuted Patriots.
4w Like Reply

[redacted]
J Les Little I was there too my friend. What a day to remember and I stand in solidarity with all of the patriots that had the heart and dedication to show up 👊
4w Like Reply

J Les Little
[redacted] God bless you, and beware! They're desperate and coming after everyone there, and as you know have more and more been arresting people who didn't enter the building.
Tonight, Eric Bolling reported that the FBI on J6 dropped the investigation of a pedophile who told an undercover Agent that he was molesting a nine year old boy, so they could target us, and now have found him in Alaska where he has molested a ten year old boy. It's time to abolish unconstitutional federal law enforcement and return law enforcement to the STATES! The federal government has the flipping military, what else do we need at that level and what else is CONSTITUTIONAL?
4w Like Reply Edited

[redacted]
J Les Little you and I both know that this world is about to get flipped upside down and I hope you are stocking up on popcorn 🍿. Always here for you and any patriots that need a friend
4w Like Reply

[redacted]
J Les Little sent you a pm
4w Like Reply

Ex. B at B-31.

These concerning post-conviction and even post-incarceration actions counsel against an exercise of discretion to terminate probation and raise serious questions about the effect this Court's prior sentence has had on Little.

## CONCLUSION

The mandate of the Circuit must be followed: Little must be resentenced.  This Court should deny Little's motion and resentence him as currently scheduled.

**JA224**

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052


By:     /s/ Patrick Holvey
       PATRICK HOLVEY
       DC Bar No. 1047142
       Assistant United States Attorney
       United States Attorney's Office
       601 D Street N.W.
       Washington, D.C. 20530
       Telephone: 202-252-7224
       Patrick.Holvey@usdoj.gov

**JA225**

**CERTIFICATE OF SERVICE**

On this 3rd day of January, 2024, a copy of the foregoing was served upon all parties

via the Electronic Case Filing (ECF) System.

> */s/ Patrick Holvey*
> PATRICK HOLVEY
> DC Bar No. 1047142
> Assistant United States Attorney
> United States Attorney's Office
> 601 D Street N.W.
> Washington, D.C. 20530
> Telephone: 202-252-7224
> Patrick.Holvey@usdoj.gov

# Exhibit A

**Holvey, Patrick (USADC)**

| | |
|---|---|
| **From:** | ███████████████████ @dcd.uscourts.gov> |
| **Sent:** | Wednesday, December 27, 2023 11:31 AM |
| **To:** | Holvey, Patrick (USADC) |
| **Subject:** | JAMES LITTLE Case# 21cr315 |

Hi Patrick

Just checked his account and no payment has been made so there is no payment history report yet.

**Total Owed**: $510.00
**Collected**: $0.00
**Outstanding**: $510.00

Thank you

███████████████

Financial Specialist
U.S. District & Bankruptcy Courts for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001
███████████

# Exhibit B

Facebook Posts in Chronological Order
(PII Redacted)





(whole image next page)

B-2



B-3



J Les Little ▸ Catawba County News
April 30, 2022 · 🌐                                                    ···



YOUTUBE.COM
**J6 Patriot: I Did NOT COMMIT Suicide!**

😂👍 3                                                        7 comments

👍 Like            💬 Comment            ↪ Share

                                                     Top comments ▾

███  ██████████  I thought this was a news group, not a place for someone to post their diatribes.
       1y   Like   Reply   Share                              👍😆 3

**(Comments continued next page)**

B-4





Top comments

[redacted]
I thought this was a news group, not a place for someone to post their diatribes.
1y Like Reply Share 3

J Les Little Author
[redacted] if J6 isn't news, and a Jedge taking away my first and second amendment rights and me going to prison for a single count misdemeanor isn't news, what is ???
If they get by with silencing me, your future diatribes will be illegal one day too, but since you prefer to keep your head in the sand, I will block you!
1y Like Reply Share 3

[redacted]
J Les Little treason=prison. And this belongs on your personal page not a local news group.
1y Like Reply Share 4

[redacted]
[redacted] =
1y Like Reply Share 2

[redacted] It's local news to us . Free speech is imperative. The man stood up for what he believes. He believes in freedom.
1y Like Reply Share

[redacted]
You spelled "insurrection" wrong
1y Like Reply Share 4

J Les Little Author
[redacted] it's a video. There was no spelling .
1y Like Reply Share

(Selected comments continued next page)





**J Les's Post**

[redacted]
Continued prayers always!
1y Like Reply

[redacted] Follow
That looks painful! What is "covid sentencing". I've never heard that term. Get Well Soon.
1y Like Reply

J Les Little
[redacted] I got this Cellulitis in prison, so I said "Additional sentience."
1y Like Reply

J Les Little
[redacted] I had COVID a whole month before being sentenced to political prison for peaceful protest.
1y Like Reply

[redacted] Follow
J Les Little "covid" is a seasonal flu repackaged, many believe it was preplanned like ME, who knows the "epidemic" to sell the most addictive "opioid" created and distributed by satanic men and women posing as "healthcare" workers! A monopoly run "news", hospitals, and country systems!
1y Like Reply

J Les Little
[redacted] it was created by China and their Communist "Democrat" domestic enemies of America for a three fold purpose:
I. Shutdown President Trump's record economy and get the late mail in ballots to steal the 2020 election and complete the four year coup against God's anointed, appointed, and prophesied Donald John Trump.
II. Get rid of the non producers (Elderly, handicapped, terminally ill) who are a drain on the Marxist system.
III. Gain totalitarian government control over the people using emergency powers to all Governors to become dictators making "Law" on their own, and persecuting Christians by closing churches.
1y Like Reply

[redacted] Follow
J Les Little SPOT ON! Not gonna happen! WE hold the power not advertisers with money killing to profit.
1y Like Reply

J Les Little
[redacted] II Chronicles 7 14
1y Like Reply

**J Les's Post**

J Les Little
July 30, 2022 ·

"EVERYONE must SUBMIT to the governing authorities, for ALL AUTHORITY comes from God, and those in positions of authority, HAVE BEEN PLACED THERE BY GOD.
So, ANYONE who rebels against authority is rebelling against what God has instituted, and they will be punished." -Apostle Paul in Romans 13:1-2
Although my ❤️ was in the right place, my feet weren't. I was on the right side of the truth, the Bible on social and political issues, on the right side of history, the Constitution, our REPUBLIC (Not a democracy), our freedom, and capitalism that has made us the most free and rich nation in history, but in being a vigilante and taking matters into my own hands, I got out of God's will thinking I was doing His will.
His will was to punish America and cause us to repent and seek Him again, by allowing this evil fraudulent regime to take over our republic, just like He punished Israel over and over with evil Kings or like now allowing our enemies to reign over us.
While I will always be proud for trying to save America, I regret and repent of getting out of God's will and in the way of His much needed discipline of us.
"IF My people who are called by My name will HUMBLE THEMSELVES, PRAY, SEEK MY FACE, and TURN FROM THEIR WICKED WAYS, then I will hear from Heaven, forgive their sins, and heal their land." -God in II Chronicles 7 14

7 · 12 comments · 8 shares

Like · Comment · Share

Most relevant

[redacted]
Well said!
1y Like Reply

J Les Little
[redacted] thanks! I pray everyday that I will only do and say what God wants me to, and although I may miss the mark, at least I know I'm in the ballpark.
1y Like Reply

[redacted]
J Les Little amen!
1y Like Reply

Write a reply...

[redacted]
Amen, I pray God will heal our evil Land. These are times where evil is considered right and right is wrong! We need to take our country back with the help of God! Our country was founded on God's principles
1y Like Reply

J Les Little
[redacted] bsolutely! We're in the last days when the Bible says good will be called evil and evil good.
1y Like Reply

(Comments continued next page)



J Les's Post

I refuse to bow my knee to this dangerous Governmental Overreach...Just Like I Refuse
to bow the knee to Nazism or Communism...
Was Hitler God's Choice for a National
Leader...God Allowed it, But God gives us Freewill...God didn't "Choose Hitler,"
Man did...Man's Sinful nature Allows
Man to be decieved...James says we sin when we are drawn away by our own lusts and
enticed...then the end is
Death...
If Hitler was a legitimate Leader, then
Why was there a WW2 to put a stop
To Hitler's Takeover of Eastern Europe
& Japan's forcible Takeover of China,
and islands Guam, and the Philippines??...Was Japan "Justified"
In bombing Pearl Harbor, just because
They "felt like it"??...No..It was Immoral, Injust, and just plain WRONG!!!...
The Civil War...Even though both sides
thought they were Morally Just & Prayed for God's Favor in thier endeavors to fight for
thier "Right"
To Oppress One another, or another race, altogether...
Now, there were many issues brought up by BOTH sides during those 4 Bloody Years,
BUT, the greatest Moral
Question of Slavery was a greater issue than the industrial gains of Money, Market
Advancements, and Overreaching Taxes (not the Federal Tax Laws that we have now)
Laid Upon
The Southern States...
The Immorality of keeping another Human Being as a Slave...Not Endentured
Serventhood, like was comman in Europe, prior to all-out Total Ownership of another
Human Being..
The enslavement of another, plus growing public outcry from Church
Leadership, and President Lincoln's
own hatred of Slavery, forced the Federal Government's actions, after the attack at Fort
Sumter...The catalyst
For The Civil War...and subsequent loss
Of the Southern States and All Thier Slaves (after an astounding loss of life
for North and South)...
Bottom line being, When TYRANNY
Becomes a Law...Rebellion becomes
a Must...I'm not talking about "Taking Up Arms" against Our Government, but
I am talking about NON-COMPLIANCE
Of OPPRESSIVE OVERREACH to stifle and suppress American Citizens and
thier Unalienable Rights....Given
By the Supreme Authority of God
Almighty.....Because....
THIS IS THE LAND OF THE FREE & THE HOME OF THE BRAVE...
The 1st paragraph of the Declaration
Says it all...

1y   Like   Reply   Edited

Write a comment...

**(Comments continued next page)**

B-9

**JA238**



### J Les's Post    ✕

The 1st paragraph of the Declaration
Says it all...🇺🇸🇺🇸

1y  Like  Reply  Edited

**J Les Little**
_____ of course Hitler was appointed by God. The scripture I just quoted said so. He like Assyria/Babylon/Iraq, and evil Kings line Ahab and Ahaz, was used to punish Israel for rejecting their Messiah, and don't forget God created Lucifer and Pharaoh to show His power against them.
If you believe in the myth of "Freewill," read Romans 9 real slow and over and over until you understand that there is no free will, and God is sovereign over everything that happens and uses it all for His will glory, the sin, the good, the bad, and the ugly.

1y  Like  Reply

**J Les Little**
Hitler was one of the most evil leaders ever, but he was not illegitimate. He was DULY ELECTED BY THE GERMAN PEOPLE IN 1933.

1y  Like  Reply

**J Les Little** Duly Elected by the German people because that was the will of the People...But was it God's will?...
Rom.13 says that he is the servant of God for good...Tyranny is not NEVER GOOD...and Leaders are Not a threat to those who do good works but tyrants are...When wicked leaders rule the righteousness mourn...When the righteous rule the people rejoice

1y  Like  Reply  Edited

**J Les Little**  _____ "God raised up Pharaoh to show His power against him." -Romans 9. Read that chapter yet. If God isn't on total control, He would be no God at all. Hitler didn't surprise Him and was no more out of His plan than Lucifer was.

1y  Like  Reply

**J Les Little**
Over and over in the Bible, God punished Israel with with wicked Kings and let the Iraqis (Assyria Babylon) carry them off into captivity, to cause them to repent and turn back to Him. The Bible says God disciplines those He loves. He always has a purpose in bad leaders: REPENTANCE of His people.

1y  Like  Reply

B-10

**JA239**







J Les Little
August 10, 2022 ·

I know how President Trump feels. When I was arrested for my MISDEMEANOR of peacefully protesting in our Capital, the guy who banged on the door was in full Desert Storm uniform uniform with machine gun across his chest, and in addition to the three local FBI agents, the house was surrounded by Catawba County Sheriff Deputies and their cruisers.
 The only thing on my rap sheet was a single DWI conviction. You would think I was Hunter Biden, Bin Laden, Manson, Obama, a Clinton, or any other dangerous and treasonous crook the way I was treated. Keep in mind, they knew my then 85 year old mother was in the house because they interviewed me there before and we showed them southern hospitality. God help us in Jesus name!

5 3 comments 2 shares

Like Comment Share

View more comments

[redacted]
Just BS!!!
1y Like Reply

Write a comment...

B-12

**JA242**



B-14



B-15



(Comments continued next page)

B-16



**J Les's Post**

Like Comment Share

Most relevant

[redacted]
Totally political .
50w Like Reply

[redacted]
That's so crazy!
50w Like Reply

J Les Little
[redacted] the whole thing is. I think he was talking about the Hickory office or maybe just him and his partner, but the FBI usually doesn't mess with small fish, unless the small fish supports Trump. They were almost apologetic. It's the ones in DC that I believe are the problem.
50w Like Reply

[redacted]
J Les Little it still blows me away that they have the Guts to put people in jail for that!! You might as well robbed a bank!! It's all a bunch of political BS. They planned all that and everyone knows it! I hate you were done that way and others to.
50w Like Reply

[redacted]
Where did you have to go?
50w Like Reply

J Les Little
[redacted] thanks! Romans 8 28. God will and has brought good out of it. I led a PA firefighter to Christ in federal prison, have written a memoir about my prison experience and how Jesus got me through it, and plan on writing one about exactly what when down on J6 as seen through my eyes, and heard through my ears. I also have some libel lawsuits to do against media who said I broke into the Capital and pled guilty to violent entry. Even the FBI agree police let me in, and I pleaded to "Parading in the Capital" which means they didn't like us singing "We're not going to take it anymore" by Twisted Sister in the Capital 😜.
50w Like Reply

J Les Little
[redacted] Jesup GA Federal Correctional Institution. I was supposed to be in low security the whole time, but was quarantined in solitary confinement in medium security two weeks coming and going because I was not vaccinated. One of my favorite guards told me, "You're not supposed to be incarcerated for a misdemeanor," and about the quarantine, "The Democrats put you in here for not taking the jab." I said, "I know."
2
50w Like Reply

(Comments continued next page)



















J Les's Post

One of my favorite guards told me, "You're not supposed to be incarcerated for a misdemeanor," and about the quarantine, "The Democrats put you in here for not taking the jab." I said, "I know."

2

50w Like Reply

[redacted]

Wow, well at least you led that PA firefighter to the Lord! That's awesome! Well I hope they get made to pay you back for all the money you lost, due to this mess! I've been praying justice on these Democrats and that they are going down! No matter what it looks like right now, God is working behind the scenes and he will get the last laugh!! They can take that to the bank!!

50w Like Reply

J Les Little

[redacted] amen sister and thanks for your support! Sadly most conservative Christians who should know better, drank the poison fake news Kool aid taking the bait of the carefully crafted narrative line and sinker.

I now know how the returning Vietnam vets must have felt. For a moment in time, I risked life, limb, and freedom to save the country I love and for the Christian beliefs I love, only to be shunned, deleted, looked down on, and talked down to by armchair soldiers of family and "Friends" who weren't there and who don't understand the gravity of what stolen elections mean.

Sadly, they're learning some of the consequences of a stolen election through high prices and subsequent inflation, but it's nothing to the irreversible price the dead in Afghanistan, Ukraine, and Russia have had to pay as a result of the stolen election. We're a communist dictatorship now, a banana Republic, because on 1/6 our military didn't keep it's vows against domestic enemies and the public threw the thousand out of 330 million who tried to save our republic and freedom under the bus. President Trump will be the first President elected to the office three times, and in a bigger landslide than ever. We just need to pray that it's counted this time. I also pray daily like you do, that the truth will be known and it will set the Patriots free and lock up the traitors and tyrants. Are you familiar with Pastor Kim Clement's correct prophesies about President Trump and that he prophesied two terms? He and Rabbi turned Pastor Jonathan Cahn said President Trump is the Trump of God sounding before Jesus returns. Hallelujah amen!

50w Like Reply

[redacted]

**J Les Little** yes very true! I know Gods not done with our Great country!! While things spin out of control in this world! I just know, I might live here, but I'm not from here! I am the righteousness of God, because He made me righteous through the blood of Jesus!! Yes I know Kim Clement and Jonathan Cahn! I have listened to them for years now! Also, **One Voice Ministries: Hank and Brenda Kunneman!** He has some awesome prophesies as well! Yes Trump is the Trump of God!! Hallelujah that is what I hang onto! God is awesome 🙏🙏🙏

50w Like Reply

J Les Little

[redacted] amen!

50w Like Reply

B-18

**J Les Little** is at **Colorado State Capitol.**
April 29 · Denver, CO ·

I just drove by, didn't stop in to say hi, in a city a mile high. Although it's pretty and historic and I'm sure I would enjoy seeing the inside of it as I did my US Capitol, I didn't get out of the car.
I just got an idea to tour the capitals of all 50 states, and take a proper tour of our US Capitol, and write a book about capitals. My nickname in political prison was "Capital" 😂.
I saw a Cowboy in a suit and figured he's in the Colorado legislature, and pretty sure not one of the Communists.

**J Les's Post**

J Les Little
July 30, 2022 ·

"EVERYONE must SUBMIT to the governing authorities, for ALL AUTHORITY comes from God, and those in positions of authority, HAVE BEEN PLACED THERE BY GOD.
So, ANYONE who rebels against authority is rebelling against what God has instituted, and they will be punished." -Apostle Paul in Romans 13:1-2
Although my ❤️ was in the right place, my feet weren't. I was on the right side of the truth, the Bible on social and political issues, on the right side of history, the Constitution, our REPUBLIC (Not a democracy), our freedom, and capitalism that has made us the most free and rich nation in history, but in being a vigilante and taking matters into my own hands, I got out of God's will thinking I was doing His will.
His will was to punish America and cause us to repent and seek Him again, by allowing this evil fraudulent regime to take over our republic, just like He punished Israel over and over with evil Kings or like now allowing our enemies to reign over us.
While I will always be proud for trying to save America, I regret and repent of getting out of God's will and in the way of His much needed discipline of us.
"IF My people who are called by My name will HUMBLE THEMSELVES, PRAY, SEEK MY FACE, and TURN FROM THEIR WICKED WAYS, then I will hear from Heaven, forgive their sins, and heal their land." -God in II Chronicles 7 14

7 12 comments 8 shares

Like Comment Share

Most relevant

[redacted]
Well said!
1y Like Reply

J Les Little
[redacted] thanks! I pray everyday that I will only do and say what God wants me to, and although I may miss the mark, at least I know I'm in the ballpark.
1y Like Reply

[redacted]
J Les Little amen!
1y Like Reply

Write a reply...

[redacted]
Amen, I pray God will heal our evil Land. These are times where evil is considered right and right is wrong! We need to take our country back with the help of God! Our country was founded on God's principles
1y Like Reply

J Les Little
[redacted] absolutely! We're in the last days when the Bible says good will be called evil and evil good.
1y Like Reply

**J Les Little**
October 21 · 🌐

Back in the good ole days! The best days America has ever seen have turned to the worst, and any honest person with a lick of common sense knows more peace and prosperity is what we voted for, but destruction of our Constitutional rights, legal system, freedom, inflation, and war, war, and more war is what we got.

If you want the good ole days of 17-21 back, everyone vote Trump, because you know being in control the Communists will cheat more than ever, and it's going to take a vote from everyone on the street to #BeattheCHEAT!

🔒 **This content isn't available right now**
When this happens, it's usually because the owner only shared it with a small group of people, changed who can see it or it's been deleted.

👍 Like        💬 Comment        ↪ Share

Write a comment...











**J Les Little**
November 17 · 🌐

"Remember those in prison as if you were there yourself (I pray for my brother's at Jesup, and for the release of all J6 Patriots daily). Remember also those being mistreated, as if you felt their pain IN YOUR OWN BODIES." -Hebrews 13:3

👍😮😢 7                                                                      6 comments

👍 Like              💬 Comment              ↪ Share

Most relevant ▾

Full pardon coming soon. Hold the line 👊        ❤️ 2
4w  Like  Reply

**J Les Little**
          and a lot more than that $$$! They not only attacked us, and trapped us, but they didn't allow us or our council to have the 42k hours of exculpatory video evidence that Speaker Johnson just released to the public today, almost three years after the fact. Thanks brother! Pray for us, our fearless leader God's anointed and appointed Donald John Trump the Trump of God sounding before the return of Jesus Christ and all presecuted Patriots.
4w  Like  Reply                                                             😘

J Les Little I was there too my friend. What a day to remember and I stand in solidarity with all of the patriots that had the heart and dedication to show up 👊
4w  Like  Reply                                                             ❤️

**J Les Little**
          God bless you, and beware! They're desperate and coming after everyone there, and as you know have more and more been arresting people who didn't enter the building.
Tonight, Eric Bolling reported that the FBI on J6 dropped the investigation of a pedophile who told an undercover Agent that he was molesting a nine year old boy, so they could target us, and now have found him in Alaska where he has molested a ten year old boy. It's time to abolish unconstitutional federal law enforcement and return law enforcement to the STATES! The federal government has the flipping military, what else do we need at that level and what else is CONSTITUTIONAL?
4w  Like  Reply  Edited                                                     👍

J Les Little you and I both know that this world is about to get flipped upside down and I hope you are stocking up on popcorn 🍿. Always here for you and any patriots that need a friend
4w  Like  Reply

J Les Little sent you a pm
4w  Like  Reply  💬

B-31

**JA260**



B-32





J Les Little
November 20 at 8:23 PM · YouTube ·

Mind blowing, jaw dropping exact time fulfilled prophecies explained by Rabbi turned Pastor Jonathan Cahn. One of them is about prophet Jehu's people storming the capital and eighty people being arrested that day which is the exact number of Patriots arrested on 1/6/2021. I remember reading that text and it blows my mind that I am in a small way in a biblical prophetic event! [redacted] thanks for sharing!

YOUTUBE.COM
The Josiah Manifesto: Revealing Prophetic Mysteries For Now & The End Times with Jonathan Cahn

4

Like Comment Share

Write a comment...

**J Les Little** is at **Petrified Forest National Park**.
November 21 at 6:45 PM · Chambers, AZ · 🌐

Petrified wood from Papaw Noah's worldwide flood 4k years ago, Mamaw ▇▇▇ bought for me on her and Papaw's camping tour of the canyons out west.

B-34

**JA263**



IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JAMES LESLIE LITTLE,

Defendant.

Case No. 1:21-CR-315 (RCL)

**REPLY IN SUPPORT OF MOTION TO
AMEND JUDGMENT AND TERMINATE PROBATION**

James Little, through undersigned counsel, files this reply in support of his motion to amend judgment and terminate probation (Doc. 58). The government's memorandum in opposition (Doc. 65) insists that this Court must conduct a resentencing hearing following the D.C. Circuit's remand and that, at such a hearing, the Court would have authority to impose additional punishment beyond what Mr. Little has already served.

In at least two similar cases, the district court has rejected similar government arguments and simply terminated the remaining probation term without a hearing. *See* Order (Minute Order), *United States v. Ianni*, 1:21-cr-451 (D. D.C. Dec. 14, 2023); Order (Doc. 44), *United States v. Entrekin*, 1:21-cr-686 (D. D.C. Dec. 11, 2023). The same outcome is warranted here. This Court should grant Mr. Little's motion and enter judgment striking or terminating his probationary term.

1

**JA265**

The government's arguments to the contrary lack merit. First, the mandate rule does not bar this Court from concluding that double jeopardy prohibits an increased sentence of imprisonment. Second, the *Lange / Bradley* rule applies here: because Mr. Little has fully served one of the two alternative punishments imposed upon him, this Court lacks authority to impose additional punishment. Third, and perhaps most importantly, even if additional punishment were permitted, the § 3553(a) factors weigh in favor of a Time Served sentence.

## I. The mandate rule does not prohibit this Court from entering a judgment of Time Served on remand without a resentencing hearing.

The government first contends that the mandate rule precludes this Court from accepting Mr. Little's double jeopardy argument. But the case cited by the government demonstrates that its contention is without merit. Citing *Independent Petroleum Association of America v. Babbitt*, 235 F.3d 588, 596 (D.C. Cir. 2001), the government describes the "mandate rule" as providing that "an inferior court has no power or authority to deviate from the mandate issued by the appellate court." Gov't Memo., at 4.

That basic description of the mandate rule is accurate, but the remainder of the *Independent Petroleum* decision illustrates why the rule doesn't foreclose Mr. Little's double jeopardy argument. After stating the rule, the panel in *Independent Petroleum* explained it did not apply because the legal issue presented "was not before us, nor decided by us, even by implication" in the prior appeal. 235 F.3d at 597. Although the appellant cited language from the prior opinion, the D.C. Circuit explained that "[a]ny confusion read into our earlier opinion stems from the fact

2

that this issue was not cleanly raised." *Id.* Given this posture, the D.C. Circuit explained that the prior mandate did not preclude the panel, or the district court, from "considering this issue today, with the question placed squarely before us uncluttered by other claims or cases." *Id.*

The same is true here.  The briefing in the D.C. Circuit appeal did not raise a double jeopardy argument regarding the remedy, and the opinion does not mention double jeopardy at all. Although Mr. Little's brief did request a remand with instructions to strike the probationary term, the brief merely described that remedy as "proper"; it neither cited any precedent in support of that request nor argued that such a remedy was required by double jeopardy principles. To borrow the language from *Independent Petroleum*, the double jeopardy argument was not "cleanly raised" in the prior appeal, meaning that the mandate rule does not bar this Court from "considering this issue today, with the question placed squarely before [it]."

Two final points. First, the D.C. Circuit's opinion says only that Little must be resentenced. It says nothing about double jeopardy or whether the resentencing could permissibly result in an increase in Mr. Little's sentence. On those issues, the government relies on the dissenting opinion from Judge Wilkins, who said in a footnote that "it appears" the court on remand could impose "either a longer prison or probationary term [if] required to meet the goals of 18 U.S.C. § 3551." *See United States v. Little*, 78 F.4th 453, 469 n.3 (D.C. Cir. 2023); *see also* Gov't Memo., at 7. Even on its own terms, Judge Wilkins's statement is equivocal ("it appears"), which makes sense given that the issue wasn't briefed. More importantly, and at the risk

3

**JA267**

of stating the obvious, any statements in a dissent are not binding and, therefore, not relevant under the mandate rule.

Second, the government says there is nothing to "amend" because the original judgment has been vacated. Gov't Memo., at 6. While this argument may seem like a clever "gotcha" attempt, it misses the point. There is no dispute that the Court possesses authority to correct an illegal sentence by entering a new or amended judgment without a hearing. Indeed, conducting a "resentencing" in this manner is common practice after a sentence is vacated as illegal. *See, e.g.*, *United States v. Sumner*, 1:00-cr-383-CKK (granting motion to vacate and ordering "resentencing" on March 30, 2022, and entering amended judgment imposing time-served sentence without a hearing on May 17, 2022); *United States v. Carter*, 1:04-cr-155-ESH (vacating sentence on October 29, 2019, with order directing that defendant "be resentenced," and entering amended judgment without a hearing on November 26, 2019); *United States v. Wilson*, 1:96-cr-157-ESH (vacating judgment pursuant to *Johnson*-based § 2255 motion on April 18, 2017, and entering judgment imposing corrected sentence without a hearing on May 31, 2017); *United States v. Brown*, 1:09-cr-00358-EGS (granting motion to vacate sentence and ordering "resentencing" on April 12, 2017, and entering judgment imposing sentence without a hearing on May 12, 2017).

In sum, this Court can comply with the D.C. Circuit's mandate by resentencing him to Time Served through the entry of a written judgment without the need for a hearing.

4

**JA268**

## II.    The government's double jeopardy arguments lack merit.

The government devotes much of its memorandum to arguing that the double jeopardy clause does not bar this Court from imposing additional punishment, even though Mr. Little has already served fully the imprisonment term imposed upon him. As explained in Mr. Little's motion, the Supreme Court's still-binding precedent dictates the opposite conclusion. *See* Doc. 58, at 2-10. Most directly, the decision in *In re Bradley*, 318 U.S. 50 (1943), remains binding in single-count cases like this one. Under the rule in *Bradley*, if a defendant has fully satisfied one of the two alternative "portion[s] of the sentence which could lawfully have been imposed," the court is without "power" to alter the judgment in a way that would increase the punishment or require the defendant to serve the other alternative portion of the sentence. *Id.* at 52.

The government resists this conclusion by relying on two separate sets of case law, one involving multi-count cases such as *Jones v. Thomas*, 491 U.S. 376 (1989), and the other involving "expectation of finality" cases such as *United States v. DiFrancesco*, 449 U.S. 117 (1980).

These cases do not help the government here. To begin, the multi-count cases are not controlling because this case involves a single count. In *Jones*, the Supreme Court specifically distinguished multi-count cases from single-count cases:

> *Bradley* and *Lange* both involved alternative punishments that were prescribed by the legislature *for a single criminal act*. The issue presented here, however, involves separate sentences imposed for what the sentencing court thought to be separately punishable offenses, one far more serious than the other.

5

**JA269**

491 U.S. at 383 (emphasis added). Nothing in *Jones* suggests that its rule applies to "a true alternative sentence case such as *Bradley*." *Id.* Because this case is also a "true alternative sentence case," the government can find no help in *Jones* or analogous multi-count cases under the sentencing-package doctrine.

Likewise, the "expectation of finality" cases are not on point for a single-count, alternative-options case like this one. The distinction is apparent when you contrast this case with *DiFrancesco*. In that case, Congress specifically provided that the government could appeal the sentence imposed on a defendant determined to be a "dangerous special offender." 449 U.S. at 125 & n.9. Because of this provision, the Supreme Court explained that a "defendant is aware at the original sentencing" that "a dangerous special offender sentence is subject to increase on appeal." *Id.* at 137. Accordingly, the defendant cannot have a "legitimate expectation[ ]" of a final sentence until the conclusion of any government appeal. *Id.*

Here, by contrast, there is no analogous provision, and the government did not appeal. When Mr. Little filed his appeal arguing that the dual sentence was not authorized by statute, the *Bradley / Lange* line of cases provided him with a "legitimate expectation" that a successful appeal would not result in additional punishment.

Finally, it is worth highlighting that the government itself seems to recognize the weakness of its own precedent-based arguments. Its memorandum acknowledges that the cases it relies on "can be distinguished," meaning that the

6

**JA270**

government has found no case that applies its theory to a case like this one. Gov't Memo., at 16. Nonetheless, the government asks this Court to extract "broad principles" from other cases, *id.* at 16, and apply them in a way that effectively overrules *Bradley*.

This Court should reject decline the government's invitation. Because this case involves a "true alternative sentence case such as *Bradley*," *see* Jones, 491 U.S. at 383, this Court should apply the *Bradley* rule. Under that rule, the Court is without power to impose an increased punishment.

## III. Even if double jeopardy does not bar additional punishment, the facts justify a time-served sentence.

Alternatively, even if this Court rejects Mr. Little's double-jeopardy argument (or if it decides not to resolve the issue), the Court should hold that the § 3553(a) factors do not support additional punishment. At this point, Mr. Little has served his two-month sentence of imprisonment without incident and completed 18 months of his 36-month term of probation without any violations of his conditions. This Court's colleagues have determined that additional punishment is unwarranted in at least two similar cases. *See* Order (Doc. 44), *United States v. Entrekin*, 1:21-cr-686 (D. D.C. Dec. 11, 2023); Order, *United States v. Ianni*, 1:21-cr-451 (D. D.C. Dec. 14, 2023) ("Upon consideration of Defendant's Motion for Termination of Probation, it is hereby ORDERED that the Motion is GRANTED. Even if the Court has the authority to resentence Defendant (a question it does not decide at this time), additional punishment beyond what she has already served would not be warranted under 18 U.S.C. § 3553(a).").

7

**JA271**

The government explicitly declines to take a position on the appropriate sentence on remand. *See* Gov't Memo., at 9 n.3. However, the government acknowledges that the Court must provide Mr. Little with credit for the portion of his sentence already served. *See* Gov't Memo., at 14-15 n.8. While the government describes the "precise crediting ratio" as "an open question," *see id.*, the fact that Mr. Little has already both his term of imprisonment and half of his three-year probation term weighs heavily in favor of a time served sentence.

Although the government takes no position on the appropriate sentence, its memorandum highlights two aspects of Mr. Little's "post-incarceration conduct" that it believes should be considered under the § 3553(a) factors. Neither one supports additional punishment.

First, the government highlights that Mr. Little has not yet paid the $510 owed for restitution and a special assessment. Gov't Memo., at 17. The government suggests the failure to pay represents a "disregard for [Mr. Little's] responsibilities in meeting this Court's orders." *Id.* The reality is much different. Based on conversations with Mr. Little and his Probation Officer, the lack of any payments to date stems from a simple misunderstanding. Mr. Little was informed that he would receive postage paid envelopes in which to send the restitution payments:

> Make your criminal debt payments according to the payment schedule set forth in your Judgment directly to the **Clerk of Court, Washington D.C.** You will be supplied with postage paid envelopes addressed to the Clerk of Court for the appropriate divisional office which will be:

When Mr. Little never received those envelopes, he mistakenly concluded that the payments were not yet due. Now that he recognizes the misunderstanding, Mr.

8

**JA272**

Little intends to begin payment as soon as possible. Nothing about this misunderstanding warrants additional punishment under the § 3553(a) factors.

Second, the government suggests that Mr. Little's "social media presence" is a factor that should be considered under the § 3553(a) factors. Gov't Memo., at 18. In its memorandum, the government notes that Mr. Little's conditions of probation include "a Social Media restriction." Gov't Memo., at 4. Although not quoted by the government, that restriction provides that Mr. Little "shall not access, view or use any online social media . . . without the approval of the Probation Officer." Doc. 52, at 5. The government does not allege that Mr. Little has violated this restriction or that any of his social media usage has been undertaken "without the approval of the Probation Officer." And Mr. Little's Probation Officer confirmed during a call with counsel that Mr. Little did have permission to post on social media.

Moreover, the social media posts cited by the government represent core political speech, protected by the First Amendment, for which Mr. Little cannot be punished under the § 3553(a) factors. To begin, the government cites a post with "a biblical quote insinuating justice is twisted in the courts." Gov't Memo., at 18. The D.C. Circuit recently reiterated that speech of this nature, challenging the use of prosecutorial discretion as politically motivated, is protected by the First Amendment:

> Prosecutors are vested with immense authority and discretion, including the power to take steps that can result in persons' loss of liberty. The public has a weighty interest in ensuring that such power is exercised responsibly. And criminal defendants facing potential curtailments of liberty have especially strong interests in commenting, within reasonable bounds, on prosecutors' use of their power.

9

**JA273**

*United States v. Trump*, --- F.4th ---, 2023 WL 8813752, *26 (4th Cir. 2023)

The government's other examples of "concerning" social media posts, *see* Gov't Memo., at 19-25, are in a similar vein. For example, the government suggests that a reference to #BeattheCHEAT could raise a "concern regarding future election interference." Gov't Memo., at 21. That "concern" is unfounded. In the post, Mr. Little urges "everyone [to] vote Trump" and says that "it's going to take a vote from everyone on the street to #BeattheCHEAT." *See* Gov't Memo, at 22 (screenshot of post). Thus, far from advocating improper "election interference," the post encourages just the opposite—that people vote for Mr. Little's preferred candidate, exactly what is supposed to happen in a democracy.

As this example illustrates, the government's focus on Mr. Little's social media posts appears to be an effort to punish him for his continued political support of former President Trump. Needless to say, punishing a person for their political beliefs is not just inconsistent with the § 3553(a) factors; it is also distinctly un-American. This Court should clearly and expressly reject the government's attempt to do so.

Judge Moss has already rejected a similar government argument in a different January 6 case. In *United States v. Entrekin*, the government opposed the defendant's request for a post-*Little* termination of an illegal imprisonment-plus-probation sentence. In doing so, the government argued—as it does here—that the defendant's "posts on social media" were "problematic" and indicated "a lack of remorse for his offense." Order (Doc. 44), at 2, *United States v. Entrekin*, 1:21-cr-686

10

**JA274**

(D. D.C. Dec. 11, 2023). The judge rejected that argument, noting that the posts "do[ ] not cross over into any criminal conduct" and that the government "offers no evidence that Entrekin has engaged in anything more than political speech." *Id*. The same is true here.

The bottom line for the § 3553(a) analysis in this case is simple. Mr. Little has served his two-month prison sentence, and he has successfully completed 18 months of probation without any problems. Although his social media posts demonstrate that he believes—like many supporters of former President Trump— that some of the prosecutorial decisions made in relation to January 6 are politically motivated, he is entitled to express that opinion under the First Amendment. And the fact that he has done so, in social media posts made with the full knowledge and permission of his Probation Officer, cannot support increased punishment under the § 3553(a) factors. In sum, the § 3553(a) factors support a sentence of time served.

*        *        *

For these reasons, this Court should grant Little's motion, cancel the scheduled hearing, and enter an amended judgment that strikes the probation term and/or imposes a sentence of time served.

Respectfully submitted,

John G. Baker
Federal Public Defender

/s/ Joshua B. Carpenter
Joshua B. Carpenter
Appellate Chief

11

**JA275**

1 Page Avenue, Suite 210
Asheville, NC 28801
Joshua_Carpenter@fd.org

Date: January 10, 2024

Case 1:21-cr-00315-RCL    Document 69    Filed 01/17/24    Page 1 of 13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| **v.** | Case No. 1:21-cr-315-RCL |
| **JAMES LITTLE**, | |
| *Defendant*. | |

<u>**MEMORANDUM AND ORDER**</u>

For his involvement in the January 6, 2021 attack on the United States Capitol, Defendant James Little pleaded guilty to a petty offense. This Court imposed a sentence of imprisonment, followed by probation. On appeal, the D.C. Circuit held that Little's "split sentence" was unlawful. It therefore "vacate[d] Little's sentence and remand[ed] to the district court for resentencing." *United States v. Little*, 78 F.4th 453, 461 (D.C. Cir. 2023).

Now, Little asks the Court to disregard the D.C. Circuit's directive to resentence him and to instead simply let him off probation. Yet the Court is bound by the mandate rule to follow the instructions from the D.C. Circuit. The Court will thus **DENY** Little's motion and proceed to resentencing as scheduled on January 25, 2024. Little's double jeopardy objection to resentencing is squarely foreclosed by governing precedent, so when the Court resentences Little, it may lawfully impose an additional term of imprisonment or probation, if it chooses to do so.

## I.    BACKGROUND

### 1.    Little's Initial Sentence

The Court previously summarized Little's contribution to the events of January 6, 2021:

January 6, 2021, marked a tragic day in American history. The peaceful transfer of power—one of our most important and sacred democratic processes—came under

1

**JA277**

a full-fledged assault. While the immediate threat may have subsided, the damage from January 6 persists. Rioters interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred law enforcement officers, and caused more than a million dollars of property damage to the U.S. Capitol. Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

*United States v. Little*, 590 F. Supp. 3d 340, 342 (D.D.C. 2022), *vacated and remanded*, 78 F.4th 453 (D.C. Cir. 2023).

On November 16, 2021, Little pleaded guilty to Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). *See* Plea Agr., ECF No. 25. Little admitted to entering the United States Capitol, despite knowing that he lacked permission, and then parading, demonstrating, and/or picketing within the building. Statement of Offense, ECF No. 26, 4.

On March 14, 2022, the Court sentenced Little to a "split sentence," meaning "a term of imprisonment followed by a term of probation." *Little*, 590 F. Supp. 3d. at 343. The Court recognized that because the statutory maximum term of imprisonment for Little's offense was six months, federal law classifies the crime as a petty offense. *Id.* (citing 40 U.S.C. § 5109(b), 18 U.S.C. § 3559(a)(7), and 18 U.S.C. § 19). But it held that a split sentence was legally permissible for a defendant convicted of a petty offense. It also concluded that a split sentence was warranted in this case, because "[s]ome term of imprisonment may serve sentencing's retributive goals . . . [b]ut only a longer-term period of probation is adequate to ensure that Little will not become an active participant in another riot." *Little*, 590 F. Supp. 3d at 344. It therefore sentenced Little to

2

**JA278**

60 days' imprisonment, 36 months' probation, $500 in restitution, and $10 in special assessment. *Id.* at 351.

### 2. Little's Appeal

On appeal, Little challenged his sentence, arguing that a split sentence for a single conviction for a petty offense was illegal. Br. for Appellant *40, *United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023) (No. 22-3018). He argued that because he had "already served his entire term of imprisonment, the proper remedy is to reverse and remand with instructions that Little be immediately discharged from probation and that an amended judgment be issued reflecting no probationary term." *Id.*

A divided panel of the D.C. Circuit agreed with Little's substantive argument, holding that under 18 U.S.C. § 3561(a)(3), a court could impose imprisonment or probation but not both. *Little*, 78 F.4th at 454. However, it rejected Little's proposed remedy of instructing the district court to discharge Little from probation and issue an amended judgment reflecting no term of probation. Instead, the court of appeals "vacate[d] Little's sentence and remand[ed] to the district court for resentencing." *Id.* at 461. Writing in dissent, Judge Wilkins stated that "[f]ollowing vacatur of the sentence on remand, it appears that the district judge could impose a sentence of imprisonment or probation, and that he would not be limited to the 90 days or three years that were imposed before if he concluded that either a longer prison or probationary term were required to meet the goals of 18 U.S.C. § 3551." *Id.* at 469 n.3 (Wilkins, J., dissenting) (citing *Davenport v. United States*, 353 F.2d 882, 884 (D.C. Cir. 1965)).

3

**JA279**

### 3. The Present Dispute

Little completed his sixty days of imprisonment on July 8, 2022, and is currently on probation. *See* Gov. Opp'n 4. According to the Government, he has failed to pay either the $500 restitution or the $10 special assessment ordered by the Court. *Id.*

On November 9, 2023, the Court received the mandate from the D.C. Circuit. ECF No. 57. Little moved for the Court to amend the judgment to remove the term of probation, to terminate the term of probation, or to do both. Def. Mot., ECF No. 58. The Government initially moved to hold Little's motion in abeyance pending the D.C. Circuit's decision in *United States v. Caplinger*, No. 22-3057, ECF No. 61, but then withdrew that motion as filed in error, ECF No. 63. The Government then filed an opposition to Little's motion. *See* Gov. Opp'n, ECF No. 65. Little filed a reply. *See* Def. Reply, ECF No. 66.

Little's motion is now ripe for review.

## II.    DISCUSSION

Given the mandate from the D.C. Circuit, the Court must resentence Little. In doing so, double jeopardy principles do not prevent the Court from imposing additional punishment, so long as the Court credits the punishment already served by Little against any further penalty.[1]

---

[1] Little also argues that even if double jeopardy does not require termination of probation, the Court should release him from probation because "[h]e has been compliant with the terms of probation as far as counsel is aware, and presents no future danger to the community." Def. Mot. 10. He also contends that resentencing him to time served without a hearing would be in compliance with the D.C. Circuit's mandate. Def. Reply at 4. However, whenever the Court imposes a sentence, it must carefully consider the factors provided in 18 U.S.C. § 3553(a). The Court will not short-circuit the usual process for considering those factors by deciding the issue at this stage.

4

**JA280**

## A. Under the Mandate Rule, the Court Must Resentence Little

The D.C. Circuit did not leave Little's remedy as an open question. Instead, it "vacate[d] Little's sentence and remand[ed] to the district court for resentencing." *Little*, 78 F.4th at 461. The mandate rule requires the Court to obey that directive by resentencing Little.

The mandate rule means a district court must do as it was told by the court of appeals. "Under the mandate rule, 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'" *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 596 (D.C. Cir. 2001) (quoting *Briggs v. Pennsylvania R.R. Co.*, 334 U.S. 304, 306 (1948)); *see also* 28 U.S.C. § 2106 ("The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."). Therefore, "[a] trial court is without power to do anything which is contrary to either the letter or spirit of the mandate construed in the light of the opinion of [the] court deciding the case." *Yablonski v. United Mine Workers of Am.*, 454 F.2d 1036, 1038 (D.C. Cir. 1971) (internal quotation marks and citation omitted).[2]

Little's argument that this Court may disregard the mandate fails for two reasons. He contends that the Court cannot resentence him as instructed because imposing any additional punishment would violate double jeopardy. Def. Mot. 1–2. The first problem with this approach is that the Court does not agree that double jeopardy precludes resentencing in this case, for the

---

[2] The mandate rule applies to criminal sentencing appeals. *See* 18 U.S.C. § 3742(g) ("A district court to which a case is remanded pursuant to [§ 3742(f)(1), which permits a defendant to appeal a sentence "imposed in violation of law," or (f)(2)] shall resentence a defendant in accordance with [§ 3553] and with such instructions as may have been given by the court of appeals . . . .").

5

**JA281**

reasons stated below.  But even if the Court were inclined to agree with Little on that, it still could not flout the mandate of the D.C. Circuit.  In arguing that the Court should refuse to resentence him, Little asks the Court to do something it has no authority to do, since the Court lacks discretion to deviate from the mandate.  *See Yablonski*, 454 F.2d at 1038.

Similarly, Little's argument that the mandate rule does not apply because the D.C. Circuit did not consider double jeopardy, Def. Reply 2–3, fails because a higher court's decision is binding, even if that decision did not take into account a relevant but unraised argument.  Little points out that the briefing on appeal did not raise the double jeopardy argument and that the resulting opinion does not reference double jeopardy.  *Id.* 3.  But he offers no authority for the radical idea that this absence saps the force of the mandate.  His reliance on *Independent Petroleum Association of America v. Babbit* is misplaced.  235 F.3d 588 (2001).  In that case, a party argued that the D.C. Circuit had already decided that the party had taken a certain action, and that the mandate rule thus prevented the district court from holding otherwise.  *Id.* at 596.  The D.C. Circuit rejected this argument on the basis of " [a]lthough some portions of" its earlier "decision may be read to suggest that" the party had taken that action, that question "was not before us, nor decided by us, even by implication."  *Id.* at 597.

The Court's point was simply that the mandate rule does not control a district court's decision of a question not actually before or decided by the court of appeals.  That is quite different from Little's suggestion that when the court of appeals expressly decides a matter without considering a relevant but unraised argument, its directive to the lower court becomes optional.  Were he right, a district court could disregard instructions from above whenever a litigant advanced a previously unraised objection to the otherwise binding decision.  That cannot be correct, because "[a] trial court is without power to do anything which is contrary to either the

6

**JA282**

letter or spirit of the mandate construed in the light of the opinion of [the] court deciding the case." *Yablonski*, 454 F.2d at 1038. Accordingly, the Court will not give Little the remedy refused by the D.C. Circuit.

### B. Double Jeopardy Principles Do Not Prevent the Court From Imposing Additional Punishment on Little, so Long as It Credits the Punishment Already Incurred

Principles of double jeopardy do not prohibit the Court from imposing an additional term of imprisonment or probation when it resentences Little, as long as it credits the time already served in prison or probation against any new punishment. Little's argument disregards established principles of law, according to which a defendant who appeals an illegal sentence has no legitimate expectation of finality in that sentence and therefore may be resentenced even if he receives additional punishment and even if he has already served part of the original sentence. Applying these principles, it is clear that in resentencing Little, the Court may impose additional penalties, provided it appropriately reduces the new punishment to reflect the time he has already served of his initial terms of imprisonment and probation.

Little relies on two Supreme Court decisions to argue that because he has already fully served his term of imprisonment, double jeopardy prohibits the Court from imposing any additional punishment. *See* Def. Mot. 2–9. He principally invokes the Supreme Court's decision in *Ex Parte Lange*, 85 U.S. 163 (1873). In that case, the defendant's single statute of conviction permitted imposition of a fine *or* imprisonment, but the judge imposed a maximum prison term *and* a maximum fine. *Id.* at 164. The Supreme Court vacated the sentence and, applying double jeopardy principles, held that because the defendant "had fully suffered one of the alternative punishments to which alone the law subjected him, the power of the court to punish further was gone." *Id.* at 176. Little also cites *In re Bradley*, 318 U.S. 50 (1943). There, as in *Lange*, the

7

**JA283**

judge sentenced the defendant to both a fine and imprisonment although the statute permitted only one or the other. *Id.* at 51. After the defendant had already paid the fine, the court amended the judgment to omit the fine but keep the imprisonment. *Id.* at 51–52. Citing *Lange*, the Supreme Court concluded in a brief opinion that "[a]s the judgment of the court was thus executed so as to be a full satisfaction of one of the alternative penalties of the law, the power of the court was at an end." *Id.* at 52 (citing *Lange*, 85 U.S. at 176). Based on these two cases, Little says that the completion of his term of imprisonment amounts to "full satisfaction of one of the alternative penalties of the law" and that the Court thus lacks authority to further punish him. Def. Mot. 3 (quoting *Bradley*, 318 U.S. at 52). Little's argument fails, however, because the case law does not support such a stark, sweeping reading of *Lange* or *Bradley*.

Indeed, the Supreme Court has read those cases narrowly. In *Jones v. Thomas*, the Court emphasized that in *Lange*, the defendant had already paid the statutorily maximum fine and served five days of his maximum one-year prison sentence when the trial court attempted to resentence him to no fine but a further year in prison. 491 U.S. 376, 383 (1989) (citing *Lange*, 85 U.S. at 175). The Court explained that "*Lange* therefore stands for the uncontested proposition that the Double Jeopardy Clause prohibits punishment in excess of that authorized by the legislature . . . and not for the broader rule suggested by its dictum." 491 U.S. at 383 (citing *United States v. DiFrancesco*, 449 U.S. 117, 139 (1980)). The Court also stated that "we do not think the law compels application of *Bradley* beyond its facts." *Id.* at 386. And based on *United States v. DiFrancesco*, 449 U.S. 117 (1980), the D.C. Circuit has concluded that "the holdings in *Ex parte Lange* and [*United States v. Benz*, 282 U.S. 304 (1931)] now mean only that a court which imposes a sentence greater than that authorized by the legislature subjects a defendant to multiple

8

**JA284**

punishment in violation of the double jeopardy clause." *United States v. Fogel*, 829 F.2d 77, 86–87 (D.C. Cir. 1987).

By now it is well-established that the Constitution does not categorically bar additional punishment at resentencing. In *DiFrancesco*, the Supreme Court held that neither a statutorily authorized government appeal of a criminal sentence nor an increase of the sentence upon post-appeal resentencing violates double jeopardy. 449 U.S. at 132, 136–37. The Court noted that its precedents "clearly establish that a sentence does not have the qualities of constitutional finality that attend an acquittal." *Id.* at 134. And it observed that because the statute clearly permitted appellate review of the sentences at issue, "[t]he defendant . . . has no expectation of finality in his sentence until the appeal is concluded or the time to appeal has expired." *Id.* at 136; *see also id.* at 139.

From this statement in *DiFrancesco*, the D.C. Circuit has derived the principle that "whether 'an increase in a sentence' violates the Double Jeopardy Clause 'turns on the extent and legitimacy of a defendant's expectation of finality in that sentence.'" *United States v. Casseday*, 807 F. App'x 5, 7 (D.C. Cir. 2020) (quoting *Fogel*, 829 F.2d at 87).[3] When does a defendant not have a legitimate expectation in the finality of a sentence? When "he is or should be aware at sentencing that the sentence may permissibly be increased." *Fogel*, 829 F.2d at 88. "If . . . there is some circumstance which undermines the legitimacy of" the defendant's expectation of finality, "then a court may permissibly increase the sentence." *Id.* at 87.

---

[3] Little asserts that "the 'expectation of finality' cases are not on point for a single-count, alternative-options case like this one." Def. Reply at 6. He seems to read *DiFrancesco* as applying only to instances in which the government appeals the sentence pursuant to specific statutory authorization. *See id.* But there is no warrant to read *DiFrancesco* as limited to its facts when the D.C. Circuit has already used it to distill a broader principle—in a single-count case, no less. *See Fogel*, 829 F.2d at 79.

9

Here, Little lacked a legitimate expectation of finality under *Fogel* because he received an illegal sentence and challenged it on direct appeal. First, Little did not have a legitimate expectation that his sentence was final because it was illegal. *See Fogel*, 829 F.2d at 88 (finding that one reason the defendant had a legitimate expectation of finality was because "an increase in appellant's term of probation was not necessary to bring the sentence into compliance with any statute" as "[t]he originally imposed sentence was not impermissible under the penalty statute"); *see also United States v. Rourke*, 984 F.2d 1063, 1066 (10th Cir. 1992) ("A defendant cannot acquire a legitimate expectation of finality in a sentence which is illegal, because such a sentence remains subject to modification.").

Second, Little did not legitimately expect his sentence to be final because he challenged it on direct appeal. *Fogel*'s holding that the district court violated double jeopardy by "unnecessarily increase[ing]" the defendant's sentence on its own initiative, *Fogel*, 829 F.2d at 80–81, 90, is "inapposite" when, as in this case, the defendant "voluntarily placed his sentence at issue by challenging it." *United States v. Townsend*, 178 F.3d 558, 567 n.1 (D.C. Cir. 1999); *see also United States v. Andersson*, 813 F.2d 1450, 1461 (9th Cir. 1987) ("Andersson has no legitimate expectation of finality in the original sentence when he has placed those sentences in issue by direct appeal and has not completed serving a valid sentence.").

The fact that Little has already served part of his initial sentence does not change the result. An increased punishment is permissible even if the defendant has begun serving the original, illegal sentence, although any punishment already incurred must be credited against the increased punishment. "[T]here no longer exists a *per se* rule that prohibits a court from increasing a defendant's sentence after service has begun." *Fogel*, 829 F.2d at 86–87. A defendant whose initial sentence was "plainly illegal" may receive additional punishment at resentencing. *United*

10

**JA286**

*States v. Evans*, 459 F.2d 1134, 1136 (D.C. Cir. 1972) ("It is well settled that a sentence in all

respects legal cannot be increased after the defendant has begun serving it . . . . A sentence plainly

illegal, however . . . may be corrected even after the defendant has begun serving it.") (citations

omitted) (collecting cases); *see also Hayes v. United States*, 249 F.2d 516, 518–19 (D.C. Cir. 1957)

("True it is that defendant had begun to serve time; but as we read [*Bozza v. United States*, 330

U.S. 160 (1947)] this time was not lawful punishment the augmentation of which, to make the

sentence equal to the statutory penalty, constituted double jeopardy."); *Davenport v. United States*,

353 F.2d 882, 884 (D.C. Cir. 1965) (affirming the holding of *Hayes* "that a defendant who

successfully attacks an invalid sentence can 'be validly resentenced though the resentence

increased the punishment'" (quoting *Hayes*, 249 F.2d at 517)).   Therefore, because Little's

sentence was illegal, he can receive further penalties at resentencing.

    This is not a case in which imposing an additional penalty would fall afoul of the *Lange*

rule that a defendant cannot be made to suffer greater criminal punishment than that prescribed by

the legislature.  *See Fogel*, 829 F.2d at 86–87 (citing *Lange*, 85 U.S. 163).  The defendant in *Lange*

had already paid the maximum fine permitted by law, *Lange*, 85 U.S. at 164, and so any further

penalty would have resulted in his total punishment exceeding the maximum set by Congress.  In

contrast, although Little has fully served his term of imprisonment, those two months fall well

short of the statutory maximum of six months.  *See Little*, 590 F. Supp. 3d at 343.

    And Little is misguided in arguing that under *Bradley* he can suffer no further penalty

because "one valid alternative provision of the original sentence has been satisfied" by his

completion of the term of imprisonment imposed.  Def. Mot. 3 (quoting *Bradley*, 318 U.S. at 52).

Little can receive additional punishment so long as the Court credits the punishment already

incurred against the new punishment.  In *Thomas*, the Supreme Court explained that the

11

**JA287**

"alternative sentences in *Bradley*" of fine and imprisonment "were of a different type," meaning that "it would not have been possible to 'credit' a fine against time in prison." 491 U.S. at 384. By contrast, "crediting time served under one sentence against the term of another has long been an accepted practice." *Thomas*, 491 U.S. at 384 (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969)). Crediting time ensures the defendant's punishment does not exceed the maximum prescribed by the legislature, which would violate *Lange*. *See Fogel*, 829 F.2d at 86–87 (citing *Lange*, 85 U.S. 163); *cf. Pearce*, 395 U.S. at 718–19 ("[T]he constitutional guarantee against multiple punishments for the same offense absolutely requires that punishment already exacted must be fully 'credited' in imposing sentence upon a new conviction for the same offense."), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 798–803 (1989).

Accordingly, the Court may impose an additional punishment on Little so long as it appropriately credits the time Little served in prison and on probation against the punishment. *See United States v. Lominac*, 144 F.3d 308, 318 (4th Cir. 1998) ("Unlike the monetary sanction of a fine, which cannot be converted into an equivalent temporal sanction, Lominac's term of supervised release restrained his liberty for a known period of time that can be credited against any future sentence of imprisonment. Accordingly, *Bradley* does not bar resentencing."), *abrogated on other grounds by Johnson v. United States*, 529 U.S. 694 (2000); *United States v. Martin*, 363 F.3d 25, 38 (1st Cir. 2004) ("[W]e join other courts of appeals in holding that these similarities [between probation and imprisonment] are sufficient to allow crediting of probation against imprisonment" upon resentencing after an appeal) (collecting cases).

If the Court decides to impose additional punishment, it must reduce that punishment to reflect the punishment already incurred by Little of 60 days' imprisonment and approximately 18 months' probation. *See Thomas*, 491 U.S. at 384. In crediting time served on probation against a

12

**JA288**

later sentence of imprisonment, or vice versa, the Court would not engage in a "day-to-day offset" because probation is much less onerous than imprisonment. *See Martin*, 363 F.3d at 39. If the Court chooses to impose additional punishment, it will use its judgment to select an appropriate, fact-sensitive ratio based on "the specific conditions of [the defendant's] probation and the effect of a sentence reduction on the underlying purposes of the Guidelines as set out in 18 U.S.C § 3553(a)." *Id.*

## III.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Little's Motion to Alter the Judgment is **DENIED**. Resentencing remains set for January 25, 2024.

**IT IS SO ORDERED.**

Date: ___1-17-24___

Royce C. Lamberth
United States District Judge

13

**JA289**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:21-cr-315 (RCL) |
| | : | |
| JAMES LITTLE, | : | |
| | : | |
| *Defendant.* | : | |

## GOVERNMENT'S RESENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum respecting the Court's resentencing of Defendant James Leslie Little, currently scheduled for January 25, 2024. ECF Minute Entry (December 11, 2023).

### I.  Factual Background

The Court is well familiar with Little's conduct before, during and following January 6. The Government incorporates by reference its discussion of the factual background laid out in its original sentencing memorandum. ECF 31 at 2-6. The Government presents the following condensed recitation of that background for the Court's convenience.

- In November 2020, Little uploaded a 22 minute-long youtube video in which, among other things, Little warned the Democratic Party of civil war and noted conservative law enforcement officials, members of the United States military, and conservative supporters of the former President "owned lots of guns and God forbid we'd ever have to use it on you."

- On January 5, 2021, Little travelled from his home in North Carolina to Washington, D.C., to attend the "Stop the Steal" rally.

- He attended the "Stop the Steal" rally on January 6, 2021. Following the rally, Little walked to the Capitol. During that walk, Little called his mother, and learned that she just had a medical emergency and was being tended to by emergency medical personnel. Little did not attempt to turn back and return to North Carolina; he continued to the Capitol.

1

**JA290**

- Little saw law enforcement officers deploy tear gas and rubber bullets against the riot. Little nonetheless continued to and went inside the Capitol, taking photographs inside, fist-bumping other rioters, and moving throughout the Capitol, including the Rotunda and Senate Gallery. He left the Capitol within about an hour of his entry into the Capitol.

- Little sent texts and photos to others during and after his entry into the Capitol. One of those texts stated "We just took the Capitol," and "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!"

- Little was interviewed by FBI agents on January 13, 2021, seven days after the events of January 6. During that interview, Little blamed D.C. and Capitol Police for antagonizing the crowd, blamed supporters of Antifa and Black Lives Matter for leading supporters of the former President to commit violence and stated that he believes a civil war between Americans of differing political affiliations will take place because the former President won the popular vote.

ECF 31; *see also* ECF 1, ECF 26, Plea Hr'g Tr., and Sentencing Hr'g Tr.

## II.    Procedural Background

On March 15, 2021, the Government filed a Complaint that charged Little with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 24, 2021, FBI agents arrested Little at his home in North Carolina. On April 23, 2021, the Government filed a four-count Information that charged Little with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 8. On November 16, 2021, Little pleaded guilty to Count Four of the Information, which charged Little with violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. That crime carries a sentence of six months in prison, a fine, or both. *Id.* § 5109(b). As an alternative sentence, a court may sentence a defendant to up to five years of probation, with or without a fine. 18 U.S.C. §§ 3551(b), 3561.

Pursuant to Paragraph 10 of the Plea Agreement, Little agreed to pay $500 in restitution to the Department of the Treasury. ECF 25.

This Court held a sentencing hearing on March 14, 2022, and imposed judgment on that

2

**JA291**

date.  ECF 52.  In its judgment, the Court accepted the plea to Count Four of the Information,

dismissed the other counts, and ordered:

- A term of imprisonment of 60 days (recommending placement at Catawba County Jail)[1];

- A term of probation of 36 months (3 years) with a special condition of social media restriction; and

- Restitution of $500 (interest waived) and a special assessment of $10, payable immediately.

*Id*.  This Court authorized supervision of this case to be transferred to the United States District

Court for the Western District of North Carolina.  ECF 52 at 5.[2]

     Little appealed.  ECF 51.  The Circuit held that the split sentence was unlawful, but rejected

Little's request for reversal and immediate discharge, explicitly vacating Little's unlawful split

sentence and remanding to this Court for resentencing.  *United States v. Little*, 78 F.4th 453, 454,

461 (D.C. Cir. 2023).  This Court received the mandate of the Circuit on November 9, 2023.  ECF

57.  Little moved to alter judgment and terminate his probation on December 6, 2023, ECF 58.

This Court denied the motion, addressing both the effect of the Circuit's mandate and rejecting

Little's double jeopardy assertions.  ECF 69.

     This Court will "proceed to resentencing as scheduled on January 25, 2024."  *Id*. at 1.

"[W]hen the Court resentences Little, it may lawfully impose an additional term of imprisonment

---

[1] Despite this recommendation, Little ended up being incarcerated at FCI Jesup, a medium security federal correctional institution with an adjacent low security satellite prison and a minimum security satellite camp in Georgia.  Little's incarceration was uneventful and his BOP Records are attached for reference.  Ex. A.

[2] The Government represents that it has inquired with the probation office overseeing Little's probation and that office reports that there have been no violations of probation.  Little's probation commenced on July 8, 2022; his probation as originally set was scheduled to end on July 7, 2025.

3

or probation, if it chooses to do so," "so long as the Court credits the punishment already incurred against the new punishment." *Id.* at 1, 11.

## III. This Court May Impose Any Lawful Sentence At The Resentencing

The D.C. Circuit vacated Little's split sentence of imprisonment and probation, holding that a defendant convicted of a single petty offense may not be sentenced both to imprisonment and to probation for that offense. *United States v. Little*, 78 F.4th 453, 454 (D.C. Cir. 2023). The Circuit vacated the split sentence in its entirety and remanded "to the district court for resentencing." *Id.* at 461. As the prior sentence has been vacated, there is no sentence currently in force; resentencing is mandatory, and the imposition of a lawful sentence is required. *See, e.g.*, *United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010) ("The original sentence had been vacated; accordingly, the district court was required to resentence [the defendant]."); *see also* *United States v. Hinds*, 713 F.3d 1303, 1305 (11th Cir. 2013) (". . . when a sentence is vacated, there is no sentence in effect and resentencing is required.") (citation omitted).

In the Government's view there are three possible options available to the Court on resentencing, presented in no particular order:

*First*, the Court may impose a term of probation or incarceration equal to the amount of time already served on probation or incarceration, resulting in Little's release.

*Second*, the Court may impose a term of probation longer than the time already served on probation with credit for time already served on probation and additional credit for time spent incarcerated. In terms of the credit for time previously served on probation, the credit would be one-for-one. In terms of crediting time incarcerated to time sentenced on probation, this Court should follow its announced plan to "use its judgment to select an appropriate fact-sensitive ratio based on 'the specific conditions of [Little's] probation and the effect of a sentence reduction on

4

**JA293**

the underlying purposes of the Guidelines as set out in 18 U.S.C. 3553(a).'" ECF 69 at 13 (quoting *United States v. Martin*, 363 F.3d 25, 39 (1st Cir. 2004).

The term of probation may include additional conditions of probation, like the special condition social media restriction previously imposed in the prior sentence. ECF 52 at 5. The term of probation may also include a period of intermittent confinement during the first year of the newly imposed probation sentence, 18 U.S.C. § 3563(b)(10), or any other discretionary condition provided for by statute. *See, generally*, 18 U.S.C. § 3563(b).

*Third*, the Court may impose a term of incarceration longer than the previously served term of incarceration, with credit for that term and additional credit for time spent on probation. In terms of the credit for the prior period of incarceration, the credit would be one-to-one. For the period spent on probation, the Court would conduct the fact-based inquiry discussed above and determine a credit less than one-to-one and apply that credit to the sentence.

**IV.    The Court Should Resentence Little Based on the § 3553 Factors.**

The overall purpose of the resentencing inquiry, here, like an original sentencing, is to ensure that the sentence is "sufficient, but not greater than necessary, to fulfill the purposes of [18 U.S.C.] § 3553(a)." *United States v. Palmer*, 2023 WL 2265255, at *4 (D.D.C. Feb. 28, 2023) (cited authorities omitted); *see also* ECF 69 at 4 n.1 ("whenever the Court imposes a sentence, it must carefully consider the factors provided in 18 U.S.C. § 3553(a)").[3] The Court imposed the original sentence after careful consideration of the 18 U.S.C. § 3553(a) factors. Sentencing Hr'g Tr. 60:11-21. And while the D.C. Circuit found the split sentence to be unlawful, it did not set aside this Court's analysis of the sentencing factors. Indeed, the Court properly reached a

---

[3] Accordingly, the government incorporates by reference its analysis of the § 3553(a) factors set forth in its original sentencing memo (ECF 31 at 7-17).

determination as to the impact, effect, and intent of the sentence it believed was appropriate under

18 U.S.C. § 3553(a).  Thus, at the very least, the Court should resentence Little to a lawful sentence

that effectuates the intent and effect of the original sentence imposed.

Originally, this Court sentenced Little to a term of 60 days of incarceration and a period of

probation of 36 months (3 years) with special conditions including a social media restriction.[4]  In

deciding on this sentence, this Court noted that it believed that "some term of imprisonment is

essential in these cases now to reflect the seriousness of the offense, to promote respect for the law

and to provide just punishment for the offense."  Sentencing Hr'g Tr. 59:8-11.  The Court also

noted that due to the Defendant's comments replayed from the FBI Interview at sentencing by

defense counsel and Defendant's comments made at the time of sentencing, the Court believed "a

period of [] probation [] for a period of three years" was appropriate because "the Court [did] not

have confidence that the same would not happen in the next election cycle."  *Id*. at 60:2-7.  The

Court stressed that it was imposing the original sentence to ensure the Defendant was "going to be

on probation during the next election cycle and there will not be -- you will not be without court

supervision during the next election cycle."  *Id*. at 60:8-10.

In addition to revisiting its original analysis of the statutory factors, the Court may also

consider the relevant post-sentencing actions of Little.  The Supreme Court in *Pepper v. United*

*States*, 562 U.S. 476, 481 (2011), held that when a "sentence has been set aside on appeal, a district

court at resentencing *may* consider evidence of the defendant's post-sentencing rehabilitation"

(emphasis added).  Courts have interpreted the principle articulated in *Pepper* to permit district

---

[4] Additionally, the Court recommended placement of Little at the Catawba County Jail.  ECF 52 at 2.  In the event the Court believes additional incarceration is appropriate in this case, the Government will not oppose a Defense request to recommend the same placement.

6

courts to consider post-sentencing conduct evidence that "does not always benefit the defendant" and "evidence of bad acts occurring after the defendant was originally sentenced." *United States v. Lawrence*, No. CR 03-00092 (CKK), 2020 WL 5253890, at *7 (D.D.C. Sept. 3, 2020), *aff'd*, 1 F.4th 40 (D.C. Cir. 2021) (quoted authorities omitted).

The Government respectfully submits that the Court, in conducting its analysis on resentencing should accept and consider at least the following post-sentencing conduct:

- Little's delay in paying the ordered restitution. ECF 65 Ex. A;

- Little's creation of his "J 6 Patriot James Leslie Little" public figure Facebook page (created April 28, 2022, approximately 45 days after imposition of sentence.). ECF 65 Ex. B;

- Little's activities on Facebook on both his personal page and his "J 6 Patriot James Leslie Little" public figure Facebook page including:

  o Connecting and messaging with other self-described "Patriots." *Id*. at B-31, B-30;

  o Equating his actions on January 6, 2021, to service in the Vietnam War (*Id*. at B-18):

    > "I now know how the returning Vietnam vets must have felt. For a moment in time, I risked life, limb, and freedom to save the country I love and for the Christian beliefs I love, only to be shunned, deleted, looked down on, and talked down to by armchair soldiers of family and 'Friends' who weren't there and who don't understand the gravity of what stolen elections mean."

  o Promoting "support mail" thanking Little for "standing up for our freedoms on Jan. 6th." *Id*. at B-23; *see also* B-21.

  o Asserting his imprisonment was a "political prison", *id*. at B-11, and that his incarceration was because "[t]he Democrats put [him] in here for not taking the jab." *Id*. at B-17.

  o Engaging with #BeattheCHEAT[5] discussions pertaining to future elections, *id*. at

---

[5] #BeattheCHEAT appears to be a reference to purported election integrity efforts undertaken in support of former President Trump. *See* Will Steakin, *Trump allies using false election claims, images of war to recruit ex-military as poll workers*, ABC News (Oct. 25, 2022) *available at*

B-26, and expressing a belief that his participation in January 6 fulfilled a biblical prophesy. *Id*. at B-33.

o Asserting that justice is twisted in the courts, both on his personal page and his "J 6 Patriot James Leslie Little" public figure Facebook page. *Id*. at B-28, B-29.

*See* ECF 65 at 17-25; *see also* Ex. B.

The Government recommends the Court consider sentencing Little to a term of probation that will extend, including any credit for prior probation and incarceration, through at least the completion this election cycle. *Cf.* Sentencing Hr'g Tr. 60:2-10 (stressing importance that Little be under "court supervision during the next election cycle"). Such a sentence would be "sufficient, but not greater than necessary to comply with the purposes [of the sentencing statute]," 18 U.S.C. § 3553(a), and would effectuate the intent and effect of the original sentence. Additionally, in light of Little's post-sentencing activities, the Court should consider the deterrent effect that the term of incarceration and probation have had on Little and his apparent lack of remorse or belief his actions were justified in determining whether additional imprisonment, perhaps intermittently as a condition of probation, is appropriate. Finally, in view of Little's post-sentencing activities, the Court should consider the effectiveness of the prior special condition social media restriction, whether that restriction has been appropriately carried out by the supervising probation office, and whether clarification of the restriction is necessary, or if additional restrictions are appropriate.

**V.    Conclusion**

For the reasons set forth above, the government respectfully requests that the Court resentence Defendant in accordance with the statutory sentencing factors.

---

https://abcnews.go.com/US/trump-allies-false-election-claims-images-war-recruit/story?id=91412810 [https://perma.cc/TT5G-NS8X]

8

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    /s/ Patrick Holvey
       PATRICK HOLVEY
       DC Bar No. 1047142
       Assistant United States Attorney
       United States Attorney's Office
       601 D Street N.W.
       Washington, D.C. 20530
       Telephone: 202-252-7224
       Patrick.Holvey@usdoj.gov

**CERTIFICATE OF SERVICE**

On this 19th day of January 2024, a copy of the foregoing was served upon all parties via

the Electronic Case Filing (ECF) System.

*/s/ Patrick Holvey*
PATRICK HOLVEY
DC Bar No. 1047142
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
Telephone: 202-252-7224
Patrick.Holvey@usdoj.gov

**JA299**

# Exhibit A

```
BOP2Y              *        INMATE DISCIPLINE DATA        *     01-17-2024
PAGE 001 OF 001 *       CHRONOLOGICAL DISCIPLINARY RECORD     *     06:39:24


REGISTER NO: 36398-509 NAME..: LITTLE, JAMES
FUNCTION...: PRT       FORMAT: CHRONO    LIMIT TO ___ MOS PRIOR TO 01-17-2024
```

```
G5401       DISCIPLINE DATA DOES NOT EXIST FOR THIS INMATE
```

**JA301**

```
 BOP2Y            *       PUBLIC INFORMATION        *    01-17-2024
PAGE 001          *          INMATE DATA            *    06:38:22
                            AS OF 01-17-2024

REGNO..: 36398-509 NAME: LITTLE, JAMES

                    RESP OF: JES
                    PHONE..: 912-427-0870   FAX: 912-427-1125
                                            RACE/SEX...: WHITE / MALE
                                            AGE:  53
ACTUAL RELEASE METH.: FT REL
ACTUAL RELEASE DATE.: 07-08-2022
```

```
G0002       MORE PAGES TO FOLLOW . . .
```

**JA302**

```
  BOP2Y           *            PUBLIC INFORMATION        *    01-17-2024
PAGE 002          *                INMATE DATA           *    06:38:22
                            AS OF 07-08-2022


REGNO..: 36398-509 NAME: LITTLE, JAMES

                    RESP OF: JES
                    PHONE..: 912-427-0870   FAX: 912-427-1125
HOME DETENTION ELIGIBILITY DATE: 07-03-2022


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S PRIOR COMMITMENT.
THE INMATE WAS SCHEDULED FOR RELEASE:  07-08-2022 VIA FT REL


-----------------------PRIOR JUDGMENT/WARRANT NO: 010 -----------------------

COURT OF JURISDICTION...........: DIST OF COLUMBIA, DISTRICT CRT
DOCKET NUMBER...................: 21-CR-315 (RCL)
JUDGE...........................: LAMBERTH
DATE SENTENCED/PROBATION IMPOSED: 03-14-2022
DATE COMMITTED..................: 05-12-2022
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: YES
PROBATION IMPOSED REMARKS.......: 36 MNTHS


                 FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $00.00          $10.00          $00.00       $00.00


RESTITUTION...: PROPERTY: NO  SERVICES: NO       AMOUNT: $500.00


--------------------------PRIOR OBLIGATION NO: 010 --------------------------
OFFENSE CODE....: 805    18:2101 CIVIL RIGHTS
OFF/CHG: 40:5104(E)(2)(G) PARADING, DEMONSTRATING OR PICKETING IN A
         CAPITOL BUILDING

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   60 DAYS
 DATE OF OFFENSE................: 01-06-2021










G0002      MORE PAGES TO FOLLOW . . .
```

**JA303**

```
 BOP2Y          *         PUBLIC INFORMATION          *    01-17-2024
PAGE 003 OF 003 *              INMATE DATA             *    06:38:22
                           AS OF 07-08-2022

REGNO..: 36398-509 NAME: LITTLE, JAMES

                    RESP OF: JES
                    PHONE..: 912-427-0870   FAX: 912-427-1125
--------------------------PRIOR COMPUTATION NO: 010 -------------------------

COMPUTATION 010 WAS LAST UPDATED ON 06-01-2022 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 06-01-2022 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
PRIOR COMPUTATION 010:   010 010


DATE COMPUTATION BEGAN..........: 05-12-2022
TOTAL TERM IN EFFECT............:   60 DAYS
TOTAL TERM IN EFFECT CONVERTED..:   1 MONTHS   29 DAYS
EARLIEST DATE OF OFFENSE........: 01-06-2021

JAIL CREDIT.....................:   FROM DATE    THRU DATE
                                    03-24-2021   03-25-2021


TOTAL PRIOR CREDIT TIME.........: 2
TOTAL INOPERATIVE TIME.........: 0
TOTAL GCT EARNED AND PROJECTED..: 0
TOTAL GCT EARNED................: 0
STATUTORY RELEASE DATE PROJECTED: 07-08-2022
ELDERLY OFFENDER TWO THIRDS DATE: 06-19-2022
EXPIRATION FULL TERM DATE.......: 07-08-2022
TIME SERVED.....................:   1 MONTHS   29 DAYS
PERCENTAGE OF FULL TERM SERVED..: 100.0
PERCENT OF STATUTORY TERM SERVED: 100.0

ACTUAL SATISFACTION DATE........: 07-08-2022
ACTUAL SATISFACTION METHOD......: FT REL
ACTUAL SATISFACTION FACILITY....: JES
ACTUAL SATISFACTION KEYED BY....: BTS

DAYS REMAINING..................: 0
FINAL PUBLIC LAW DAYS...........: 0




S0039      ALL CURRENT COMPS ARE SATISFIED
```

**JA304**

PROB 12A (NCW Rev. 2/13)

RECEIVED

JAN 2 2 2024

CHAMBERS OF
JUDGE LAMBERTH

# UNITED STATES DISTRICT COURT
### Western District of North Carolina

## Report on Offender Under Supervision

Name of Offender: **James  Little**                                                 Case Number: 21-CR-315 (RCL)

Name of Sentencing Judicial Officer: The Honorable Royce C. Lambert, US District Judge

Date of Original Sentence: 3/14/2022                                    Register Number: 36398-509

| | |
|---|---|
| Original Offense: | **Count Four**: 40 USC § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building |
| Original Sentence: | 3/14/2022: The defendant was sentenced to sixty (60) days imprisonment followed by 36 months (3 years) probation. |
| | **Additional Probation Terms:** 1) The Court authorizes supervision of this case to be transferred to the United States District Court for the Western District of North Carolina. |
| | 2) You are ordered to make restitution to Architect of the Capitol Building in the amount of $500. Restitution payments shall be made to the Clerk of Court for the United States District Court, District of Columbia. |
| | **Special Conditions:** 1) Social Media Restriction- You shall not access, view or use any online social media, chat services, blogs, instant messages, SMS, MMS, digital photos, video sharing websites, emails or any other interactive, online or communication applications or sites without the approval of the Probation Officer. |
| | 2) The Probation Office shall release the presentence investigation report to all appropriate agencies, which includes the United States Probation Office in the approved district of residence, in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the Probation Office upon the defendant's completion or termination from treatment. |
| Amended Sentence: | 3/14/2022: All previous conditions from the original judgement remain in effect. The United States Marshals number was updated. |
| | 8/18/2023: Sentenced vacated and case remanded to the District Court for resentencing. |

Type of Supervision: Probation                                    Date Supervision Commenced: 7/8/2022

On 7/13/2022, Mr. Little participated in the Assessment and Orientation at the Hickory Supervision Divisional Office. During this time, all conditions of probation were explained in detail. Mr. Little had concerns regarding the Social Media Restriction additional probation term special condition. At my discretion, Mr. Little was allowed to utilize social media. We discussed the expectations associated with the same; additionally, he was advised that any conduct that appears detrimental or otherwise undermining public safety or the United States government would be addressed accordingly; hence, he would no longer be allowed to utilize the aforementioned. On this date, Mr. Little additionally submitted a urine sample, which returned negative results for the use of any illegal drugs.

As part of the assessment process. Mr. Little was administered the Post-Conviction Risk Assessment (PCRA), which, in part, is a seventy-five (75) question questionnaire scientifically based assessment instrument utilized to determine the likelihood of offenders reoffending. The assessment takes into consideration certain life areas, such as Employment/Employment, Criminal History, Alcohol/Drug, Social Networks, Cognitions Domains. The assessment also includes a violence assessment, which is an objective, quantifiable instrument that provides a consistent and valid method of predicting the risk of committing a violent offense. Mr. Little scored Low/Category 1. Offenders in this category have a 3% arrest rate and a < 1% revocation rate within the next 6 months at the time of the assessment. As explained above, a violence assessment was also completed. Mr. Little scored Low on the PCRA and has 1 factor present on the Violence

Risk Assessment. Consequentially, he is in the 13.4% range, which leads to a classification of Category 1 risk for committing a violent offense. Ultimately, Mr. Little in this category had a violent arrest rate of 1%, a consistent and valid method of predicting the risk of committing a violent offense. As a result of the PCRA score, Mr. Little was enrolled in the low-risk compliant program. The low-risk compliant program (LRCP) is viewed as a privilege and is only available to a particular group of offenders based on certain criteria, mainly, those who score low on the PCRA, as Mr. Little had. The case is then staffed with a supervisor to ensure the assessment was completed correctly, which in this case confirmed the same.

On 10/26/2022, during a standard home contact, Mr. Little indicated he planned to sue the Charlotte Observer, a public media outlet based in Charlotte, North Carolina, due to the information reported about him regarding the instant offense. Mr. Little felt it was bias. He additionally mentioned appealing his conviction and, in a joking manner, through open conversation, referred to the District of Columbia as the District of Criminals. During this particular home contact, I advised Mr. Little that I preferred not to discuss politics during our conversations. It should be noted that Mr. Little was respectful while voicing his opinions during the contact.

On 11/18/2022, Mr. Little was enrolled in the low-risk compliant program, as a result, his case was transferred within district to another United States Probation Officer whom sole responsibility is supervising low risk cases. However, Mr. Little failed to comply with the program by not calling in monthly as required. Therefore, on 3/16/2023, the case was returned to a generalist caseload for supervision. The low-risk compliant program is a privilege, it is common practice for a case that has been noncompliant with the LRCP to be returned to a general case load without a petition to the court being filed. The privilege within the program is frequency of physical supervision with a officer, and the majority of communication is conducted remotely. Mr. Little regularly openly speaks of his interpretation of the First Amendment and how he feels his voice is being silenced. The Supervisory United States Probation Officer (retired) indicated through email exchange that Mr. Little refused to comply with his officer's instructions, regarding, payment of restitution, refusing to enroll in Electronic Reporting System (ERS), and refusing to comply with the additional probation term special condition requiring social media restrictions. It should be noted that each officer had discretion on how they wanted to address the social media restriction term.

On 7/24/2023, I received information from the North Carolina State Bureau of Investigation (NCSBI)-Information Sharing and Analysis Center (ISAAC) and the Federal Bureau of Investigations (FBI). Both agencies had the same complaint and identical witness. The complainant submitted a complaint form on the NCSBI website about Mr. Little's social media videos, specifically on YouTube, where Mr. Little has a channel. I personally spoke to the victim, who indicated they and the defendant were friends at one time and drank alcoholic beverages together. The complainant is also familiar with Mr. Little's family and feels he is entitled. The complainant indicated they had not had any communication with Mr. Little in two years and did not like him being on social media. In response to the complainant and after speaking with the complainant, our office conducted an independent investigation that included a search of all known social media platforms, including Facebook and YouTube. Mr. Little was advised due to an anonymous tip he is not allowed to utilize social media until our office had completed the investigation and reviewed his social media accounts. After reviewing the aforementioned, and staffing the case with upper management, to include the Western District of North Carolina Attorney Advisor, it was determined that Mr. Little may continue utilizing social media, as long as he is not communicating threats, making any threats towards the government, or voices plans of overthrowing the government. It should be noted, a fair portion of his social media content is playing a guitar, singing songs, and religious activity. Mr. Little has mentioned members of the government but has never threatened or insinuated any threats. He solely voices his opinion.

In conclusion, Mr. Little's adjustment to supervision has been marginal. Mr. Little is a resident of Catawba County, NC, where he resides with his mother. His mother is a positive, prosocial peer who encourages positive behavior. Mr. Little is not in a serious romantic relationship and occasionally goes on dates. Throughout this period of probation, Mr. Little has consistently attended Alcoholics Anonymous at several locations. It does appear that his sobriety is an aspect of his life that he takes seriously. Additionally, Mr. Little has not submitted a positive urine sample for any illegal drugs or tested positive for alcohol. Mr. Little has had several jobs while on probation. His most consistent employment being at BoxCar Grille (part-time). In December 2023, he reported securing additional employment at Goodwill (seasonal). Mr. Little has not made an effort towards satisfying the outstanding $10 assessment (balance $10) and $500 restitution (balance $500) fees. I have emailed Mr. Little the appropriate information needed to make a payment towards outstanding restitution. However, Mr. Little voices invalid excuses and circles the conversation back to how he feels his voice is being silenced. Mr. Little believes strongly in his religion and at times, will utilize his beliefs as a religious person, to guide conversations and to justify actions and his viewpoint. Although Mr. Little has been respectful from an officer, client perspective, he is opinionated and discusses his political views on a consistent basic, during public and private conversations. Mr. Little demonstrates behavior consistent with entitlement. This assertion is based on conversations with Mr. Little and his inability to fully accept responsibility for his actions. He often refers to himself as a patriot and appears to enjoy anyone who agrees with his ideology. Mr. Little has always been respectful to this United States Probation Officer. In my professional opinion, Mr. Little's biggest problem is minimizing his actions and attempting to justify the same. He regularly

PROB 12B (NCW Rev. 4/08)

3

Little, James
0104 1:21CR00315

states he was simply parading at the Capitol Building without taking accountability or thinking of the legal consequences of the unlawful situation. I have reviewed an assortment of social media videos Mr. Little has posted to social media. None of the videos threatened the United States of America, a specific person, or organization. In Mr. Little's mind, he is disappointed with how the government operates and ironically how the integrity of the United States is in jeopardy. Mr. Little is not a member of any extreme organization, and based on my prior experience as a Security Threat Group investigator, Mr. Little is not part of the sovereign citizen movement. I hope this information assists you. If you have any questions, feel free to contact me directly at (828) 228-4066. Thanks for the opportunity to provide insight.

Respectfully submitted,

By    s/ Jordan Horton

Jordan Horton
Probation Officer
101 Government Ave, SW Suite A
Hickory, NC 28602
828-267-3513
Date: January 19, 2024

Approved by:   s/ Jackie Anderson

Jackie Anderson
Supervising U.S. Probation Officer
828-267-3511
Date: January 22, 2024

**JA307**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| **v.** | **Case No. 1:21-cr-315-RCL** |
| **JAMES LITTLE**, | |
| *Defendant*. | |

## Notes for Resentencing

Today, the Court sentenced Defendant James Little, after the D.C. Circuit vacated his initial sentence and remanded the case for resentencing. The Court ordered that Mr. Little be committed to the custody of the Bureau of Prisons for a term of 150 days, with credit for 60 days already served in prison and credit for a further 30 days that reflects the 18 months Mr. Little spent on probation.[1] The following are the notes that the Court used when delivering portions of its oral resentencing today:

As the Court concluded in a recent opinion, "[p]rinciples of double jeopardy do not prohibit the Court from imposing an additional term of imprisonment or probation when it resentences Little, as long as it credits the time already served in prison or probation against any new punishment." *United States v. Little*, No. 1:21-CR-315-RCL, 2024 WL 181260, at *4 (D.D.C. Jan. 17, 2024). The Court explained that "[c]rediting time ensures the defendant's punishment does not exceed the maximum prescribed by the legislature, which would violate" double jeopardy principles under *Ex Parte Lange*, 85 U.S. 163 (1873). *Little*, 2024 WL 181260 at *6 (citing *United States v. Fogel*, 829 F.2d 77, 86–87 (D.C. Cir. 1987)).

---

[1] The written judgment and commitment order as filed shall state a sentence of 120 days. That is to ensure that Mr. Little effectively receives credit from the Bureau of Prisons for the time served on probation.

1

**JA308**

Although the case law does not provide any ready formula for converting time spent on probation to prison time, in its prior opinion this Court summarized the applicable principles:

> If the Court decides to impose additional punishment, it must reduce that punishment to reflect the punishment already incurred by Little of 60 days' imprisonment and approximately 18 months' probation. *See* [*Jones v. Thomas*, 491 U.S. 376, 384 (1989)]. In crediting time served on probation against a later sentence of imprisonment, or vice versa, the Court would not engage in a "day-to-day offset" because probation is much less onerous than imprisonment. *See* [*United States v. Martin*, 363 F.3d 25, 39 (1st Cir. 2004)]. If the Court chooses to impose additional punishment, it will use its judgment to select an appropriate, fact-sensitive ratio based on "the specific conditions of [the defendant's] probation and the effect of a sentence reduction on the underlying purposes of the Guidelines as set out in 18 U.S.C § 3553(a)." *Id.*

*Little*, 2024 WL 181260, at *6. Therefore, in arriving as an "appropriate, fact-sensitive ratio" between the 18 months Mr. Little has spent on probation and the amount of prison time for which I will give him credit, I will consider both the specific conditions of Mr. Little's probation and the effect of a sentence reduction on the Section 3553(a) factors.

*First*, the specific conditions of Mr. Little's probation indicate that this time should count for relatively little.

One thing that strikes me is that although Mr. Little has spent approximately 18 months on probation, he has spent essentially *no time* in compliance with the terms and conditions of his probation. The mandatory conditions required Mr. Little to pay the $500 in restitution and $10 in special assessment, yet on Monday the Probation Office reported to me that he "has not made an effort towards satisfying" either amount. ECF 72 at 2. The Supreme Court has explained that the "basic purpose of probation" is "to provide an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself without institutional confinement under the tutelage of a probation official and under the continuing power of the court to impose institutional punishment for his original offense in the event that he abuse this opportunity." *Roberts v. United States*, 320 U.S. 264, 272 (1943). Most defendants before me seize this

opportunity. Yet Mr. Little has not done so unless he has in fact made the payment after I made public on Monday the Probation Office report that no payment has been made despite the Probation Office having raised this issue with the defendant several times.

I will also note that Mr. Little's public commentary indicates a clear lack of remorse. Instead, his social media posts show that Mr. Little has sought to downplay the attack on the Capitol while minimizing or denying his personal responsibility. The Government's brief in opposition to Mr. Little's motion opposing resentencing is replete with examples. For instance:

- He has stated that "they're trying to take my freedom of speech and gun rights away, and for a flipping misdemeanor with no record."

- He described Jacob Chansley, the so-called QAnon Shaman, as a "fellow persecuted and prosecuted J6 Patriot." I happen to be the Judge who had Mr. Chansley's case, and I know that he was neither persecuted or prosecuted, improperly or unlawfully.

- He runs a Facebook page entitled "J 6 Patriot James Leslie Little."

- While he has posted that he regretted "being a vigilante and taking matters into my own hands" he has also posted:

    o That his "MISDEMEANOR" arrest was for "peacefully protesting in our Capital [sic]."

    o That he spent time in "political prison"

    o And he has posted copies of "support mail" he received while in prison.

This lack of remorse is not simply performative, as Mr. Little's Probation Officer has reported that in his conversations with Mr. Little, Mr. Little has failed to fully accept responsibility for his actions and indeed has attempted to minimize and justify his actions.

*Second*, too great a sentence reduction would result in a sentence inconsistent with the purposes of sentencing as articulated in 18 U.S.C. § 3553(a), in particular "the need for the sentence imposed" (A) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" (B) "to afford adequate deterrence to criminal conduct; and (C) "to protect the public from further crimes of the defendant."

*Therefore*, I conclude that Mr. Little's 18 months on probation should count as **30** days of imprisonment. I will credit that amount of time against any additional sentence of imprisonment that I impose on Mr. Little, just as I will credit the 60 days served in prison.

\*\*\*

Mr. Little has consistently refused to take responsibility for his actions on January 6— today is the first time he has come close to accepting responsibility. He has denied the gravity of what happened that day and the legitimacy of bringing the criminal justice system to bear on those who participated. He says he has been persecuted, condemned to "political prison" for having peacefully protested in the Capitol.

The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications of criminal activity have gone mainstream. I have been dismayed to see distortions and outright falsehoods seep into the public consciousness. I have been shocked to watch some public figures try to rewrite history, claiming rioters behaved "in an orderly fashion" like ordinary tourists, or martyrizing convicted January 6 defendants as "political prisoners" or even, incredibly, "hostages." That is all preposterous. But the Court fears that such destructive, misguided rhetoric could presage further danger to our country.

The Court cannot condone the shameless attempts by Mr. Little or anyone else to misinterpret or misrepresent what happened. It cannot condone the notion that those who broke the law on January 6 did nothing wrong, or that those duly convicted with all the safeguards of the United States Constitution, including a right to trial by jury in felony cases, are political prisoners or hostages.

So let me set the record straight, based on what I've learned presiding over many January 6 prosecutions, hearing from dozens of witnesses, watching hundreds of hours of video footage, and reading thousands of pages of evidence. On January 6, 2021, a mob of people invaded and occupied the United States Capitol, using force to interrupt the peaceful transfer of power mandated by the Constitution and our republican heritage.

This was not a protest that got out of hand. It was a *riot*; in many respects a *coordinated* riot, as is clear from cases before me including *Hostetter* (21-cr-392) and *Worrell* (21-cr-292). "Protestors" would have simply shared their views on the election—as did thousands that day who did not approach the Capitol. But those who breached and occupied the Capitol building and grounds halted the counting of the Electoral College votes required by the Twelfth Amendment. The rioters interfered with a necessary step in the constitutional process, disrupted the lawful transfer of power, and thus jeopardized the American constitutional order. Although the rioters failed in their ultimate goal, their actions nonetheless resulted in the deaths of multiple people, injury to over 140 members of law enforcement, and lasting trauma for our entire nation. This was not patriotism; it was the antithesis of patriotism.

And the rioters achieved this result through *force*. Not everyone present that day was violent, but violence is what let them into the Capitol. At first, a police line protected the Capitol, but eventually law enforcement was subjected to such force by such a mass of people that the

rioters pushed through.  Upon entering the Capitol, many rioters vandalized and looted, some hunted for members of Congress.

And even those who say they simply wandered around the building still played a meaningful role in the events of that day.   As the D.C. Circuit recently explained, in an opinion upholding a defendant's jury conviction for "disorderly or disruptive conduct" —

> Alford's entry into the Capitol—alongside dozens of others—directly contributed to the Congress's need to recess to ensure the safety of its members. Indeed, entering the Capitol as part of a crowd rather than as a lone individual magnified the disruptiveness of his presence. Each additional person, no matter how modestly behaved, increased the chaos within the building, the police's difficulty in restoring order and the likelihood of interference with the Congress's work.

*United States v. Alford*, 89 F.4th 943 (D.C. Cir. 2024).

That brings me to the matter of misdemeanors.  Some have questioned whether it is proper for a court to sentence to prison a January 6 defendant convicted of a misdemeanor rather than a felony.  The Court wishes to emphasize something: *Misdemeanors can be serious crimes*.  What the Court already said in reference to Mr. Little at his original sentencing remains true:

> January 6, 2021, marked a tragic day in American history. The peaceful transfer of power—one of our most important and sacred democratic processes—came under a full-fledged assault. While the immediate threat may have subsided, the damage from January 6 persists. Rioters interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred law enforcement officers, and caused more than a million dollars of property damage to the U.S. Capitol. Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

**JA313**

*United States v. Little*, 590 F. Supp. 3d 340, 342 (D.D.C. Mar. 14 2022), *vacated and remanded*, 78 F.4th 453 (D.C. Cir. 2023).

Let me add one more thing. According to the defendant, the criminal justice system has denied him his freedom of speech. Of course, Mr. Little has a right under the First Amendment to believe that the 2020 presidential election was stolen. He has a right to express that view today, and he had a right to do so on January 6th as well. He even has a right to argue that this was a politically motivated prosecution. But the First Amendment does *not* give anyone the right to enter a restricted area or to engage in riotous activity in the Capitol. In resentencing Mr. Little on the count to which he pleaded guilty, the Court is not suppressing his constitutional right to freedom of expression. For Mr. Little to style himself a political prisoner and to accuse the Court of infringing his rights is not only incorrect, it is offensive to the Court. The public should understand that such notions are preposterous.

This is a matter of right and wrong. Little cannot bring himself to admit that he did the wrong thing, although he came close today. So, it is up to the Court to tell the public the truth: Mr. Little's actions, and the actions of others who broke the law on January 6th, were *wrong*. The Court does not expect its remarks to fully stem the tide of falsehoods. But I hope a little truth will go a long way.

Date: _____1-25-24_____

_____Royce C. Lamberth_____
Royce C. Lamberth
United States District Judge

7

**JA314**

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
     *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-315
vs.                              )
                                 )
JAMES LITTLE,                    )  January 25, 2024
                                 )  10:29 a.m.
              Defendant.         )  Washington, D.C.
     *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF RESENTENCING HEARING
BEFORE THE HONORABLE ROYCE C. LAMBERTH,
UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES:**</u>

FOR THE UNITED STATES:
                PATRICK C. HOLVEY
                REUVEN DASHEVSKY
                U.S. Attorney's Office
                for the District of Columbia
                601 D Street, NW
                Washington, DC 20530
                (202) 252-7224
                Email: patrick.holvey@usdoj.gov

FOR THE DEFENDANT:  (Appearing via Zoom)
                JOSHUA CARPENTER
                Federal Public Defender
                Western District of North Carolina
                1 Page Avenue, Suite 210
                Asheville, NC 28801
                (828) 232-9992
                Email: joshua_carpenter@fd.org

ALSO PRESENT:       CRYSTAL LUSTIG, U.S. Probation

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                Official Court Reporter

*This hearing was partly held via videoconference and
is, therefore, subject to the limitations associated
with audio difficulties while using technology, i.e.,
audio feedback, poor audio quality, overlapping speakers,
static interference, et cetera.*

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

```
1                    P R O C E E D I N G S

2           THE COURTROOM DEPUTY:  This is Criminal Case

3    21-315, United States of America versus James Little.

4           Starting with the government, please approach the

5    podium and state your appearance for the record.

6           MR. HOLVEY:  Good morning, Your Honor.

7    Patrick Holvey for the United States.  With me at counsel

8    table is Reuven Dashevsky.

9           THE COURT:  Good morning.

10           MR. CARPENTER:  Hi, Your Honor.  This is Josh

11    Carpenter representing James Little.

12           THE COURT:  Okay.  The defendant, Mr. Little, can

13    you hear me okay?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Okay.

16           The case is on remand for resentencing.  I will

17    allow the government to allocute first and then I will hear

18    from Mr. Little's attorney and then Mr. Little if he wishes

19    to speak.

20           The government may proceed.

21           MR. HOLVEY:  Thank you, Your Honor.

22           May it please the Court.

23           Your Honor, this Court is well familiar with the

24    factual background and circumstances of this matter.

25           If you would like, I am happy to provide a brief
```

**JA316**

1    recitation of the facts of Mr. Little's actions leading up

2    to January 6th.

3              THE COURT:  That's not necessary.

4              MR. HOLVEY:  In that case, I will briefly discuss

5    the prior sentencing events and the government's

6    recommendation regarding Mr. Little's sentence, and a short

7    discussion of the government's views on how the Court should

8    conduct the appropriate analysis under Section 3553.

9              THE COURT:  Can you hear all of this, Mr. Little,

10   okay?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  Okay.  Just let me know if you can't

13   hear any of this since you are appearing by video.

14             Okay.  Go ahead.

15             THE DEFENDANT:  Thank you, Your Honor.

16             MR. HOLVEY:  Thank you, Your Honor.

17             On March 14, 2020, this Court imposed a sentence

18   of 60 days' incarceration; 3 years' probation with a social

19   media restriction; and a $500 restitution, with a $10

20   special assessment payable immediately.

21             During the sentencing hearing, defense counsel

22   played the audio of the January 13th FBI interview of

23   Mr. Little.  The government has that audio available for the

24   Court to listen to again if the Court is interested in doing

25   so.

**JA317**

 1          At the conclusion of the hearing, the Court made

 2     two comments.  First, the Court noted that it believed that

 3     some term of imprisonment is essential in these cases to

 4     reflect the seriousness of the offense, to promote respect

 5     for the law, and to provide just punishment for the offense.

 6          Secondly, the Court stated that:  Due in part to

 7     Mr. Little's comments during the FBI interview and his

 8     comments to the Court during the sentencing hearing, that

 9     the Court did not have confidence that the same would not

10     happen in the next election cycle; and you are going to be

11     on probation during the next election cycle; and you will

12     not be without Court supervision during the next election

13     cycle.

14          The Court noted that it had considered the

15     provisions of 18 U.S.C. 3553 in imposing the original

16     sentence; and the D.C. Circuit, in holding the original

17     split sentence was unlawful, did not set aside or otherwise

18     undermine the Court's original 3553 analysis.

19          The government's recommendation regarding

20     Mr. Little's resentencing is straightforward.  The Court

21     should reapply the 3553 sentencing factors, considering all

22     of the relevant circumstances and the offensive conduct; and

23     in rendering its sentence, the Court should ensure that it

24     properly accounts for all of the time previously served by

25     Mr. Little both incarcerated and on probation.

**JA318**

1              The Court should be clear as to what its full

2      sentence is.  The fact that the Court properly accounted for

3      and credited all of the time served and what sentence, if

4      any, remains after the crediting.

5              The government suggests that given the Court's

6      previously expressed concerns regarding ensuring Court

7      supervision over Mr. Little through the completion of this

8      election cycle, a sentence of probation that, including the

9      appropriate credits for time previously served, extends

10     through the election cycle would be appropriate.

11             The Court has before it Mr. Little's Bureau of

12     Prison records showing no disciplinary activity, which was

13     attached to the government's resentencing memo; the

14     probation officer's report, which was filed with the Court

15     earlier this week; the government's resentencing memorandum;

16     select Facebook activity from his personal page and his J6

17     Patriot Leslie Little page -- James Leslie Little public

18     figure page, which was attached to the prior opposition at

19     ECF 65; and the prior sentencing memorandums entered for the

20     original sentencing hearing.

21             Each of these sources should, the government

22     submits, be considered as the Court engages in its 3553

23     analysis in calculation of the appropriate credits.

24             I am happy to address any questions or concerns

25     the Court may have, but, otherwise, the government has

**JA319**

1    nothing further at this time.

2            THE COURT:  All right.  Thank you.

3            Mr. Carpenter.

4            MR. CARPENTER:  Thank you, Your Honor.

5            May it please the Court.

6            We're asking the Court to conclude based on the

7    3553(a) factors that no additional punishment is necessary

8    at this point beyond what Mr. Little has already served,

9    that being the two months in prison, plus the 18 months on

10   probation.

11           That outcome, we believe, (indiscernible) other

12   cases that we cited in our memo where other judges have

13   terminated probation in light of the ruling on appeal in

14   Mr. Little's case.  So based on all of that, we're asking

15   the Court to enter a judgment that would (indiscernible) a

16   sentence of imprisonment of two months with credit for the

17   time already served.

18           THE COURT:  Well, let me ask you first if you

19   could explain to me why -- he agreed to pay the $500

20   restitution; it was a condition of his probation that he

21   cooperate with that, and he never paid a penny of it.  I

22   also ordered him to pay a $10 special assessment required to

23   be imposed by law, and he never paid that.

24           So can you explain to me why he never paid the

25   restitution he agreed to pay?

**JA320**

1          It was a condition of probation as well, and he

2     never paid it.  So he is not fully compliant with his

3     probation.

4          MR. CARPENTER:  Yes, Your Honor.  I can explain

5     that.

6          So I think we alluded to this or mentioned this in

7     the memo that we filed; I believe it was Document 66.  The

8     probation officer instructed him -- gave him instructions on

9     how to pay that.  And he -- both instructions included in

10    the statement that he would be supplied with postage-paid

11    envelopes that he would be able to use to send the payments.

12    When those never arrived he didn't understand that it was

13    necessary to pay; he didn't think it was due yet.

14          When I spoke to him, I spoke to his probation

15    officer earlier this month, and clarified that, no, you do,

16    it's payable, and you need to go ahead and do it; the next

17    day he sent out a check to cover the amounts following the

18    instructions used by the -- provided to him by the probation

19    office.

20          I have just earlier this morning, with the

21    financial litigation unit who very kindly directed me to the

22    contact there -- she informed me that the payment has not

23    yet been processed because the instruction provided by the

24    probation officer were inaccurate; they gave the wrong

25    mailing address.  So, hopefully, it will get rerouted and

**JA321**

1    appropriately repaid.  If not, we will rectify and resend

2    the initial check that was sent and resend to the

3    appropriate address.  That is the explanation of what

4    happened with the restitution payment, Your Honor.

5            THE COURT:  But in a year and a half he never paid

6    a penny.

7            MR. CARPENTER:  Your Honor --

8            THE COURT:  He agreed to pay it.  It's not like

9    something I imposed out of the blue; he agreed to pay it as

10   a part of his plea and he never paid it.

11           MR. CARPENTER:  Your Honor, there is no dispute

12   about that.  The only thing that happened here was a

13   miscommunication with the probation office about the manner

14   in which it would be paid and the time in which it would be

15   paid.  Again, as I said to counsel -- I don't think -- prior

16   counsel was not involved in those communications.

17           As soon as I communicated with the probation

18   officer and communicated with Mr. Little, conveyed to him,

19   no, this is still immediately -- read the instructions from

20   the probation office on how to pay it, the next day the

21   check went out.  And so that's --

22           (Overlapping speakers.)

23           THE COURT:  The next question I have is -- he pled

24   guilty before me.  He admitted he was guilty.  He told me he

25   was, in fact, guilty; and then he goes around saying he is a

**JA322**

1    political prisoner.

2              Why is he a political prisoner?

3              He pled guilty to me.  He told me he was, in fact,

4    guilty.  I told him I wouldn't accept his plea unless he

5    agreed that he committed the criminal offense.  And now he

6    goes around saying it to everybody, he is a political

7    prisoner.

8              Explain that one to me.

9              MR. CARPENTER:  Well, Your Honor -- certainly.

10             He has a First Amendment right under the

11   D.C. Circuit's very recent decision in the gag order case to

12   comment on the prosecution's exercise of discretion in this

13   case.

14             It is his opinion, and opinions shared by a

15   significant percentage of this country, that the

16   prosecutions in these cases are politically motivated, and

17   that other misdemeanor defendants who have committed similar

18   offenses would not have been prosecuted in the same way but

19   for their political beliefs.

20             That is a position that the D.C. Circuit in the

21   gag order case just last month said, and I quote (as read) :

22             "The public has a weighty interest in ensuring

23   that the exercise of prosecutorial discretion is exercised

24   responsibly.  Criminal defendants facing potential

25   curtailments of liberty have especially strong interests in

1    commenting, within reasonable bounds, on prosecutors' use of

2    their power."

3        The comments posted by Mr. Little on social media

4    are 100 percent protected by the First Amendment; and,

5    again, this has not been skewed.  CBS News did a poll

6    earlier this month of the public; 33 percent of the American

7    public describes January 6th defendants as patriots.  38

8    percent of the American public supports pardons of January 6

9    defendants.

10        These are views in the mainstream of our country

11    whether you and I like them or not; they are protected.

12    Nothing about the social media posts suggests that

13    Mr. Little is deserving of more than he has (indiscernible).

14        In fact, Your Honor, I think the government -- I

15    would direct the Court to consider one particular social

16    media post that I think speaks to where Mr. Little is in his

17    mindset and really tells the Court everything it needs to

18    know.  The Court was right to say, at its original

19    sentencing, that the goal of the probationary term and the

20    sentence of incarceration was to deter Mr. Little from

21    future criminal conduct.  I think the key is deterrence to

22    future criminal conduct.

23        The government, by its reliance on these social

24    media posts, is conflating future criminal conduct with

25    future political support of Donald Trump and future

**JA324**

1    political support of the MAGA movement.

2         I would direct the Court to the Facebook posts

3    from July 30th, 2022, which is at page B8 of the

4    government's memorandum which is at Docket No. 65.

5         In that post it sets out that there is deterrence

6    (indiscernible) in criminal conduct.  Mr. Little begins that

7    post with a quote -- a biblical quote from Romans 13 which

8    says that:  "Everyone must submit to governing authorities.

9    For all authority comes from God, and those in positions of

10   authority have been placed there by God."

11        Mr. Little then explains:  "Although my heart was

12   in the right place on January 6, my feet were not"; in other

13   words, he is acknowledging that he should not have been in

14   the Capitol that day.  He goes on in that post to express

15   his belief --

16        THE COURT:  He never said that to me at

17   sentencing, though.  That's new.

18        MR. CARPENTER:  Well, it may well be, Your Honor.

19   I acknowledge this is certainly not a case, as you said

20   rightly in your initial proceedings, where Mr. Little came

21   in and cried crocodile tears and then went out and changed

22   his view.  He is and always has been of the belief that he

23   was motivated by patriotic means even if he did the wrong

24   thing.  He has never backed down.

25        So in the post he went on to say:  My feet weren't

**JA325**

1    in the right place.  He says:  "I think I was on the right

2    side of truth, right side of history."  But he

3    acknowledges -- and this is the key point here -- he

4    acknowledges that he was wrong in being, quote, "a

5    vigilante" and taking matters into his own hands.  He says

6    that he regrets, hence, for his actions on January 6.

7            This tells the Court what it needs to know.

8            You are not -- no sentence you can possibly impose

9    will deter Mr. Little believing in Donald Trump, from

10   believing himself, a Christian conservative, and from

11   believing in --

12           THE COURT:  I agree he has a First Amendment right

13   to think even today that the election was stolen; that's his

14   right to believe that.  It's his right to express it, just

15   not in a restricted area; not fighting his way through to

16   get up to the Capitol Building; not in the Capitol Building

17   that day.  He can believe that even today, I have no problem

18   with that.  I agree.

19           MR. CARPENTER:  And that's -- I think that's our

20   central point, Your Honor, about our social media posts.

21           If you look again at this post from July 30th,

22   2022 -- this is after he had served his sentence of

23   incarceration, I think the message got through that the

24   consequences of his actions that day were serious.  He dealt

25   with two months of imprisonment, years of uncertainty, 18

**JA326**

1    months of probation.  He has lost friendships and

2    relationships over his conduct.  He has seen the light.

3          Now, he is going to continue to believe in Donald

4    Trump; he is going to continue to believe in MAGA, but he's

5    going to do it from the sidelines.  He is going to watch it

6    on Fox News; he is going to follow it on social media.  He

7    is not going to be a participant.  That's, I think, is the

8    core message that we see in this particular post.

9          Nothing in all of the other posts that the

10   government cites waiver from that.  In its memo, the

11   government suggests at one point that a particular post

12   suggests that he might be supporting future election

13   interference by using a hashtag called "Beat the chief,"

14   which, of course, is a reference of it being -- the view

15   that Joe Biden won the election through improper means.

16         If you look at that post, Mr. Little is not

17   advocating election interference.  On the contrary, he is

18   advocating for people to go out and vote.  It specifically

19   says in that post:  "We are going to need votes from

20   everyone to beat Joe Biden next time around."  This is

21   advocating proper democratic means for Mr. Little's

22   preferred candidates to get back into power.

23         He knows the consequences of what he has done.  He

24   has suffered significantly.  And nothing that the -- I think

25   nothing is going to dissuade him from his beliefs, but at

**JA327**

1    the same time, nothing is going to motivate him to do this

2    again.  The consequences have been significant.

3          Your Honor, I do -- at the risk of kind of

4    reiterating some things that the Court is probably well

5    aware of, I do very quickly want to remind the Court about

6    the agreed-upon facts in this case; these come from

7    Document 31, the government's memorandum, where they

8    acknowledge that Mr. Little did not engage in any planning

9    for the January 6 events.

10          He was not a member of any organized group.  He

11    traveled to Washington on his own.  He was not armed with

12    anything other than a cell phone, which he used to take

13    pictures while in the Capitol.  He did not engage in any

14    violence.  He did not engage in the destruction of any

15    property within the Capitol.  He did not destroy any

16    evidence.  He did not defy law enforcement, and, on the

17    contrary, as the Court acknowledges, he voluntarily

18    cooperated with the FBI interview immediately after -- just

19    a few days after.

20          Based on all of these facts, we do think it is

21    undisputed that his culpability for the January 6 events

22    falls on the low end of the spectrum as reflected by the

23    fact that the only charge of conviction is a Class B petty

24    offense.

25          We now know that the law, as interpreted by the

**JA328**

1    D.C. Circuit, submits someone with this conviction to only

2    one punishment, either probation or imprisonment; and we

3    know, as a practical matter, that Mr. Little has served both

4    punishments.  So I think that it would (indiscernible) --

5    one of the 3553 factors is respect for the law.  I think

6    abiding by the D.C. Circuit's decision that only one

7    punishment is sufficient for this would promote respect for

8    the law.

9        Otherwise, if Mr. Little is required to serve

10    additional punishment beyond what he's already served, it

11    sends a message that a legal decision at the D.C. Circuit is

12    not important, and it sends a message that Mr. Little is

13    being punished for these social media posts, for these

14    rather than for his conduct.

15        I do also want to spend a little bit of time, Your

16    Honor, talking about the sentencing, rehabilitation, and

17    conduct which, as this Court knows, that a sentencing

18    hearing is a relevant factor under 3553(a) based on the U.S.

19    Supreme Court decision in *Pepper*.

20        As the government acknowledges, Mr. Little

21    completed his sentence of incarceration in the Bureau of

22    Prisons with no problems and no infractions.  He has

23    completed 18 months of probation with no violations in the

24    sense of probation saying he's violated.  I acknowledged, as

25    we discussed earlier -- we spoke about the miscommunication

**JA329**

1   regarding the restitution payments and the questions about

2   the social media posts.

3            THE COURT:  What about the special assessment?

4   Why was that never paid?

5            MR. CARPENTER:  I'm sorry.  I tend to lump that

6   into restitution, it all being the same; that he received

7   the same set of instructions from probation toward the

8   payment of both of those items.  And so it's sort of the

9   same miscommunications or the reason that that payment has

10  not yet been received.

11           In addition to having no problems with the

12  incarceration, no problems with the probation officer.

13  Mr. Little has continued to work; he has continued to attend

14  Alcoholics Anonymous, both of which are very important to

15  him to maintain his sobriety.  He has volunteered during the

16  holiday season for the Salvation Army.  And he recently

17  began working full-time as a truck driver for Patio

18  Furniture Industries, which was a job that he had held

19  before all of this happened and had to give it up because of

20  the consequences of dealing with the charges of conviction

21  for this offense.

22           I was able to speak to his boss, Mr. Eddie

23  Baldwin, who confirmed that Mr. Little had worked for him

24  for more than a year before all of these events made him

25  unavailable.  Mr. Baldwin found himself recently in need of

**JA330**

1    a full-time truck driver and asked Mr. Little to return.

2         According to Mr. Baldwin, Mr. Little is a, quote:

3    "Very safe driver," "a very responsible employee."

4    Mr. Baldwin says that he is outstanding with customers and

5    is the type of person that he wants to be the face of his

6    company and interacting with customers.

7         This job is going to keep him busy for 40-plus

8    hours a week in the foreseeable future according to

9    Mr. Baldwin.  I think that's an important factor to be aware

10   of; that he is going about his life, engaging in productive

11   societal positive activity.  I think that weighs in favor of

12   additional punishment under the 3553 factors.

13        Your Honor, I think if there are no further

14   questions or items that you would like to discuss, I think

15   that's all I can say.  I think that the punishment here

16   should be a sentence either of time served or a sentence of

17   two months' imprisonment for the time already served

18   pursuant to the 3553(a) factors, and we would ask the Court

19   to impose that sentence.

20        THE COURT:  All right.

21        Anything else the government wants to say before I

22   have Mr. Little --

23        MR. HOLVEY:  Not at this time, Your Honor.

24        THE COURT:  Mr. Little, anything you would like to

25   say I would like to hear?

```
 1              THE DEFENDANT:  Yes, Your Honor.

 2         You don't have to worry about me being part of

 3    any more J6-type things.  I haven't been to -- although I

 4    have a constitutional right to, I haven't been to any

 5    political rallies since January 6th.  I don't want to be

 6    anywhere near a political rally; I am actually kind of

 7    scared to go to one now.

 8         So, yeah, I don't -- I am still somewhat

 9    politically involved online, and things like that; and I

10    will vote; but I am getting too old for this stuff, really.

11         Also, on the restitution -- in part, because of

12    the situation with January 6 and the publicity about it, I

13    have had a real hard time with my career the last three

14    years -- I have struggled with it anyway throughout my life

15    for different reasons; but I have had a hard time with my

16    career the last three years in particular.  And so it's been

17    a financial hardship for me for one thing.

18              And I actually had to borrow the money from my

19    mother.  And now that I have got this trucking job I am

20    going to pay her back.  But I wasn't even going to be able

21    to pay the restitution myself, I had to borrow it from my

22    88-year-old mother, but I do plan to pay that back fully.

23              But I just want to say that, you know, it wasn't

24    just like I had $500 accessible to pay it.  So I'm sorry

25    that it was late, but I have got to pay it now.  Thank you,
```

**JA332**

1   Your Honor.

2          THE COURT:  I will take a short recess.  I want to

3   look at a couple of issues before I issue my ruling, so

4   we'll take a short recess.  Y'all can just stay in place.

5          We'll be back in a few minutes.

6          (Whereupon, a recess was taken.)

7          THE COURT:  All right.  Let me check to see if

8   everybody can hear me okay.

9          Mr. Carpenter?

10         MR. CARPENTER:  Yes, Your Honor.

11         THE COURT:  And the defendant?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Okay.  The government is present in

14  the courtroom.

15         All right.  Pursuant to the Sentencing Reform Act

16  of 1985 and in consideration of the provisions of 18 U.S.C.

17  Section 3553, it's the judgment of the Court that you, James

18  Little, are hereby committed to the custody of the Bureau of

19  Prisons for 150 days.

20         I will basically go through how I am determining

21  that.

22         That will be credited for 60 days you have

23  previously served, as well as 30 days for the period of

24  supervised release.  So there will be a period of 60 days

25  additional incarceration.  You will be allowed to

**JA333**

1    self-surrender upon designation of a facility where you will

2    serve the additional 60 days.

3         In addition, your new -- upon resentencing, you

4    will be ordered to pay the special assessment of $10 until

5    there is satisfaction that it has been paid in accordance

6    with 18 U.S.C. Section 3013.

7         In addition, I find you do not have the ability to

8    pay a fine.  I will waive imposition of a fine, but I will

9    reenter the order of restitution to the Architect of the

10   Capitol in the amount of $500, which you had previously

11   agreed to pay as part of your plea agreement.

12        Restitution payments shall be made to:  The Clerk

13   of the Court, U.S. District Court, District of Columbia, for

14   disbursement to the following victim:  Architect of the

15   Capitol, Office of the Chief Financial Officer; attention

16   Kathy Sherrill, CPA; Ford House Office Building, Room

17   H-2205B, Washington, D.C. 20515, in the amount of $500.

18        Financial obligations are immediately payable to

19   the Clerk of the Court, U.S. District Court, 333

20   Constitution Avenue Northwest, Washington, D.C. 20001.

21        Within 30 days of any change of address, you shall

22   notify the Clerk of Court of the change until such time as

23   the financial obligation is paid in full.

24        As I recently concluded in an opinion I issued a

25   few days ago:  Principles of double jeopardy do not prohibit

**JA334**

1    the Court from imposing an additional term of imprisonment

2    or probation when it resentences the defendant as long as it

3    credits the time already served in prison or probation

4    against any new punishment.  That's *United States versus*

5    *Little*, 2024 Westlaw 181260 at 4.  My opinion was January

6    17, 2024.

7         I quoted *Ex parte Lange,* 85 U.S.C. 163, as saying

8    that crediting time ensures the defendant's punishment does

9    not exceed maximum punishment described by the legislature

10   which would violate *Ex parte Lange*, 85 U.S.C. 163, which was

11   citing *U.S. v Fogel*, at 829 F.2d 77, D.C. Circuit, 1987.

12        Although the case law doesn't provide any ready

13   formula for converting time served -- spent on probation to

14   prison time, I summarized the basic applicable principles in

15   my prior opinion that I just decided.  If the Court decides

16   to impose additional punishment, it must reduce that

17   punishment to reflect the punishment already incurred by

18   Little of 60 days' imprisonment and approximately 18 months

19   probation.  In crediting time served on probation against a

20   later sentence of imprisonment or vice versa, the Court

21   would not engage in a day-to-day offset because probation is

22   much less onerous than in prison.  See *U.S. v Martin,* 363

23   F.3d 29 at 39, First Circuit 2004.

24        If the Court chooses to impose additional

25   punishment, it will use its judgment to select an

**JA335**

1    appropriate fact-sensitive ratio based on the specific

2    conditions of the defendant's probation; and the effect of a

3    sentence reduction on the underlying purposes of the

4    guidelines is set out in 18 U.S.C. Section 3553(a).

5            That's citing my opinion from January 17.

6            Therefore, in arriving at an appropriate

7    fact-sensitive ratio between the 18 months that Mr. Little

8    has spent on probation and the amount of prison time for

9    which I will give him credit, I will consider both the

10   specific conditions of Mr. Little's probation and the effect

11   of a sentence reduction on the Section 3553(a) factors.

12           First, the specific conditions of Mr. Little's

13   probation indicates that time should count for relatively

14   little.

15           One thing that strikes me is although Mr. Little

16   spent approximately 18 months on probation, he has spent

17   essentially no time in compliance with the terms and

18   conditions of his probation.  The mandatory conditions

19   required Mr. Little to pay $500 in restitution and $10 in

20   special assessment; I had waived the fine from the outset.

21           But on Monday the probation officer reported to me

22   that he has made -- not made an effort towards satisfying

23   either amount; that's reported at ECF 72 at page 2.

24           The Supreme Court has explained that the basic

25   purpose of probation is to provide an individualized program

**JA336**

1    offering a young or unhardened offender an opportunity to

2    rehabilitate himself without institutional confinement under

3    the tutelage of a probation official, and under the

4    continuing power of the Court to impose institutional

5    punishment for his original sentence in the event that he

6    abuses this opportunity, citing *Roberts v U.S.*, U.S. 320,

7    U.S. 264 at 272.

8            Most defendants before me seize this opportunity,

9    yet Mr. Little has not done so.  Unless he did, in fact,

10   after I got this report and made it public on Monday from

11   the probation office -- did make the payment that he claims

12   he made Monday; the probation office having raised in that

13   report that they had raised with Mr. Little his failure to

14   make the payments repeatedly.

15           I also note that Mr. Little's public commentary

16   indicates a clear lack of remorse.  Instead, his social

17   media posts show that Mr. Little sought to downplay the

18   attack on the Capitol while minimizing or denying his

19   personal responsibility.

20           The government's brief in opposition to

21   Mr. Little's motion opposing resentencing is replete with

22   examples.  For instance, one, he stated that:  "They're

23   trying to take away my freedom and gun rights for a flipping

24   misdemeanor with no record."  Two, he described Jason

25   Chansley, the so-called QAnon shaman, is a fellow persecuted

**JA337**

1    and prosecuted J6 patriot.

2              I happen to be the judge that had Mr. Chansley's

3    case, and I know very well the circumstances of that case.

4    I know that he was neither persecuted nor prosecuted

5    unlawfully or improperly.

6              The next example the government used was, he runs

7    a Facebook page entitled J6 Patriot, James Leslie Little.

8              The next example they used was:  While he posted

9    that he regretted being a vigilante and taking matters into

10   his own hands, he also posts that his misdemeanor arrest was

11   for peacefully protesting in our Capitol; that he spent time

12   in political prison.  And he posted copies of support mail

13   he received while in prison.

14             This lack of remorse is not simply performative.

15   As Mr. Little's probation officer has reported, that in his

16   conversations with Mr. Little, Mr. Little has failed to

17   fully accept responsibility for his actions and, indeed, has

18   attempted to minimize and justify his actions.

19             Second, too great a sentence reduction would

20   result in a sentence inconsistent with the purposes of

21   sentencing as articulated in 18 U.S.C. Section 3553(a); in

22   particular, the need for the sentence imposed, A, to reflect

23   the seriousness of the offense, to promote respect for the

24   law, and to provide just punishment for the offense; and, B,

25   to afford adequate deterrence to criminal conduct; and, C,

1       to protect the public from further crimes of the defendant.

2               Therefore, I conclude that Mr. Little's 18 months

3       on probation should count as 30 days of imprisonment.  I

4       will credit that amount of time against any additional

5       sentence of imprisonment that I impose on Mr. Little just as

6       I will credit the 60 days that he has already served in

7       prison.

8               Mr. Little has consistently refused to take

9       responsibility for his actions on January 6.  Today's

10      expression to me is the first time he has actually accepted

11      full responsibility; he did today, I admit.

12              He has denied the gravity of what happened that

13      day and the legitimacy of bringing the criminal justice

14      system to bear on those who participated.  He says he's been

15      persecuted, condemned to political prison for having

16      peacefully protested at the Capitol.

17              The Court is accustomed to defendants who refuse

18      to accept that they did anything wrong.  But in my 37 years

19      on the bench, I cannot recall a time when such meritless

20      justifications of criminal activity have gone mainstream.

21              I have been dismayed to see outright distortions

22      and outright falsehoods creep into the public consciousness.

23              I have been shocked to watch some public figures

24      try to rewrite history, claiming rioters behaved in an

25      orderly fashion like ordinary tourists, or martyrizing

**JA339**

1    convicted January 6 defendants as political prisoners or

2    even, incredibly, hostages.  That is all preposterous.

3           The Court figures such destructive, misguided

4    rhetoric could presage further danger to our country.

5           The Court cannot condone the shameless attempts by

6    Mr. Little or anyone else to misinterpret or misrepresent

7    what happened that day; it cannot condone the notion that

8    those who broke the law on January 6 did nothing wrong or

9    that those duly convicted with all of the safeguards of the

10   United States Constitution, including a right to trial by

11   jury in felony cases, are political prisoners or hostages.

12          So let me set the record straight based on what I

13   have learned presiding over many January 6 prosecutions

14   hearing from dozens of witnesses, watching hundreds of hours

15   of video footage, and reading thousands of pages of

16   evidence:  On January 6, 2021, a mob of people invaded and

17   occupied the United States Capitol using force to interrupt

18   the peaceful transfer of power mandated by the Constitution

19   and our Republican heritage.  This was not a protest that

20   got out of hand, it was a riot; in many respects a

21   coordinated riot, as is clear from the cases before me

22   including *Hostetter* and *Worrell*.

23          Protesters would have simply shared their views on

24   the election, as did thousands that day who did not approach

25   the Capitol.  Those who breached and occupied the Capitol

**JA340**

1    building and grounds halted the counting of the Electoral

2    College votes required by the Twelfth Amendment.

3            The rioters interfered with the necessary step in

4    the constitutional process, disrupted the lawful transfer of

5    power, and, thus, jeopardized the American Constitution

6    order.

7            Although the rioters failed in their ultimate

8    goal, their actions nonetheless resulted in the deaths of

9    multiple people, injured over 140 members of law

10   enforcement, and lasting trauma for our entire nation.  This

11   was not patriotism, it was the antithesis of patriotism.

12   And the rioters who achieved results through force -- not

13   everyone that day was violent, but violence is what led them

14   into the Capitol.

15           At first a police line protected the Capitol, but

16   eventually law enforcement was subjected to such force by

17   such a mass of people that the rioters pushed through.

18           Upon entering the Capitol, many rioters vandalized

19   and looted; some hunted for members of Congress.

20           And even those who say they simply wandered around

21   the building, they still played a meaningful role in the

22   events of that day.  As the D.C. Circuit recently explained

23   in an opinion upholding a defendant's jury conviction for

24   disorderly and disruptive conduct, the D.C. Circuit in

25   *U.S. v. Alford*, 89 F.4 943, said Alford's entry into the

1    Capitol, alongside dozens of others, directly contributed to

2    Congress's need to recess to ensure the safety of the

3    members.

4         Indeed, entering the Capitol as part of a crowd

5    rather than as a lone individual magnified the

6    disruptiveness of his presence.  Each additional person, no

7    matter how modestly behaved, increased the chaos within the

8    building, the police's difficulty in restoring order and the

9    likelihood of interference with Congress's work.

10        That brings me to the matter of misdemeanors.

11        Some have questioned whether it is proper for a

12   Court to sentence to prison a January 6 defendant convicted

13   of a misdemeanor rather than a felony.  The Court wishes to

14   emphasize some things:  Misdemeanors can be serious crimes.

15        What the Court already said in reference to

16   Mr. Little at his original sentencing remains true:

17   January 6, 2021, remains a tragic day in American history.

18   The peaceful transfer of power, one of our most important

19   and sacred democratic processes, came under a full-fledged

20   assault.

21        While the immediate threat may have subsided, the

22   damage from January 6th persists.  Rioters interrupted the

23   certification of the 2020 Electoral College vote, injured

24   more than 100 law enforcement officers, and caused more than

25   a million dollars of property damage to the U.S. Capitol.

**JA342**

1          Some of the rioters, now defendants in criminal

2     cases, directly contributed to this violence by assaulting

3     members of law enforcement, or by planning, preparing, and

4     facilitating this violence.

5          Others, like Mr. Little here, did not directly

6     assault officers.  But even Little, and those who engaged in

7     this lesser criminal conduct, were an essential component to

8     the harm.  Law enforcement officers were overwhelmed by the

9     sheer swath of criminality, and those who engaged in

10    violence that day were able to do so because they found

11    safety in numbers.

12         Let me add one other thing:  According to the

13    defendant, the criminal justice system has denied him his

14    freedom of speech.  Of course, Mr. Little has a right under

15    the First Amendment to believe that the 2020 presidential

16    election was stolen; he has a right to express that view

17    today and he had a right to do so on January 6th as well; he

18    even has the right to explain again today that he thinks he

19    was politically prosecuted for political motives.  But the

20    First Amendment right does not give anyone the right to

21    enter a restricted area or to engage in riotous activity at

22    the Capitol.

23         In resentencing Mr. Little on the count to which

24    he pleaded guilty, the Court is not suppressing his

25    constitutional right to freedom of expression.  For

 1   Mr. Little to style himself as a "political prisoner" and to

 2   accuse the Court of infringing on his rights is not only

 3   incorrect, it's offensive to the Court.  The public should

 4   understand that such notions are preposterous.

 5           This is a matter of right and wrong.

 6           Little cannot bring himself to admit that he did

 7   the wrong thing.  He came close to that today.

 8           It is up to the Court to tell the public the

 9   truth:  Mr. Little's actions and the actions of others who

10   broke the law on January 6 were wrong.

11           The Court does not expect its remarks to fully

12   stem the tide of falsehoods, but I hope a little truth will

13   go a long way.

14           Pursuant to 18 U.S.C. Section 3742, Mr. Little has

15   the right to appeal the sentence imposed by the Court.

16           As defined in 18 U.S.C. Section 2255, you also

17   have the right to challenge the conviction entered or

18   sentence imposed if new or currently unavailable information

19   becomes available to you or on a claim that you received

20   ineffective assistance of counsel in entering your original

21   plea of guilty to the offense of conviction or in connection

22   with sentencing.  If you are unable to afford the cost of an

23   appeal, you may request permission from the Court to file an

24   appeal without cost to you.

25           Pursuant to the D.C. Circuit opinion in *U.S. v.*

**JA344**

1    *Hunter*, are there any objections to the sentence as imposed

2    that have not already been noted on the record?

3              MR. HOLVEY:  None from the government, Your Honor.

4              MR. CARPENTER:  Your Honor, one request -- two,

5    actually.

6              The first would be:  I would ask the Court to

7    consider first designating the Catawba County Jail as the

8    place for the service -- for the additional 60 days.

9              Additionally, we would request the Court to

10   consider allowing him to serve in intervals over several

11   weekends to permit him to continue with his current

12   employment, that he can timely rectify any of the

13   restitution payments that remain outstanding; although, like

14   I said, I think that should be processed soon.  I would

15   request the intervals in any event.

16             THE COURT:  I will just allow him to

17   self-surrender upon designation.  I will leave it to BOP

18   where they want to designate.

19             The probation officer in the courtroom will send

20   him a letter today that she will be in touch with him weekly

21   until the designation.  She will give him her phone number,

22   and then she'll notify him -- let him know the place --

23   where to report upon designation.  He will be free until a

24   place is designated.

25             I made a recommendation last time for some of

1    these, and BOP couldn't accommodate that.  I will just leave

2    it to BOP, in terms of that.

3            Was there any other objection we need to do on the

4    sentence as imposed?

5            It will be 150 days, less 60, less 30 for the

6    probation period; so it's a 60-day additional sentence.

7            MR. CARPENTER:  Your Honor, we would object just

8    for the record to the ratio that was used.

9            The government suggested in one of its cases that

10   a 5 to 1 ratio would be appropriate.  We obviously believe

11   that's a better ratio than the 18 to 1 that the Court used.

12   We would note that objection for the record.

13           THE COURT:  Okay.  Court will be in recess.

14           I will file my notes to the record of what I tried

15   to --

16           MR. CARPENTER:  Your Honor, if I may before we

17   recess.

18           THE COURT:  Yes.

19           MR. CARPENTER:  Your Honor, before we recess -- I

20   can do this by a written motion if Your Honor prefers.  But

21   I would move that the sentence be stayed or he be released

22   on appeal pending -- be released on bond pending appeal

23   under 18 U.S.C. 3143(b) to allow the double jeopardy issue

24   which I believe satisfies the substantial questions of law

25   as required by that provision to be -- to play out while he

**JA346**

1    is -- before he serves his sentence.

2              THE COURT:  That motion will be denied.  You can

3    address it to the Court of Appeals during the time that you

4    are awaiting designation.

5              The Court will be in recess.

6              MR. CARPENTER:  Thank you, Your Honor.

7              THE COURT:  We'll put that in the notes to the

8    record.

9              (Whereupon, the proceeding concludes, 11:24 a.m.)

10                        *  *  *  *  *

11                        **CERTIFICATE**

12

13             I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

14    certify that the foregoing constitutes a true and accurate

15    transcript of my stenographic notes, and is a full, true,

16    and complete transcript of the proceedings to the best of my

17    ability.

18             This certificate shall be considered null and void

19    if the transcript is disassembled and/or photocopied in any

20    manner by any party without authorization of the signatory

21    below.

22

             Dated this 27th day of January, 2024.

23

             /s/ Elizabeth Saint-Loth, RPR, FCRR

24    Official Court Reporter

25

**JA347**

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 1

(NOTE: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT
District of Columbia ▾

UNITED STATES OF AMERICA

v.

JAMES LITTLE

)
)
)
)
)
)
)

**AMENDED JUDGMENT IN A CRIMINAL CASE**

Case Number:  21cr315 (RCL)

USM Number:  36398-509

Joshua Carpenter
Defendant's Attorney

**Date of Original Judgment:**  3/14/2022
                 (Or Date of Last Amended Judgment)

**THE DEFENDANT:**

☑ pleaded guilty to count(s)   Four (4) of the Information.

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 40 USC 5104(e)(2)(G) | Parading, Demonstrating or Picketing in a Capitol Building | 1/6/2021 | 4 |

The defendant is sentenced as provided in pages 2 through _____4_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)    all remaining counts    ☐ is  ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/25/2024
Date of Imposition of Judgment

Signature of Judge

Royce C. Lamberth          US District Court Judge
Name and Title of Judge

1/29/24
Date

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
                        Sheet 2 — Imprisonment
                                                                                    (NOTE: Identify Changes with Asterisks (*))
                                                                        Judgment — Page    2    of    4

DEFENDANT:   JAMES LITTLE
CASE NUMBER:   21cr315 (RCL)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

One Hundred and Twenty days with credit for the 60 days already served.

☐    The court makes the following recommendations to the Bureau of Prisons:

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

   ☐    at _____   ☐ a.m.  ☐ p.m.   on _____

   ☐    as notified by the United States Marshal.

☑    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐    before 2 p.m. on _____ .

   ☐    as notified by the United States Marshal.

   ☑    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**JA349**

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
         Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page    3    of    4

DEFENDANT:   JAMES LITTLE
CASE NUMBER:   21cr315 (RCL)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 10.00 | $ 500.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Architect of the Capitol | | $500.00 | |
| Office of the Chief Financial | | | |
| Officer | | | |
| Attention: Kathy Sherrill, CPA | | | |
| Ford House Office Building | | | |
| Room H2-205B | | | |
| Washington, DC 20515 | | | |
| | | | |
| TOTALS | $     0.00 | $     500.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☑ the interest requirement is waived for  ☐ fine  ☑ restitution.

    ☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___4___ of ___4___

DEFENDANT: JAMES LITTLE
CASE NUMBER: 21cr315 (RCL)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☑ Lump sum payment of $ __510.00__ due immediately, balance due

      ☐ not later than _____ , or
      ☑ in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

    The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk of Court of the change until such time as the financial obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate. |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

UNITED STATES OF AMERICA,

          Plaintiff,

    vs.

JAMES LESLIE LITTLE,

          Defendant.

</td><td>

DOCKET NO. 1:21-CR-315

</td></tr>
</table>

## NOTICE OF APPEAL

James Leslie Little, by and through undersigned counsel, Assistant Federal Public Defender Joshua B. Carpenter, hereby gives notice, pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure, that he is appealing the sentence announced on January 25, 2024, and entered January 29, 2024 (Dkt. Nos. 74 and 75) by the Honorable Royce C. Lamberth to the United States Court of Appeals for the District of Columbia Circuit.

This 30th day of January 2024.

Respectfully submitted:

_s/Joshua B. Carpenter_____
Joshua B. Carpenter
Appellate Chief
North Carolina Bar No. 50333
Federal Public Defender, NCWD
One Page Avenue, Suite 210
Asheville, NC 28801
(828) 232-9992
Joshua_Carpenter@fd.org

**JA352**